# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

TERRY R. BAKER et al.,                    )
                                          )
   Plaintiffs,            )
                                          )
  v.                            )   2:19-cv-00251-JAW
                                          )
NICHOLAS GOODMAN et al.,                  )
                                          )
   Defendants.            )

## ORDER ON MOTION TO DISMISS COMPLAINT

Shortly after a pawn shop sold a customer a BB rifle,[1] a police officer shot and killed the customer in the parking lot outside the pawn shop. Personal representatives of the estate of the decedent filed suit against the pawn shop, alleging that it was negligent in selling the BB rifle to the decedent and in failing to notify the police that its customer possessed not a firearm but a BB rifle. Concluding that, despite the tragedy here, the pawn shop owed no legal duty to the decedent or his legal representatives under current Maine law, the Court grants the pawn shop's motion to dismiss the complaint.

---

[1] The Complaint alleges that Chance D. Baker purchased an "air rifle," *Aff. of John J. Wall, III*, Attach. 3, *Compl.* (ECF No. 3) (*Compl.*) ¶¶ 1, 25, 98, 100-02, 104-05, 107, an "air rifle BB gun," *id.* ¶¶ 15-18, a "BB gun," *id.* ¶¶ 19, 22, 28-29, 53-56, 59, 64-65, 70-71, and an "air rifle pellet gun." *Id.* ¶¶ 95-97, 99. Similarly, the parties use the terms "BB gun," "air rifle," and "air rifle BB gun" interchangeably in motions to refer to the non-lethal weapon Mr. Baker purchased in this case.

Although a BB gun is a type of air gun, the more generic term, "air gun," includes such guns as compressed air rifles. The Court assumes for the sake of this order that Mr. Baker bought a BB rifle at the pawn shop.

# I. BACKGROUND

## A. Procedural History

On February 13, 2019, Terry R. Baker and Shantel L. Baker, acting as personal representatives of the estate of Chance D. Baker (Plaintiffs), filed a lawsuit in state of Maine Superior Court for Cumberland County pursuant to 42 U.S.C. § 1983, 5 M.R.S. § 4682, and 18-A M.R.S. § 2-804 against Portland Police Sergeant Nicholas Goodman, Lewiston Pawn Shop, Inc. d/b/a Coastal Trading & Pawn (Lewiston Pawn),[2] and John Doe. *Aff. of John J. Wall, III*, Attach. 1, *Docket R.* (ECF No. 3); *Compl.* The Plaintiffs alleged that Sergeant Goodman used excessive and deadly force against Chance D. Baker on February 18, 2017, in Portland, Maine and thereby violated his rights under the United States and Maine Constitutions. *Compl.* ¶ 1. Sergeant Goodman answered the Complaint on June 24, 2019. *Answer to Compl. and Affirmative Defenses and Demand for Jury Trial (Nicholas Goodman)* (ECF No. 11). The Plaintiffs also alleged that Lewiston Pawn and its employee or manager, John Doe, were negligent under state of Maine common law in selling Mr. Baker a BB rifle when he was noticeably intoxicated and suffering from a mental breakdown. *Compl.* ¶ 1.

---

[2] The Plaintiffs filed their complaint against Coastal Pawn Shop. *Compl.* ¶ 6. Since then, however, the Defendant store stated that its correct legal name is Lewiston Pawn Shop, Inc. doing business as Coastal Trading & Pawn, *Def. Lewiston Pawn Shop, Inc. d/b/a Coastal Trading & Pawn's (Incorrectly Named as Coastal Pawn Shop) Mot. to Dismiss* at 1 (ECF No. 9) (*Lewiston Pawn Mot.*). At the February 13, 2020, hearing, the store made an oral motion to drop Coastal Pawn Shop and add Lewiston Pawn Shop, Inc., d/b/a Coastal Trading & Pawn as the Defendant store pursuant to Federal Rule of Civil Procedure 21, *Oral Mot. to Substitute Party Pursuant to Federal Rule 21 to Terminate Def. Costal Pawn Shop and Add Def. Lewiston Pawn Shop d/b/a Coastal Trading & Pawn* (ECF No. 21), and, without objection, the Court granted the oral motion to drop and add the parties. *Oral Order Granting Without Obj. Mot. to Substitute Party* (ECF No. 22).

On June 3, 2019, Sergeant Goodman removed this case from state to federal court. *Notice of Removal* (ECF No. 1). On June 20, 2019, Lewiston Pawn filed a motion to dismiss the complaint and a request for oral argument. *Lewiston Pawn Mot.* On July 12, 2019, the Plaintiffs responded to the motion to dismiss. *Pls.' Resp. to Def. Lewiston Pawn Shop, Inc. d/b/a Coastal Trading & Pawn's Mot. to Dismiss* (ECF No. 16) (*Pls.' Opp'n.*). On July 25, 2019, Lewiston Pawn replied. *Reply in Supp. of Mot. to Dismiss* (ECF No. 18) (*Lewiston Pawn Reply*). On July 26, 2019, the Court granted the motion for oral argument, *Order Granting Mot. for Oral Argument/Hr'g* (ECF No. 19), and the Court held the oral argument on February 13, 2020. *Notice of Hr'g on Mot. to Dismiss* (ECF No. 20); *Min. Entry* (ECF No. 23).

## B. The Factual Allegations in the Complaint as Against Lewiston Pawn

Terry R. Baker is the maternal grandmother and Shantel L. Baker the mother of Chance D. Baker and they are personal representatives of his estate. *Compl.* ¶¶ 2-3. In February 2017, when the events of this case happened, Mr. Baker was twenty-two years old and a resident of Portland. *Id.* ¶¶ 1, 4. Lewiston Pawn was a duly licensed business in Portland and an individual named in the Complaint as John Doe, but whose real name was unknown to the Plaintiffs, was acting as an employee or manager of Lewiston Pawn. *Id.* ¶¶ 6-7.

On February 18, 2017, Mr. Baker was suffering from mental health issues and was drinking alcohol. *Id.* ¶¶ 8-9. At approximately 11:00 a.m., Mr. Baker walked to Union Station Plaza, a moderate size strip mall in Portland at the intersection of Congress Street and St. John Street. *Id.* ¶¶ 10-11. Mr. Baker went into Lewiston

Pawn, a pawn shop in Union Station Plaza. *Id.* ¶ 13. It was apparent to the employees inside Lewiston Pawn that Mr. Baker was intoxicated based on his movements, the odor of intoxicants, and his speech. *Id.* ¶ 14. Mr. Baker purchased a BB rifle, a non-lethal weapon, from Lewiston Pawn. *Id.* ¶¶ 15-16. A BB rifle is smaller than an actual firearm and is made with a distinct wood stock. *Id.* ¶ 17. A reasonable police officer can tell the difference between a BB rifle and an actual firearm.[3] *Id.* ¶ 18.

After purchasing the BB rifle, Mr. Baker walked out of Lewiston Pawn into Union Station Plaza and was unsteady on his feet. *Id.* ¶¶ 19-20. Mr. Baker fell onto his back on the sidewalk, several people became concerned due to his condition and possession of a BB rifle, and several people called 911. *Id.* ¶¶ 21-22. Dispatch received the 911 calls at about 11:11 a.m. *Id.* ¶ 23. Sergeant Goodman, along with several other Portland police officers, responded to a call from dispatch and arrived at Union Station Plaza at approximately 11:17 a.m. *Id.* ¶¶ 24, 31, 40. Mr. Baker pumped the BB rifle, put it down, drank from a beer bottle, picked the BB rifle back up, and then assumed a crouching position, holding the BB rifle parallel to the ground below his knees. *Id.* ¶¶ 55, 59-60, 64-65. At roughly 11:19 a.m., Sergeant Goodman shot Mr. Baker in the head. *Id.* ¶¶ 66-69. Mr. Baker was taken to the hospital, where he was pronounced dead from Sergeant Goodman's gunshot wound. *Id.* ¶ 78.

---

[3] This statement is a mixed allegation of law and fact. As discussed below, when evaluating a motion to dismiss, a court must first "distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). For the purposes of this Order, the Court accepts as true only the factual part of this statement.

### C. The Complaint's Legal Theories Against Lewiston Pawn

In their Complaint, the Plaintiffs set out three counts against Lewiston Pawn and John Doe: (1) Count Five, negligence, (2) Count Six, wrongful death, and (3) Count Seven, wrongful death and conscious pain and suffering. *Compl.* ¶¶ 94-115. Count Five, the negligence count, alleges that when Lewiston Pawn and John Doe sold Mr. Baker the BB rifle, Mr. Baker was "noticeably intoxicated and suffering from a mental health breakdown" and was "acting and communicating in an incoherent manner, [was] unsteady of his feet, and smelled of intoxicants." *Id.* ¶¶ 96-97. It further alleges that "[a]nother person inside [Lewiston] Pawn Shop at the time told John Doe, and other employees or management, that Mr. Baker was not in a good mental state and they should not sell the air rifle to Mr. Baker." *Id.* ¶ 98. It states that at the time when "[Lewiston] Pawn Shop and 'Joh[n] Doe' sold Mr. Baker the air rifle[,] it was known or reasonably foreseeable that Mr. Baker would be at reasonable risk of harming himself or being harmed based on his intoxicated or mental health state at the time." *Id.* ¶ 100.

It alleges that "[Lewiston] Pawn Shop and John Doe made no effort [to prevent] Mr. Baker from leaving the store with the air rifle" and "made no effort and provided no safety tips to Mr. Baker regarding proper use and display of the air rifle in a public place, despite knowing that he was walking out of the store into Union Plaza which is a busy public place." *Id.* ¶¶ 101-02.

Finally, it claims that, even though Lewiston Pawn and John Doe were aware of the police presence in Union Street Plaza, Lewiston Pawn and John Doe did not

contact the Portland Police Department to inform them that Mr. Baker had purchased a BB rifle, not a "real firearm." *Id.* ¶¶ 103-06.

Counts Six and Seven, the wrongful death and conscious pain and suffering claims, allege that Lewiston Pawn's and John Doe's actions directly led to Mr. Baker's death at the hands of the Portland Police Department. *Id.* ¶¶ 109-15.

## II. THE PARTIES' LEGAL POSITIONS

### A. Lewiston Pawn's Motion to Dismiss

In its motion to dismiss, Lewiston Pawn states that the Plaintiffs' Complaint "failed to set forth any allegation that properly forms the basis of any legal duty that Lewiston Pawn owed to the decedent." *Lewiston Pawn Mot.* at 1. As a matter of law, Lewiston Pawn says, "Lewiston Pawn cannot be legally responsible for consequences attributable to the unforeseeable, intentional act of a third party." *Id.*

To its motion, Lewiston Pawn attached a memorandum of law.[4] *Lewiston Pawn's Mem.* at 4-17. Lewiston Pawn argues that it was not required to perform any of the acts that the Plaintiffs now claim constitute negligence because "[n]o such duty to perform any of the . . . acts exists under Maine law." *Id.* at 5. Lewiston Pawn writes:

> To require such a duty would force upon any and all retailers an affirmative duty to assess the sobriety level (violating the patron's individual rights), make uninformed medical diagnoses and judgments on complete strangers, alert the police of BB gun sales, and falsely imprison its customers.

*Id.*

---

[4]     The memorandum is attached to the motion in one document with pagination the same for the memorandum and ECF.

Lewiston Pawn posits that "[u]nder Maine law, a cause of action for negligence has four elements," including "a duty of care owed to the plaintiff." *Id.* at 8. Lewiston Pawn argues that "if a danger is not foreseeable, then no duty is owed to a potential plaintiff." *Id.* at 9. Second, Lewiston Pawn asserts, "there is also no general obligation to protect others from the actions of third parties, even where one knows the third party is or could be dangerous." *Id.* Here, Lewiston Pawn maintains, there is "no way that Lewiston Pawn could have been expected to anticipate that the decedent would be shot by another for carrying a non-lethal BB rifle in broad daylight, a completely legal act." *Id.* Put differently, Lewiston Pawn rejects the idea that a "duty of care can attach to Lewiston Pawn to protect the decedent against his own poor decisions, or the intentional decision of a police officer." *Id.*

Lewiston Pawn protests that the Plaintiffs' Complaint attempts "to cobble together the existence of a legal duty by alleging multiple theories against Lewiston Pawn," including that Lewiston Pawn was negligent (1) in its sale of the BB rifle to an intoxicated person who was not in a good mental state, (2) in failing to prevent Mr. Baker from leaving the store and walking into Union Street Plaza, (3) in failing to provide Mr. Baker with safety tips, and (4) in failing to contact the Portland Police Department to inform them that Mr. Baker had just purchased a BB rifle. *Id.* at 10. Lewiston Pawn says that even if all these facts are assumed to be true, "it [wa]s completely unforeseeable as a matter of law that a police officer would intentionally shoot and kill Mr. Baker," and therefore, "no legal duty exists in this case." *Id.*

Lewiston Pawn cites *Mastriano v. Blyer*, 2001 ME 134, 779 A.2d 951, a Maine Supreme Judicial Court decision in which the Law Court declined to find that a cab driver owed a duty to a visibly intoxicated passenger who arranged for the cab to pick him up and drop him off at his own car and then crashed his own car, resulting in his death. *Lewiston Pawn Mot.* at 11. Lewiston Pawn asserts that, as in *Mastriano*, the pawn shop "cannot be 'asked to anticipate a harm that may or may not occur at some other location and with that anticipation, act affirmatively to limit the [decedent's] freedom of choice or freedom of movement.'" *Id.* (quoting *Mastriano*, 2001 ME 134 ¶ 18). Lewiston Pawn adds that "[t]he key difference between *Mastriano* and the present matter is that the cab driver in *Mastriano* would have had reason to believe that the particularized harm might arise," whereas in the present case "the manner of harm is not just unconnected to the purchase itself, but seems almost random." *Id.* Lewiston Pawn also cites other Maine caselaw and the caselaw of other jurisdictions that it says support its position. *Id.* at 12-14.

Lewiston Pawn argues that it "has no duty to diagnose or identify . . . a customer, including Mr. Baker, as intoxicated or . . . 'not in a good mental state,'" and that to do so would require Lewiston Pawn to violate its customers' privacy rights. *Id.* at 14. It further contends that it had no legal right to prevent Mr. Baker from leaving its store and could have been charged with a crime had it attempted to do so. *Id.* at 15. Lewiston Pawn rejects the notion that it had an obligation to give Mr. Baker safety tips, asserting that there is no law or regulation that requires it to do so. *Id.*

Moreover, Lewiston Pawn states that it has no duty to "aid or assist or control the actions of a third party, including the Portland Police Department." *Id.* at 16.

Finally, Lewiston Pawn says that if the negligence claim fails, the "derivative" wrongful death claims must fail as well. *Id.*

## B.    The Plaintiffs' Opposition

After setting forth the relevant allegations in their Complaint and the legal standard for a motion to dismiss, the Plaintiffs point to the following facts to establish a duty of care: (1) Mr. Baker was a customer of Lewiston Pawn, (2) he was in "an obvious state of mental health crisis and intoxication," (3) he was "acting and communicating in an incoherent manner," (4) it "was apparent [Mr. Baker] was not in a condition to purchase and possess an air rifle," and (5) "[a]nother customer warned the Pawn Shop not the sell [Mr. Baker] the air rifle." *Pls.' Opp'n* at 7-8.

The Plaintiffs concede that the question of the existence of a legal duty and the scope of that duty are questions of law, not fact. *Id.* at 8.  In making this determination, the Plaintiffs say that "the concept of 'foreseeability' enters into both the willingness of the court to recognize the existence of a duty . . . and into the determination by a trier of fact whether the specific injury in issue was foreseeable." *Id.* at 9 (quoting *Cameron v. Pepin*, 610 A.2d 279, 281 (Me. 1992)).  The Plaintiffs add that Maine law considers "societal expectations regarding behavior and individual responsibility in allocating risks and costs" and the "hand of history, our ideals of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall." *Id.* at 9-10 (quoting *Alexander v. Mitchell*, 2007 ME

108, ¶ 16, 930 A.2d 1016, 1020).  The Plaintiffs argue that it was foreseeable to Lewiston Pawn that selling the BB rifle to Mr. Baker "would put him at risk for injury."  *Id.* at 10.  They maintain they have raised a question of fact on liability that must be resolved by a factfinder.  *Id.*

The Plaintiffs cite Maine caselaw that addresses a business' obligation to prevent harm, even harm by third persons, to its invitees.  *Id.* at 12.  Specifically, they cite *Fish v. Paul* for the proposition that the Maine Supreme Judicial Court has "recognized the general duty of a business proprietor to exercise reasonable care to prevent injury to business invitees."  *Id.* (quoting *Fish v. Paul¸* 574 A.2d 1365, 1366 (Me. 1990)).  They further argue that by selling Mr. Baker the BB rifle, Lewiston Pawn created the risk of harm and therefore was obligated to act to prevent or minimize the danger.  *Id.* at 13-14.  They distinguish the present case from *Mastriano* by stating that "[i]t was the action of the Pawn Shop [in selling the BB rifle], not the omission to act as in *Mastriano*, that created the risk in this case."  *Id.* at 13.

### C.    Lewiston Pawn's Reply

In Lewiston Pawn's view, the Plaintiffs failed "to rebut . . . Lewiston Pawn's central thesis that it cannot be held liable for the decedent's unforeseeable harm."  *Lewiston Pawn Reply* at 1.  Lewiston Pawn worries that if it is held liable, "Plaintiffs would impose a duty on *all* stores selling non-lethal merchandise to assess a patron's sobriety level, make uninformed medical diagnoses and judgments on complete strangers, alert the police regarding someone's possession of a non-lethal item, and falsely imprison its customers."  *Id.* at 2.

Lewiston Pawn rejects the Plaintiffs' "societal expectations" theory, noting that the *Alexander* language is only potentially applicable when no clear legal duty exists, and the courts are being asked to expand the scope of legal duty. *Id.* at 2-3. Lewiston Pawn says that the Plaintiffs' argument thus implicitly concedes that "no current duty exists under Maine law to do as they suggest." *Id.* at 3. Even when these "societal expectations" are considered, Lewiston Pawn maintains that the Plaintiffs' theory would shift "the burden of predicting and preventing harm away from the customer—a stranger to the store owner, who is in a much better place to protect himself from harm and regulate his own behavior, particularly once he leaves the premises." *Id.* Lewiston Pawn warns that liability for the sale of a BB rifle could well extend to a wide range of other products such as a steak knife or a handheld propane tank purchased with a cigarette lighter. *Id.* at 4. In addition, Lewiston Pawn observes that it did not create the risk of third-party harm from the Portland Police Department and therefore was under no obligation to attempt to prevent it. *Id.* at 4-6. Lewiston Pawn counters the Plaintiffs' discussion of *Mastriano* by calling it "circular reasoning" and stating that the Plaintiffs "cannot paint Lewiston Pawn's actions as 'the affirmative step of allowing' a customer to make a purchase (a contradictory statement), while also suggesting that the act in *Mastriano* of dropping off the passenger at the passenger's specifically selected location and upon the passenger's specific instruction was somehow not 'affirmative.'" *Id.* at 5-6. Finally, Lewiston Pawn acknowledges that Mr. Baker's death was tragic but places the blame for his death solely on Mr. Baker himself. *Id.* at 6.

## III.   LEGAL STANDARDS

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011) (citing FED. R. CIV. P. 12(b)(6)).  A court need not assume the truth of conclusory allegations, and the complaint must state at least a "plausible claim for relief . . .." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  However, "[n]on-conclusory factual allegations in the complaint must . . . be treated as true, even if seemingly incredible." *Ocasio-Hernández,* 640 F.3d at 12.  A court may not "attempt to forecast a plaintiff's likelihood of success on the merits . . .." *Id.* at 12-13.

In 2007, the United States Supreme Court issued *Bell Atlantic Corporation v. Twombly*, which emphasized the need for a plaintiff's complaint to marshal sufficient facts to demonstrate a "plausible entitlement to relief . . .." 550 U.S. 544, 559 (2007). Two years later, in *Iqbal*, the United States Supreme Court refined the dismissal standard:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

556 U.S. at 678 (internal quotation marks and citations omitted).  The *Iqbal* Court suggested that courts, when considering motions to dismiss, could "choose to begin by

identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Having isolated "the well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

In 2013, the First Circuit described the *Twombly* and *Iqbal* decisions as "watershed cases." *García-Catalán*, 734 F.3d at 101. The "plausibility standard," the First Circuit wrote, has become "the 'new normal' in federal civil practice." *Id.* (quoting *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 78-79 (1st Cir. 2013)). The First Circuit recently explained that "[i]n assaying plausibility, we engage in a two-step parvane." *Parker v. Landry*, 935 F.3d 9, 14 (1st Cir. 2019) (citing *Garcia-Catalán*, 734 F.3d at 103; *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013)). "First, we separate facts from conclusory allegations." *Id.* (citing *Iqbal*, 556 U.S. at 679). "Second, we determine whether the factual allegations that remain give rise to a plausible claim for relief." *Id.* (citing *Morales-Cruz*, 676 F.3d at 224). "The second step entails a decision as to whether the claim as stated admits of a 'reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). "The allegations cannot be 'too meager, vague, or conclusory to remove the possibility of relief for the misconduct alleged.'" *Id.* (quoting *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc)).

## IV. DISCUSSION

### A. The Existence of a Legal Duty

To state a negligence claim in the state of Maine, a plaintiff must establish the following elements: "a duty owed, a breach of that duty, and an injury . . . that is proximately caused by a breach of that duty." *Belyea v. Shiretown Motor Inn, LP*, 2010 ME 75, ¶ 6, 2 A.3d 276, 278 (quoting *Stanton v. Univ. of Me. Sys.*, 2001 ME 96, ¶ 7, 773 A.2d 1045, 1049). The issue presented in this motion to dismiss is whether Lewiston Pawn owed a duty to Mr. Baker that the law recognizes. Duty is a question of law. *Brown v. Delta Tau Delta*, 2015 ME 75, ¶ 9, 118 A.3d 789, 791 ("Even though the issue is fact driven, the question of duty is a legal question decided by the court, not the jury").

"Duty involves the question of whether the defendant is under any obligation for the benefit of the particular plaintiff." *Davis v. Dionne*, 2011 ME 90, ¶ 10, 26 A.3d 801, 805 (quoting *Jackson v. Tedd-Lait Post No. 75, Am. Legion*, 1999 ME 26, ¶ 7, 723 A.2d 1220, 1221). The Maine Supreme Judicial Court has reiterated the general, no-duty rule:

> [I]n instances of nonfeasance rather than misfeasance, and absent a special relationship, the law imposes no duty to act affirmatively to protect someone from danger unless the dangerous situation was created by the defendant. Only when there is a "special relationship," may the actor be found to have a common law duty to prevent harm to another, caused by a third party. There is simply no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless . . . a special relation exists . . ..

*Belyea*, 2010 ME 75, ¶ 9 (alternations in original) (quoting *Bryan R. v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 1999 ME 144, ¶ 14, 738 A.2d 839, 845).

14

## B.     Foreseeability of Harm

At oral argument, the Plaintiffs pressed the notion that if individuals, even ones without a special legal duty, can reasonably foresee that harm would result from their actions, a legal duty arises not to do the action that foreseeably would cause harm.  The Plaintiffs conceded that they had no caselaw in Maine, the First Circuit, or elsewhere that has adopted such a broad concept of negligence.

The Court is aware of no extended discussion of what is sometimes referred to as "pure foreseeability" in Maine law.  To provide context, the Court turns to *Demond v. Project Service, Inc.*, a 2019 case from the Supreme Court of Connecticut, which gives a succinct description of the concept.  331 Conn. 816, 208 A.3d 626.  The *Demond* Court wrote:

> Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action.  The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual.  Foreseeability is a critical factor in the analysis, because no duty exists unless an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result.  Our law makes clear that foreseeability alone, however, does not automatically give rise to a duty of care:  A simple conclusion that the harm to the plaintiff was foreseeable cannot by itself mandate a determination that a legal duty exists.  Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed.  A further inquiry must be made, for we recognize that duty is not sacrosanct in itself but is only an expression of the sum total of those considerations of policy that lead the law to say that the plaintiff is entitled to protection.  The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results.

*Id.* at 834-35 (internal punctuation and citations omitted). In other words, the Plaintiffs urge the Court to find that Lewiston Pawn owed the Plaintiffs a legal duty because they knew or should have known that some harm would result to Mr. Baker if they sold him the BB rifle.

The Court concludes that the Maine Supreme Judicial Court has not adopted the concept of pure foreseeability as a principle of Maine law. The concept of foreseeability "enters into . . . the willingness of the court to recognize the existence of a duty . . .." *Cameron*, 610 A.2d at 282 (quoting *Thing v. La Chusa*, 771 P.2d 814, 819 n.3 (1989)). The Maine Supreme Judicial Court quoted the California Supreme Court's view of the way a court should consider foreseeability:

> [A] court's task—in determining "duty"—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.

*Id.* (quoting *Thing*, 771 P.2d at 819 n.3) (alteration and emphasis in original).

Moreover, in *Cameron*, the Maine Supreme Judicial Court expressly rejected a pure foreseeability test for negligent infliction of emotional distress claims. *Id.* at 284 ("The foregoing analysis supports our rejection of the pure foreseeability standard urged by the Camerons and supported by a broad reading of *Gammon* [*v. Osteopathic Hospital of Maine, Inc.*, 534 A.2d 1282 (Me. 1987)]"). The Law Court stated more generally that "[f]oreseeability . . . is one consideration among many that must be taken into account when courts engage in a duty analysis," including policy considerations. *Id.* at 282, 284. A few years later, the Maine Supreme Judicial Court

applied its reasoning in *Cameron* to a general negligence claim, stating in a negligence analysis that the *Cameron* Court "limit[ed] 'pure foreseeability' test to avoid imposing liability in excess of culpability[]." *See Gray v. Maine*, 624 A.2d 479, 485 (Me. 1993) (citing *Cameron*, 610 A.2d at 284).[5]  In other words, the Maine Supreme Judicial Court has rejected the theory that a person, who otherwise does not owe a legal duty, automatically owes a duty to prevent a foreseeable harm.

Instead, as will be discussed, the Maine Supreme Judicial Court along with the Maine Legislature have defined the circumstances in which Maine law will impose a duty.  If, as the Plaintiffs propose, foreseeability alone is enough to establish a duty, the duty categories carefully limited by the Maine Supreme Judicial Court and the Maine Legislature would serve no discernable purpose because pure foreseeability would trump the absence of a recognized legal duty, imposing far-ranging duties that Maine law to date has not adopted.

Even if a pure foreseeability analysis were available to the Plaintiffs in establishing a legal duty on Lewiston Pawn, the Plaintiffs would stretch the boundaries of foreseeability to capture the possibility that in selling Mr. Baker the BB rifle, it was foreseeable that a member of the city of Portland Police Department

---

[5]    *Gray* is illuminating.  It involved a claim against the Maine Department of Human Services (DHS) arising out of a child protective investigation, and the Law Court noted that the plaintiff had secured a legislative resolve authorizing a lawsuit against the DHS.  *Id.* at 481.  Therefore, the Law Court wrote that "[t]he Legislature by its resolve has determined that the DHS owed a duty of due care to the plaintiff as 'between individuals.'" *Id.* at 485.  The Law Court wrote further that "[i]n view of the legislative authorization for Gray's action which obviates concerns otherwise present in imposing liability on the State for its negligent conduct, we discern no additional policy considerations in this case that militate against the State's liability for a negligent or careless child abuse investigation."  *Id.*  Thus, once DHS's legal duty was established, the *Gray* Court discussed whether DHS breached its duty by acting without the competence which a reasonable person in the position of the actor would recognize as necessary to prevent an unreasonable risk of harm to another.  *Id.*

would shoot and kill him for holding the BB rifle. The Plaintiffs argue that it was foreseeable to Lewiston Pawn that selling the BB rifle to Mr. Baker "would put him at risk for injury." *Pls.' Opp'n* at 10. Lewiston Pawn argues that "it [wa]s completely unforeseeable as a matter of law that a police officer would intentionally shoot and kill Mr. Baker." *Lewiston Pawn Mot.* at 10. Looking more generally at "whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party," *Cameron*, 610 A.2d at 282, the Court determines that death at the hands of a third party is not foreseeable from selling an intoxicated person in a mental health crisis a non-lethal weapon. Similarly, death is not a foreseeable result of not telling third parties that the seller sold the buyer a non-lethal weapon. Moreover, even if these actions or inactions were likely to result in death, policy concerns such as the practicality of requiring stores to assess customers before selling items weigh in favor of not finding a duty.

### C. A Special or Fiduciary Relation

Since there is no duty based on the foreseeability of harm, the Court turns to whether there is a special or fiduciary relation present. The Plaintiffs propose that Lewiston Pawn's duty to Mr. Baker arose from the buyer-seller relationship and the law imposes a duty on a retailer not to sell a product that could foreseeably harm the buyer. The Court is aware of no such broad duty under Maine law compatible with what the Plaintiffs propose.

There are two sources of authority for defining a special relation under tort law: the Maine Supreme Judicial Court and the Maine Legislature. In *Dragomir v. Spring Harbor Hospital*, 2009 ME 51, 970 A.2d 310, the Maine Supreme Judicial Court clarified that the term "special relation," in Maine law, "is limited to four kinds of relationships: (1) common carriers and their passengers; (2) innkeepers and their guests; (3) possessors of land and members of the public who are their invitees; and (4) those who are required by law to take physical custody of another or who voluntarily do so, 'such as to deprive the other of his normal opportunities for protection.'" *Id.* ¶ 18 (quoting Restatement (Second) of Torts § 314A (Am. Law Inst. 1965)) (Restatement Torts). Even when these relationships exist, though, the duty imposed is not unlimited. *See Mastriano*, 2001 ME 134 ¶¶ 14-16 (refusing to "expand the common carrier's duty to provide a safe exit at a safe place to include an *in loco parentis* type of responsibility to intervene in an arguably intoxicated passenger's life, perhaps against the passenger's wishes, to ensure that the passenger does not harm himself or herself after the common carrier has given the safe exit that the law requires").

The Law Court has also imposed a duty where a fiduciary relationship exists between the parties. *Id.* ¶ 19. The Maine Supreme Judicial Court defines such a fiduciary relationship as one "in which there exists a 'great disparity of position and influence between the parties . . ..'" *Id.* (quoting *Fortin v. Roman Catholic Bishop of Portland*, 2005 ME 57, ¶ 34, 37, 871 A.2d 1208, 1220, 1222). It has found a fiduciary relationship, for example, between a hospital and highly vulnerable psychiatric

patients, *id.* ¶ 21, and between a church and a student/altar boy who was sexually abused by a priest. *Fortin*, 2005 ME 57, ¶ 34. It has also found a special relation between a custodial parent and a child, *Steadman v. Pagels*, 2015 ME 122, ¶ 27, 125 A.3d 713, 720 ("The relationship between a custodial parent and child is a 'special relationship' that gives rise to a heightened responsibility of care"), and federal courts have found a special relation in other narrow circumstances. *See, e.g.*, *Parker v. Dall-Leighton*, No. 2:17-cv-216-GZS, 2017 U.S. Dist. LEXIS 202220, at *27 (D. Me. Dec. 8, 2017) (finding that a special relation may exist between a corrections officer and an inmate).

However, neither the Maine Supreme Judicial Court nor the federal courts have extended the special or fiduciary relationship beyond these limited categories. *See, e.g.*, *Fisk v. Mid Coast Presbyterian Church*, No. 2:16-cv-00490-JDL, 2017 U.S. Dist. LEXIS 68177, at *24-25 (D. Me. May 4, 2017) (declining to find a duty where there was employment and a church and churchgoer relationship); *Gniadek v. Camp Sunshine at Segao Lake, Inc.*, 2011 ME 11 ¶¶ 22-23, 26-27, 11 A.3d 308, 314-15 (declining to recognize either a fiduciary or a custodial relationship between a summer camp for chronically ill children and campers); *Mahar v. StoneWood Transp.*, 2003 ME 63, ¶ 10, 823 A.2d 540, 543 ("We have not yet recognized the independent tort of negligent supervision of an employee"); *Bryan R.*, 1999 ME 144 ¶ 17 (declining to recognize a general common law duty on the part of an organization such as a church to protect its members from each other).

The Plaintiffs fail to cite and the Court is unaware of a case where a court applying Maine law has found a special or fiduciary relation in the typical buyer-seller relationship as existed in this case. *See* JACK H. SIMMONS, DONALD N. ZILLMAN & ROBERT H. FURBISH, MAINE TORT LAW § 7.09 (2018 ed.) (surveying court decisions on the existence or not of a special or fiduciary relation in Maine tort law) (MAINE TORT LAW). The Plaintiffs cite *Mastriano* and *Fish* as establishing a special relation between a business and a customer of the business. *See Mastriano*, 2001 ME 134 ¶ 12 (listing as a duty one's obligation to "otherwise conduct ourselves or our business in ways that do not cause injury to others"); *Fish*, 574 A.2d at 1366 ("We have recognized the general duty of a business proprietor to exercise reasonable care to prevent injury to business invitees"), but neither case establishes a special relation in the buyer-seller relationship in the present case.

*Mastriano* involved a common carrier, and under Maine law a common carrier "owes its passengers a duty that requires 'the exercise of the highest degree of care compatible with the practical operation of the machine in which the conveyance was undertaken.'" *Mastriano*, 2001 ME 134 ¶ 13 (quoting *Roberts v. Yellow Cab Co.*, 240 A.2d 733, 735 (Me. 1968)). Thus, *Mastriano* is dissimilar in a critical way from the buyer-seller relationship in this case.

Even if *Mastriano* could somehow be extended to encompass the buyer-seller relationship here, the Maine Supreme Judicial Court required the common carrier, rather than a third party, to cause the harm. *Id.* ¶ 12. Reading the word "cause" broadly, the Maine Supreme Judicial Court's analysis in *Mastriano* distinguished

this duty from "the 'duty' urged upon [the *Mastriano* Court]," namely, to ensure the person does not harm him or herself. *Id.* ¶ 12. Again skipping over the legal duty question, although there are some differences, to the extent the situation in *Mastriano* is akin to the facts in the present case, the Maine Supreme Judicial Court did not mean for the duty of a business not to cause injury to others to include the duty to prevent a person from harming him or herself.

The Plaintiffs' citation of *Fish* is also inapposite. In *Fish*, three friends rented a hotel room and, during the night, they proceeded to drink "a substantial quantity of alcohol." 574 A.2d at 1366. The next morning, a hotel employee saw two friends carry Mark Colvin, who was unconscious, to a waiting car. *Id.* Tragically, Mr. Colvin died on his way back home in the rear seat of the car. *Id.* The Law Court recognized "the general duty of a business proprietor to exercise reasonable care to prevent injury to business invitees" and "that in certain circumstances the relationship between a guest and an innkeeper may give rise to a duty to render aid in case of illness or injury." *Id.* But the Maine Supreme Judicial Court concluded that the guest-innkeeper relationship ended when Mr. Colvin's friends carried him to the car and were rendering aid. *Id.*

As in *Mastriano*, the guest-innkeeper relationship is one, unlike the buyer-seller relationship, where the Law Court has recognized special legal duties. Moreover, the Maine Supreme Judicial Court did not extend the innkeeper's duty to Mr. Colvin once he left the premises and is unconvincing authority for the view that Lewiston Pawn continued to owe a duty to Mr. Baker once he left the store.

The closest the Maine Supreme Judicial Court has come to extending a special relation to a commercial transaction is *Gray v. TD Bank, N.A.*, 2012 ME 83, 45 A.3d 735, where the Law Court found that a bank where the plaintiff had been a customer had a legal duty to maintain adequate records to accurately reflect the ownership status of a checking account. *Id.* ¶ 19. But *Gray v. TD Bank* involved an ongoing customer relationship and the Law Court emphasized that a special relationship depends upon "the closeness and nature of a pre-existing relationship between the parties and the measure of control." *Id.* ¶ 18 (quoting *Estate of Cilley v. Lane*, 2009 ME 133, ¶ 20, 985 A.2d 481, 488). Here there is no allegation that Mr. Baker had a pre-existing relationship with Lewiston Pawn or that Lewiston Pawn had any control over that relationship.

Nor does the second source of authority, the Maine Legislature, provide a basis for finding a statutorily-created duty here. The Maine Legislature has imposed a legal duty in certain circumstances, such as on servers of alcohol, 28A M.R.S. §§ 2501-20 (Maine Liquor Liability Act), and therefore knows how to impose a legal duty on retail businesses. *See* MAINE TORT LAW § 7.10 (describing other statutory duties under Maine law). Yet, no state statute imposes a legal duty on a retail store such as Lewiston Pawn in the circumstances of this case.

### D.  Malfeasance Leading to Harm by a Third Party

Although not directly argued by the Plaintiffs, Maine law may find a legal duty where a defendant creates the risk. *Gniadek*, 2011 ME 11, ¶ 28 ("[T]he law may impose a duty to protect someone from the danger created by the defendant"). But in

*Gniadek*, the Maine Supreme Judicial Court cautioned that it had not yet expressly adopted § 302B of the Restatement (Second) of Torts, which defines what constitutes a negligent act where a third party inflicts the harm. *Id.* The *Gniadek* Court quoted § 302B:

> An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.

*Id.* (quoting Restatement Torts § 302B). The Law Court noted, however, that the Restatement gave as an example of negligence a situation where "the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct." *Id.* (quoting Restatement Torts, § 302B cmt. e(D)).

This exception, even if adopted by the Maine Supreme Judicial Court, does not provide relief in this case. The Plaintiffs argued during oral argument that John Doe or another employee of Lewiston Pawn should have called dispatch or 911 to tell the police that Lewiston Pawn had sold Mr. Baker a BB rifle rather than a real firearm, and that not doing so was an omission that created the risk of harm. There is no allegation that Lewiston Pawn knew that Officer Goodman, or any other police officer on scene, was "peculiarly likely to commit intentional misconduct." Restatement Torts § 302B cmt. e(D). In fact, during oral argument, the Plaintiffs' attorney stated explicitly that the Plaintiffs were not making this allegation.

To the extent the Plaintiffs are arguing that selling Mr. Baker the BB rifle was the act that created the risk, this exception still provides no relief. There is no evidence that Lewiston Pawn knew Mr. Baker before he entered the store on February 18, 2017, that Lewiston Pawn knew or had reason to know that, once the BB rifle was sold, Mr. Baker would handle the rifle in a way to cause general alarm, or most particularly, that Lewiston Pawn knew or had reason to know that a police officer would come into contact with Mr. Baker, let alone shoot him dead in the parking lot. In any event, since the Plaintiffs make no claim that Lewiston Pawn knew or should have known that the Portland Police Department officers were likely to commit intentional misconduct, the exception does not apply.

### E. The Hand of History

Mr. Baker's fallback is the "hand of history" argument in *Alexander*, namely that even if the Maine Supreme Judicial Court had not found a legal duty in these circumstances, this Court should, because Maine law considers "societal expectations regarding behavior and individual responsibility in allocating risks and costs" and "the 'hand of history, our ideals of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall.'" *Alexander*, 2007 ME 108, ¶ 16 (quoting *Decker v. New England Pub. Warehouse, Inc.*, 2000 ME 76, ¶ 7, 749 A.2d 762, 765). Thus, here, the Plaintiffs argue that Lewiston Pawn knew or should have known that Mr. Baker was in no condition to purchase a BB rifle, should have refused to sell him the BB rifle, and should have anticipated that some type of harm might befall him if it made the sale. *Pls.' Opp'n* at 9-10.

Lewiston Pawn responds by observing that the Plaintiffs' arguments assume a degree of knowledge on the part of its employees about Mr. Baker's presentation, whether caused by alcohol or mental illness or a combination, assume that Lewiston Pawn has the legal obligation to prevent an adult from making a legal purchase, and assume that once Lewiston Pawn sold Mr. Baker the BB rifle, Lewiston Pawn had the duty to mitigate the danger from the sale by taking action to prevent harm to its customer. *Lewiston Pawn Reply* at 3.

This case involves the sale by a retail business to a retail customer of a non-lethal, legal product. There are innumerable situations where a retailer might privately doubt the wisdom of a buyer's purchase and worry that the buyer could cause himself or others harm. But thus far, the law has been reluctant to impose a duty on a sales clerk to refuse to make a sale when the purchase conflicts with the clerk's ill-defined value system, namely that a particular customer should not be allowed to buy an item that other customers may purchase.[6] Even so, except in narrowly-defined instances, such as Maine's Liquor Liability Act, 28A M.R.S. §§ 2501-20, neither the Maine Legislature nor the Maine Supreme Judicial Court has suggested that Maine tort law should be expanded to protect retail customers from themselves, much less from potential harm from others.[7]

However willing the Maine Supreme Judicial Court might be to expand the contours of state negligence law beyond its current boundaries and to impose a legal

---

[6] If the law were extended to cover retail sales, it is a puzzle how it would apply to internet retailers. Would the relative anonymity of an internet sale immunize or inculpate the seller?

[7] Here, there is no allegation that the BB rifle was defective or unreasonably dangerous, *see* 14 M.R.S. § 221, or that Lewiston Pawn breached a warranty. *See* 11 M.R.S. §§ 2-313, 2-314.

duty to prevent harm on a retailer selling a non-lethal product to a retail buyer, the federal court, as has been repeatedly said, is "not the place to make new state law." *Pinkham v. Liberty Ins. Corp.*, No. 1:18-cv-222-DBH, 2018 U.S. Dist. LEXIS 128923, at *4 (D. Me. Aug. 1, 2018) (quoting *Town & Country Motors, Inc. v. Bill Dodge Auto. Grp., Inc.*, 115 F. Supp. 2d 31, 33 (D. Me. 2000)); *see also Douglas v. York County*, 433 F.3d 143, 149 (1st Cir. 2005) ("As a federal court sitting in diversity, we try to apply our best understanding of the principles Maine has adopted. It is not our role to expand Maine law; that is left to the courts of Maine"). Moreover, it is by no means clear that the Maine Supreme Judicial Court, if given the invitation, would conclude that Lewiston Pawn had the legal duties to Mr. Baker that the Plaintiffs now propose.

## V.   CONCLUSION

The Court GRANTS Defendant Lewiston Pawn Shop, Inc. d/b/a Coastal Trading & Pawn's Motion to Dismiss (ECF No. 9) and dismisses Lewiston Pawn Shop, Inc. d/b/a Coastal Trading & Pawn as a party.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 19th day of February, 2020