UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

TERRY R. BAKER and SHANTEL L. BAKER as
personal representatives of the estate of
CHANCE D. BAKER,

        Plaintiffs,

        vs.

NICHOLAS SGT. GOODMAN,

        Defendant.

Civil No. 19-00251-JAW

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, WITH INCORPORATED MEMORANDUM OF LAW

Defendant Nicholas Goodman, in his capacity as a City of Portland police sergeant,[1] responded to a call from dispatch about a man in the parking lot of a busy strip mall who was armed with what appeared to be a rifle or shotgun. Sgt. Goodman later learned that the man was Chance Baker. Despite numerous requests by Sgt. Goodman to disarm, Mr. Baker did not comply. Facing the prospect that Mr. Baker might, at any moment, open fire on Sgt. Goodman, other officers, or innocent bystanders, Sgt. Goodman shot Mr. Baker. The shot turned out to be fatal. Despite Mr. Baker's tragic death and the eventual determination that Mr. Baker's weapon was a pellet gun, Sgt. Goodman's use of force in this context was objectively reasonable – therefore, it did not violate the Fourth Amendment. Moreover, Sgt. Goodman did not violate any clearly established right. Therefore, he is protected by qualified immunity. Finally, as discretionary function immunity is essentially coextensive with qualified immunity in the use of force context, Sgt. Goodman is immune from suit with regard to the wrongful death claims asserted by Plaintiffs Terry Baker and Shantel Baker, personal representatives of Mr. Baker's estate. Pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7 and 56, Sgt. Goodman requests summary judgment on all claims.

---

[1] At the time of the events in this case, Goodman was employed by the City of Portland as a police sergeant. Goodman has since been promoted to the rank of police lieutenant. This Motion will refer to Goodman as "Sgt. Goodman."

## I.     FACTS

The factual background for the Motion for Summary Judgment is set forth in the accompanying Statement of Material Facts, which is hereby incorporated by reference.

## II.     PROCEDURAL POSTURE

The Plaintiffs commenced this action by a Complaint filed in the Cumberland County Superior Court on February 13, 2019. Sgt. Goodman removed the case to this Court based on the existence of a federal question. Upon motion by Defendant Coastal Pawn Shop (aka Lewiston Pawn Shop, Inc.), the Court dismissed all claims against that party. (ECF No. 24). The Complaint contains the following claims against Sgt. Goodman: excessive force in violation of the Fourth Amendment of the United States Constitution brought pursuant to 42 U.S.C. § 1983 (Count One); excessive force in violation of the Maine Civil Rights Act (5 M.R.S. § 4682) ("MCRA") and Article 1, Section 5 of the Maine Constitution (Count Two); wrongful death pursuant to 18-A M.R.S. § 2-804 (Count Three); and wrongful death – conscious pain and suffering – pursuant to 18-A M.R.S. § 2-804 (Count Four). Defendant filed an Answer denying the Complaint's material allegations and asserting numerous affirmative defenses, including: failure to state a cognizable claim; qualified immunity; and discretionary function immunity.

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56, the Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The rule affords the Court an opportunity "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) (citation omitted). "In practice, [the] rule acts as a firewall to contain the blaze of cases that are so lacking in either factual foundation or legal merit that trial would be a useless exercise." *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 18 (1st Cir. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)).

In response to a properly supported summary judgment motion, the nonmovant must present "definite, competent evidence" to rebut issues upon which he or she bears the ultimate burden of proof. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986) and *Garside*, 895 F.2d at 48). The United States Court of Appeals for the First Circuit has emphasized that "[t]his evidence 'cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.'" *Id.* (citing *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989) and *Anderson*, 477 U.S. at 249-50 (evidence that "is merely colorable or is not significantly probative" cannot deter summary judgment)).

## ARGUMENT

### I.    SGT. GOODMAN IS PROTECTED BY QUALIFIED IMMUNITY.

Plaintiffs assert a claim under 42 U.S.C. § 1983 alleging that Mr. Baker was subjected to excessive force on February 18, 2017 – a claim that implicates the Fourth Amendment. *See Graham* v. *Connor*, 490 U.S. 386, 394 (1989) (when a claim of excessive force is asserted as a result of an arrest or investigatory stop of a free citizen, the claim is analyzed under the Fourth Amendment). Plaintiffs also assert a parallel claim under the MCRA. This Court has noted that the MRCA was patterned after Section 1983, including the defense of qualified immunity. *See Grenier v. Kennebec County,* 733 F. Supp. 455, 458 n.6 (D. Me. 1990); *Hegarty v. Somerset County*, 848 F. Supp. 257, 269 (D. Me. 1994) ("The same qualified immunity analysis applies under the Maine Civil Rights Act as under § 1983."). Therefore, the Court's resolution of the Section 1983 claim will also control the MCRA claim. *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) ("The disposition of a 42 U.S.C. § 1983 claim also controls a claim under the MCRA.").

Sgt. Goodman is entitled to summary judgment on the Plaintiffs' civil rights claims based on qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  As the First

Circuit has emphasized, qualified immunity affords officers broad protection even in circumstances in which they may have violated a plaintiff's constitutional rights:

> Thus, the qualified immunity ... allows as well for the inevitable reality that "*law enforcement officials will in some cases reasonably but mistakenly conclude* that [their conduct] is [constitutional], and . . . that . . . *those officials* like other officials who act in ways they reasonably believe to be lawful *should not be held personally liable*." [*Anderson* v. *Creighton*, 483 U.S. 635, 641 (1987) (emphasis added)]; [*Burns* v. *Loranger*, 907 F.2d 233, 237 (1st Cir. 1990)]. In other words, qualified immunity sweeps so broadly that "all but the plainly incompetent or those who knowingly violate the law" are protected from civil rights suits for money damages.

*Hegarty v. Somerset County*, 53 F.3d 1367, 1373 (1st Cir. 1995) (emphasis in original) (quoting *Hunter* v. *Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986))).

In applying these standards, there are two relevant inquiries: whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and whether that right was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The United States Supreme Court has held that these inquiries do not have to occur in a particular order, and that a court is free to address the "clearly established" issue without first determining whether the facts that a plaintiff has shown make out a constitutional violation. *Pearson*, 555 U.S. at 236 (holding that the sequence set forth in *Saucier* "should no longer be regarded as mandatory").

The "clearly established" prong of the qualified immunity test involves two questions: (1) whether the legal contours of the constitutional right were sufficiently clear; and (2) whether in the specific factual context of the case, the violation would have been clear to a reasonable official. *MacDonald v. Town of Eastham*, 745 F.3d 8, 12 (1st Cir. 2014). Moreover, the Supreme Court has held that "clearly established" for purposes of qualified immunity means that the contours of the constitutional right are "sufficiently clear" that "*every* 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (emphasis added) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). While the Supreme Court does not require a case directly on point, "existing precedent must have placed

the statutory or constitutional question *beyond debate*." *See id.* (emphasis added) (citing *Anderson*, 483 U.S. at 640 and *Malley*, 475 U.S. at 341).

### A.  Sgt. Goodman did not violate Mr. Baker's Fourth Amendment rights.

A police officer's use of deadly force is considered a seizure under the Fourth Amendment. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has held that "the objective reasonableness of a particular seizure under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (quoting *Graham*, 490 U.S. at 396). That inquiry requires the Court to assess the totality of the circumstances "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). The standard "[allows] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. The First Circuit has noted that its precedent is "comparatively generous" to officers facing "potential danger, emergency conditions or other exigent circumstances," providing "a fairly wide zone of protection" for the police in borderline cases. *Roy v. City of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994) (citing *Graham*, 490 U.S. at 396-97 and *Berube*, 506 F.3d at 85).

Supreme Court and the First Circuit precedent establishes that a use of deadly force is reasonable – and, therefore, constitutional – when "at a minimum, a suspect poses an immediate threat to police officers or civilians." *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 149 (1st Cir. 2003) (*per curiam*) (citing *Garner*, 471 U.S. at 11). And while a warning must generally be given before force is used, if feasible, no "magic words" are required. *Conlogue v. Hamilton*, 906 F.3d 150, 157 (1st Cir. 2018). At the summary judgment stage, the Court must assess

whether a reasonable jury could find that Sgt. Goodman violated Mr. Baker's Fourth
Amendment rights under these standards.

Based on the totality of the circumstances that confronted Sgt. Goodman, no reasonable
factfinder could conclude – within the fairly wide zone of protection afforded the police – that
Sgt. Goodman's use of force was objectively unreasonable. Sgt. Goodman was dispatched to
Union Station Plaza in Portland – a busy strip mall – at 11:00 a.m. on a Saturday in response to
several 911 calls reporting an armed man walking around with what appeared to be a rifle or
shotgun. While in route to the scene, Sgt. Goodman also learned that people were reporting that
the man was waving a rifle or shotgun around and aiming it at people, at cars driving by, and at
various businesses within the Plaza, including Margarita's and Subway restaurants. While Sgt.
Goodman also received reports that the weapon might be a BB gun, none of the information he
received in that regard was definitive. Pursuant to his training, Sgt. Goodman could not assume
that the weapon was a BB gun if it looked like a firearm.

Shortly after arriving, Sgt. Goodman and another officer, Officer Kyle Knutson, observed
Mr. Baker from a distance of about 100 yards. From that distance, Sgt. Goodman could see Mr.
Baker brandishing a long weapon, holding it in a manner that the weapon could be fired at
others at any moment. Sgt. Goodman did not see Mr. Baker pumping the weapon and he was
not able to distinguish from that distance whether the weapon was a BB gun or a firearm.

Based on a concern for people out and about in the Plaza, Sgt. Goodman repositioned
himself by a pickup truck about 114 feet from Mr. Baker. Officer Knutson joined Sgt. Goodman
at that position. Sgt. Goodman was aware that there were other officers on the scene and he
observed many people walking around the Plaza and heavy vehicular traffic on Congress Street.

At that point, Sgt. Goodman observed Mr. Baker by the Subway restaurant, a few steps
from the entrance. Mr. Baker appeared to be manipulating the bolt area of the firearm – an area
that included the trigger – as if trying to figure out how to clear or load the weapon.

Sgt. Goodman, who was in his full police uniform, started yelling to Mr. Baker. He
identified himself as a police officer and he instructed Mr. Baker to put the weapon down. He

yelled the command to disarm several times. Sgt. Goodman did not see or hear anything to indicate whether Mr. Baker was hearing him. However, Sgt. Goodman did observe Mr. Baker level the gun, holding it parallel to the ground, and scan it over the Plaza, prompting Sgt. Goodman to yell even louder that Mr. Baker needed to put the gun down. Sgt. Goodman yelled to Mr. Baker numerous times to "please put your gun down, we don't want to have to shoot you."

At one point, after commanding Mr. Baker to put the weapon down, Sgt. Goodman observed Mr. Baker put the weapon down by leaning the gun against the Subway building approximately one foot from where he was standing, with the butt of the gun on the ground and the barrel sticking straight up in the air. Sgt. Goodman then yelled for Mr. Baker to come towards him. Instead of complying with Sgt. Goodman's command, Mr. Baker reached into his jacket pocket and pulled out what appeared to be a bottle of malt liquor, from which he started to drink. While that was occurring, Sgt. Goodman observed a woman walk in close proximity to Mr. Baker towards the Subway restaurant entrance.

Despite Sgt. Goodman's commands for Mr. Baker to come toward him and away from the weapon, Sgt. Goodman observed Mr. Baker remain in position and pick the weapon back up. Sgt. Goodman then observed Mr. Baker hold the gun at waist level, parallel to the ground, and with the muzzle facing out. With the weapon in that position, Mr. Baker was capable of firing the weapon at others at any moment. Sgt. Goodman and Officer Knutson observed Mr. Baker move the barrel of the rifle over everybody in the parking lot several times, which they described using terms such as scanning, lasering, flagging, and searching.

Sgt. Goodman then observed Mr. Baker face his and Officer Knutson's position, with his weapon leveled at them. Sgt. Goodman then observed Mr. Baker begin to manipulate the gun in a manner consistent with a bolt-action rifle, either trying to clear a malfunction or load a bullet into it. Sgt. Goodman never once observed Mr. Baker pumping the gun like someone would a BB gun. At that point, Sgt. Goodman believed the weapon was a rifle because (1) it looked like a rifle; (2) he appeared to be manipulating it like a rifle; (3) the lever was up making the weapon appear to have a regular-sized barrel; and (4) it had a large optic (telescopic sight) on top of it,

which was inconsistent with Sgt. Goodman's experience with BB guns or pellet guns. The weapon looked to Sgt. Goodman – who has experience with firearms – like a hunting rifle, such as a Marlin 30-30 or a .30-06.

With Mr. Baker's weapon leveled, Sgt. Goodman continued to yell at Mr. Baker to put the gun down and that "I don't want to shoot [you]." Someone in the crowd to Sgt. Goodman's right then yelled something like, "he's pulling the trigger again" or "he's pulling the trigger." Officer Knutson, who was still next to Sgt. Goodman, also heard someone to his right say something like they heard a trigger click. At the time, Mr. Baker was standing with his rifle just steps from the entrance of the Subway restaurant, and Sgt. Goodman noted that there were customers inside Subway and the nail salon adjacent to Subway.

With the barrel of Mr. Baker's gun leveled and facing towards Mr. Knutson and Sgt. Goodman, and Mr. Baker's right hand apparently manipulating an area of the rifle that included the bolt and the trigger, Sgt. Goodman fired a single shot from his police carbine at Mr. Baker. At the time Sgt. Goodman fired his weapon, Sgt. Goodman believed Mr. Baker's use of deadly force on Mr. Knutson, Sgt. Goodman, or others present at the Plaza was imminent. This belief was based on his training, education, and experience, as well as the totality of the circumstances, including: the fact that Mr. Baker appeared to be manipulating the bolt as if trying to clear a malfunction in the weapon, signaling to Sgt. Goodman that he may have tried to fire the weapon already; that he had the weapon leveled on Sgt. Goodman and Officer Knutson (not pointed towards his feet); that he had been waving the leveled weapon all around the parking lot; the fact that a woman had walked right next to Mr. Baker just seconds before; and that there were so many people in the area. Moreover, his observations coincided with the comment Sgt. Goodman heard from a bystander about Mr. Baker pulling a trigger. In light of the totality of these circumstances, no reasonable factfinder could conclude that Sgt. Goodman's use of force to protect himself, other officers, and other persons in the Plaza from a threat of imminent harm was objectively unreasonable.

This determination is consistent with prior decisions of this Court. For example, in

*Vincent v. Town of Scarborough*, Civil No. 02-239-P-H, 2003 U.S. Dist. LEXIS 20910 (D. Me. Nov. 20, 2003) (magistrate judge's recommended decision), *adopted by* 2003 U.S. Dist. LEXIS 22934 (D. Me. Dec. 19, 2003), the Court ruled that three officers who had shot an armed plaintiff were entitled to summary judgment with regard to the plaintiff's excessive force claim. *Id.* at *106. The officers were dispatched to a grocery store parking lot based on a report of an armed man. *Id.* at *28. Upon arriving, the officers observed that the plaintiff, who was armed with a .30-.30 caliber lever-action rifle, had unobstructed access to stores in an adjacent mall. *Id.* at *31-33. The officers began to communicate with the plaintiff and ordered him to put the rifle down. *Id.* at *44. The plaintiff did not comply. *Id.* at *44. During the course of the next few minutes, the officers learned that the plaintiff might be deaf and suffering from mental health issues. *Id.* at *47. However, with the assistance of a sign language interpreter, the officers believed they made their request to disarm clear to the plaintiff and that he simply refused to do so. *Id.* at *50-53. Eventually, the plaintiff took a shooting position and leveled the rifle at two of the officers. *Id.* at *59-63. Believing the plaintiff was going to shoot him, one of the officers fired at him. *Id.* at *61. The bullet struck the plaintiff's shoulder, simulating the motion that occurs when a weapon recoils. *Id.* Two other officers – seeing the plaintiff in this shooting position, hearing a shot, seeing what appeared to be the recoil of the plaintiff's weapon, and noting that the plaintiff appeared to be manipulating the weapon as if to chamber another round – both fired on the armed man. *Id.* at *63-64.

Based on that record evidence, this Court concluded that the officers' use of force did not violate the plaintiff's Fourth Amendment rights. The Court noted that a reasonable trier of fact could not find that the officers' use of lethal force at the moment it was employed by each of them constituted excessive force. *Id.* at *108-09. With regard to the initial shooter, the Court reasoned:

> Levier assumed a shooter's stance and pointed a high-powered rifle at Trooper Sperrey. Regardless of whether Levier was turning his head from side to side and hesitating to fire (thus arguably indicating a lack of intention to shoot), Trooper Sperrey's decision to deploy deadly force was objectively reasonable under the circumstances.

*Id*. at *110-11 (citing *Garner*, 471 U.S. at 3 (use of deadly force found objectively reasonable when "officer has probable cause to believe that the suspect poses a significant threat of death or serious physical harm to the officer or others.")). The Court applied similar reasoning to the officers who opened fire based in part on a mistaken belief that the plaintiff had fired a shot at other officers:

> So it was with Ramsdell and Moore, both of whom (i) saw Levier in a shooter's stance, aiming at Trooper Sperrey and others, (ii) heard a gunshot following a pause, and (iii) saw Levier's right shoulder recoiling backwards, as it might from the force of firing his own weapon, as a result of which they reasonably perceived that Levier had fired his weapon.

*Id*. at *112. The Court also held that the mistake by the later-firing officers did not preclude summary judgment for them: "a mistake – even a fatal mistake – does not form the basis for a Fourth Amendment violation if the use of force is objectively reasonable based on the facts and circumstances known to the officer at the time." *Id*. at *111-12 (citing *Milstead v. Kibler*, 243 F.3d 157, 165 (4th Cir. 2001) and *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). The reasoning applied by the Court in *Vincent* is directly applicable to the claims against Sgt. Goodman.

Similarly, the First Circuit has recently upheld summary judgment for an officer on the grounds that his use of deadly force did not violate the Fourth Amendment. In *Fagre v. Parks*, 985 F.3d 16 (1st Cir. 2020), a police officer was standing beside his cruiser when a suspect operating a truck started accelerating in his direction. *Id*. at 20. Believing the suspect intended to ram the cruiser, the officer moved away from his cruiser and up onto a snowbank. *Id*. The officer nonetheless thought he was in imminent danger of being hit by the oncoming vehicle; therefore, he shot into the vehicle. *Id*. Unfortunately, one of his shots hit a passenger in the vehicle, killing her. *Id*. at 20-21. A representative of the passenger's estate asserted a Fourth Amendment claim against the officer alleging excessive force. This Court granted summary judgment on the grounds that the passenger had not been "seized" under the Fourth Amendment. *Fagre v. Parks*, Case No. 1:19-cv-00083-LEW, 2020 U.S. Dist. LEXIS 38447, at *13-14 (D. Me. Mar. 5, 2020). The First Circuit affirmed, but it did so on a different basis.

Specifically, the First Circuit held that the officer had not violated the passenger's Fourth Amendment rights because "[n]o reasonable jury could conclude that it was unreasonable for [the officer] to believe that the driver posed an immediate threat" at the time the officer shot at the truck. *Id.* at 23. The First Circuit rejected the argument made by the passenger's estate that the vehicle presented no immediate danger to the officer: "[The plaintiff's] argument that [the officer] was not in immediate danger because the Durango did not hit him and appeared to turn slightly away from him before hitting the cruiser is not persuasive. It relies on the '20/20 vision of hindsight,' not the 'perspective of a reasonable officer on the scene.'" *Id.* at 24 (quoting *Graham*, 490 U.S. at 396).

Notably, other circuit courts of appeal have held – on facts similar to those in this case – that no Fourth Amendment violation had occurred. For example, in *DeMerrell v. City of Cheboygan*, 206 Fed. Appx. 418 (6th Cir. 2006),[2] the United States Court of Appeals for the Sixth Circuit affirmed summary judgment in favor of an officer who shot and killed a man armed with a weapon, which the officer later learned was a pellet gun. *Id.* at 421. The district court had ruled that the officer did not violate the Fourth Amendment by using lethal force under the circumstances:

> the [district] court noted that "all officers observed DeMerrell advance toward them with a gun pointed," and at least one other officer was also ready to shoot DeMerrell. The [district] court thus found "overwhelming evidence of DeMerrell's threatening conduct in the record" and that "Officer White was confronted with a dangerous, volatile situation involving an intoxicated, armed, aggressive suspect that, it is uncontested, was advancing on the police and defying commands to stand down."

*Id.* at 424 (quoting the district court) (citations to the record omitted). The Sixth Circuit held that the conclusion reached by the district court was compelled by the facts in light of circuit precedent. *Id.* at 425 (citation omitted). In doing so, the Sixth Circuit emphasized two important factors: one, the armed man advanced on the officers with his weapon pointed at them – which

---

[2] Although *DeMerrell* was not recommended for full-text publication, the United States Court of Appeals for the Sixth Circuit's Local Rule 32.1(a) permits citation to that opinion. *See also* United States Court of Appeals for the First Circuit Local Rule 32.1.0(b) (providing that citation to dispositions of other courts are governed by Fed. R. App. P. 32.1 and the local rules of the issuing court).

indicated an intent to inflict harm; and two, the officers attempted to convince the armed man to drop his weapon before firing on him. *Id*. at 425. The fact that the man was armed with a pellet gun – rather than a firearm, as the officers believed – did not prevent summary judgment based on the lack of a Fourth Amendment violation.

In *Thorkelson v. Marceno*, 849 F. App'x 879, 2021 U.S. App. LEXIS 8440 (11th Cir. 2021),[3] the United States Court of Appeals for the Eleventh Circuit reached the same result on facts similar to those in the instant case. Officers responded to a 911 call from a woman who lived at a multi-level apartment complex. *Id*. at *2. While an officer was investigating which resident made the call, another resident pointed out to the officer a woman in a second-level apartment holding what appeared to be "'a cock .22 single [rifle] or a pellet gun.'" *Id*. at *2-3. Over the course of the next two hours the woman kept the officers at bay by wielding a gun that resembled a hunting rifle and threatening "to kill" and "to shoot" them. *Id*. at *3-5. While a neighbor reported seeing Thorkelson pump her gun as if it were a BB gun, the woman stated she had "a rifle" and the officers were unable to discern whether the weapon was a BB gun or a firearm. *Id*. at *4-5. The officers consistently implored the woman to drop her gun, but she never responded to those requests. *Id*. at *4-5. When the woman walked onto the back porch of her second-floor apartment and aimed her gun at an officer standing below her, another officer shot her in the chest, killing her. *Id*. at *5-6.

The Eleventh Circuit, in affirming summary judgment for the officer who took the shot, concluded that no Fourth Amendment violation had occurred. *Id*. at *10. The court listed several factors that indicated the officer acted reasonably:

> Thorkelson was behaving erratically and ignoring officers' repeated requests to disarm and to come out of her apartment. "Non-compliance of this sort supports the conclusion that use of deadly force was reasonable." Thorkelson wielded a gun that resembled and that she described as a lethal firearm. She threatened "to kill" and "to shoot" officers. Even though "an officer is not required to wait

---

[3] Although *Thorkelson* is an unpublished opinion, the Federal Rules of Appellate Procedure provides that the opinion can be relied upon by other courts. *See* Fed. R. App. P. 32.1 (forbidding courts from prohibiting or restricting the citation of unpublished opinions issued on or after January 1, 2007); *see also* United States Court of Appeals for the First Circuit Local Rule 32.1.0(b) (providing that citation to dispositions of other courts are governed by Fed. R. App. P. 32.1 and the local rules of the issuing court).

> until an armed and dangerous [person] has drawn a bead on the officer or others
> before using deadly force," Captain Casale did. Officers did not use any force
> during the lengthy period that Thorkelson was unapproachable and menacing.
> Captain Casale shot Thorkelson only when she posed an imminent threat to a
> defenseless officer.

*Id.* at *8-9 (citations omitted). *Accord Tomas Garza v. Briones*, 943 F.3d 740, 745 (5th Cir. 2019). In reaching its conclusion, the Eleventh Circuit directly addressed the uncertainty surrounding the nature of the woman's weapon:

> Thorkelson was holding a BB gun, but that fact was not evident to the officers.
> Bryant, Thorkelson's neighbor, thought she possessed a lethal firearm and
> warned Deputy Woodby to take cover. Although the owner of the apartment
> occupied by Sergeant Nader reported seeing Thorkelson pump her gun like a
> BB gun, the gun resembled and Thompson stated that she had "a rifle."
> Thorkelson's husband reported that she had a BB gun, but he was not at the
> scene to observe what was in her hand. And the officers never had an unimpeded
> view of Thorkelson's gun. Captain Casale had to make a split-second decision
> whether to shoot an unpredictable woman armed with a dangerous weapon
> aimed at a fellow officer. He was not required "to wait 'and hope for the best.'"

*Id.* at *9-10 (citations omitted). *Accord Tomas Garza v. Briones*, 943 F.3d at 745-46.

Finally, none of the elements that prevented the First Circuit from finding a use of deadly force constitutional in other cases exist in this case. Unlike the armed man in *McKenney v. Mangino,* 873 F.3d 75, 80 (1st Cir. 2017), *cert. denied*, 138 S. Ct. 1311, 200 L. Ed. 2d 475 (2018), Mr. Baker did not constitute a passing risk to Sgt. Goodman, other officers, or the public. From the time Sgt. Goodman arrived, he observed Mr. Baker pointing the weapon around the busy parking lot in a manner that appeared to Sgt. Goodman as "scanning" for a target. At times, Mr. Baker leveled the weapon in the direction of Sgt. Goodman and Officer Knutson. While it is true that Mr. Baker momentarily put the weapon down to drink something, he did not heed Sgt. Goodman's orders to refrain from taking the weapon back up – an action that an objectively reasonable officer could have understood to mean that Mr. Baker had not finished what he was prepared to do with the weapon. Mr. Baker resumed leveling the weapon and "scanning" an area of the Plaza that included the officers. Finally, just prior to taking the shot, Sgt. Goodman heard someone say that "he's pulling the trigger again" or "he's pulling the trigger," and he observed Mr. Baker take an action that looked like a preparation to fire. An objectively reasonable officer

could have concluded that these actions represented an imminent threat that required the use of deadly force.

In addition, unlike the armed man in *McKenney*, Mr. Baker consistently exhibited non-compliant and threatening behavior in the face of efforts by Sgt. Goodman to de-escalate the situation. It is undisputed that Sgt. Goodman, who was dressed in his police uniform, identified himself to Mr. Baker as a police officer. It is also undisputed that Sgt. Goodman repeatedly yelled to Mr. Baker to put the weapon down from the time he took a position about 40 yards from Mr. Baker until he took the shot. Although Mr. Baker did not make any sudden movements, he generally seemed intent on searching out a target. Mr. Baker rearmed himself after putting the weapon down and taking a drink, despite Sgt. Goodman's exhortations not to do so and statement that he might have to shoot Mr. Baker if he rearmed. Finally, Mr. Baker ignored warnings given by Sgt. Goodman when Mr. Baker resumed leveling the weapon, started "scanning" an area that included Sgt. Goodman and Officer Knutson, and took actions consistent with a preparation to fire.

And unlike *McKenney* and *Begin v. Drouin*, 908 F.3d 829, 836 (1st Cir. 2018), the officers and innocent bystanders were in sufficient proximity to Mr. Baker – who was apparently armed with a long gun – to place them within the zone of danger. It is undisputed that the events unfolded at around 11:00 a.m. on a Saturday in a busy strip mall parking lot adjacent to Congress Street, a major street in Portland. It is also undisputed that the officers took a position about 40 yards from the Plaintiff, that other officers were in the area, and that the parking lot contained numerous people. In fact, shortly before Sgt. Goodman fired, he observed a woman walk very near Mr. Baker to enter the Subway. Since Mr. Baker was armed with what appeared to be a rifle or shotgun, the officers and the public were well within range of what Sgt. Goodman believed was deadly force. *See Conlogue*, 906 F.3d at 158 ("When an individual is pointing a loaded firearm, anyone within firing range is in proximity to the life-threatening danger.").

For all of these reasons, Sgt. Goodman's use of force did not violate Mr. Baker's Fourth Amendment rights. Therefore, the Plaintiffs cannot satisfy the first prong of the qualified

immunity test and Sgt. Goodman is entitled to summary judgment.

**B.  An objectively reasonable officer in Sgt. Goodman's position would not have known that his or her actions violated clearly established law.**

As of February 18, 2017, there was no "controlling case or robust consensus of cases" from the Supreme Court or the First Circuit finding a Fourth Amendment violation under circumstances similar to those confronting Sgt. Goodman. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 591 (2018). To the contrary, cases in the First Circuit with facts analogous to those in this case indicate that the officers were, at the very least, protected by immunity. *See, e.g., Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) (officers confronted by a large man armed with a dangerous weapon protected to immunity); *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691, 694 (1st Cir. 1994) (holding that summary judgment for officers who confronted a man armed with knives was proper because "in our view a jury could not find that [the defendant's] conduct was so deficient that no reasonable officer could have made the same choice"). Therefore, Sgt. Goodman is entitled to summary judgment due to a lack of clearly established law.

In any event, over the course of the past decade, the Supreme Court has repeatedly emphasized that "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Plumhoff* v. *Rickard*, 572 U. S. 765, 778-79 (2014)); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). ("A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'") (quoting *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987)). Two recent decisions – one by the Supreme Court and another by the First Circuit – demonstrate that a reasonable officer in Sgt. Goodman's position at the time he shot Mr. Baker would not have understood that he or she was violating a clearly established right.

In *Kisela*, the Supreme Court held that an officer accused of violating the Fourth Amendment when he shot an armed woman through a chain link fence was entitled to qualified immunity. At the time of the incident – which occurred in May of 2010 – the defendant officer and another officer were investigating a report of a woman who was seen hacking a tree with a large kitchen knife. *Kisela*, 138 S. Ct. at 1151. The officers received a description of the woman from an eyewitness, who also told them that the woman had been behaving erratically. *Id*. Soon thereafter, the officers (who had by then been joined by a third officer) observed a woman at a nearby house who was soon joined by another woman carrying a large knife at her side. *Id*. The two women were separated from the officers by a chain link fence with a locked gate. *Id*. When the woman with the knife got within six feet of the other woman, the officers drew their guns and told the armed woman several times to drop the knife. *Id*. While the other woman said "take it easy" to the officers, the armed woman did not respond, nor did she comply with the officers' commands. *Id*. At that point, the defendant officer fired four shots at the armed woman, wounding her. *Id*. While the defendant officer conceded that he did not have concern for the officers' safety at the time he shot the armed woman, he believed the armed woman was a threat to the other woman behind the fence. *Id*. at 1153. On those facts, the district court granted the officer summary judgment on the basis of qualified immunity. The United States Court of Appeals for the Ninth Circuit reversed the summary judgment decision.

On certiorari review, the Supreme Court reversed the Ninth Circuit. After reviewing general principles governing the use of force under the Fourth Amendment, the Supreme Court emphasized the importance of assessing the legality of the defendant's conduct in the appropriate context for the purposes of qualified immunity: "This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Id*. at 1152 (internal quotation marks omitted) (citing *City and County of San Francisco* v. *Sheehan*, 575 U. S. 600, ___, 135 S. Ct. 1765, 1774 (2015) (quoting *Ashcroft* v. *al-Kidd*, 563 U. S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011))). The Supreme Court noted that such specificity "'is especially important in the Fourth Amendment context, where the Court

has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Id.* at 1152-53 (quoting *Mullenix* v. *Luna*, 577 U. S. 7, 12 (2015) (*per curiam*) (internal quotation marks omitted)). Reviewing the facts outlined above, the Supreme Court concluded that "[t]his is far from an obvious case in which any competent officer would have known that shooting Hughes to protect Chadwick would violate the Fourth Amendment." *Id.* at 1153.

As was true for the officer in *Kisela*, the circumstances that confronted Sgt. Goodman would not have indicated to a reasonable officer that the use of force would violate clearly established law. In fact, the situation confronting Sgt. Goodman was even more compelling than that in *Kisela*. As the dissent in *Kisela* noted, the record indicated that the armed woman made no overt threat – in word or deed – toward the other woman behind the fence before the defendant officer started shooting:

> Hughes stood stationary about six feet away from Chadwick, appeared "composed and content," Appellant's Excerpts of Record 109 (Record), and held a kitchen knife down at her side with the blade facing away from Chadwick. Hughes was nowhere near the officers, had committed no illegal act, was suspected of no crime, and did not raise the knife in the direction of Chadwick or anyone else.

*Id.* at 1155 (Sotomayor, J., dissenting). The dissent also noted that the defendant officer did not give a warning before firing. *Id.* By contrast, Mr. Baker's actions that morning had been described as erratic, descriptions that Sgt. Goodman was able to confirm by his own observations. Moreover, by leveling an apparent firearm and scanning the Plaza – passing the barrel of the weapon in the direction of occupied Plaza businesses, people in the Plaza, moving vehicles, and police officers – Mr. Baker engaged in an overt act that placed Sgt. Goodman in imminent fear for himself and for others in the Plaza. Finally, Sgt. Goodman gave numerous warnings throughout his interactions with Mr. Baker, including prior to firing. In short, if *Kisela* is – as the Supreme Court described it – a "far from obvious case," the circumstances confronting Sgt. Goodman render his use of force even further from "the obvious case."

The First Circuit's decision in *Conlogue* suggests a similar conclusion. In that case, the district court granted an officer who shot an armed man summary judgment on the basis of qualified immunity. *Conlogue*, 906 F.3d at 152. In August of 2014, several officers engaged in a standoff with a potentially suicidal man armed with a semi-automatic handgun. *Id.* at 152-54. During the course of that standoff, the officers repeatedly warned the armed man to drop his weapon. *Id.* The armed man began to alternate pointing the gun at himself and pointing it in the direction of the officers, who were positioned about 200 feet away. *Id.* The officers yelled additional warnings to disarm, to no avail. *Id.* When the armed man pointed the gun in the direction of the officers and at a 45 degree angle above their heads, the officers again shouted to the man to drop the weapon. *Id.* Eleven seconds later, with the armed man still pointing the gun in the direction of the officers, an officer shot and killed him. *Id.* The First Circuit affirmed summary judgment for the officer who took the shot on the basis of qualified immunity: "we are satisfied that an objectively reasonable officer standing in Hamilton's shoes would have thought it appropriate to deploy deadly force against an armed man who, after a nearly three-and-one-half-hour standoff in which he was repeatedly warned to drop his weapon, persisted in pointing a loaded semi-automatic firearm narrowly above the heads of three officers and within easy firing range." *Id.* at 155.

In reaching that conclusion, the First Circuit held that the circumstances confronting the officer who took the shot would have led a reasonable officer to believe that even the most elemental aspects of Fourth Amendment law had been satisfied. The First Circuit noted that "two principal requirements must be satisfied before a police officer can lawfully use deadly force": one, that "a suspect poses an immediate threat to police officers or civilians"; and two, that a warning be given before force is used, if feasible. *Id.* at 155-56. Since the First Circuit concluded that the situation confronting the officer met those requirements, it ruled that the officer was entitled to qualified immunity: "In the case at hand, the undisputed facts make it abundantly clear both that it was reasonable for Hamilton to believe that Conlogue was an imminent threat to others and that he was repeatedly warned to drop his weapon." *Id.* at 156.

The First Circuit rejected several arguments offered by the estate of the armed man. First, after reviewing pertinent case law, the court held that the fact the armed man's gun may have been pointed slightly above the officers' heads at the time he was shot would not preclude qualified immunity: "It follows, we think, that when the plaintiff suggests that a gun must be pointed directly at an officer in order to be threatening, she is simply wrong." *Id.* at 157. The First Circuit also rejected the plaintiff's argument that the officers were required to specifically warn the armed man that they would shoot him if he did not drop his weapon: "Here, however, Conlogue received several clear and timely warnings to drop his weapon, and he chose to ignore them. No more was exigible." *Id.* (citing *Garner*, 471 U.S. at 11-12). Finally, the First Circuit dismissed the plaintiff's effort to equate her case with *McKenney*, both because the armed man pointed his gun in the direction of the officer immediately before he was shot and because the armed man was in sufficient proximity to the officers to justify their fear of imminent harm: "When an individual is pointing a loaded firearm, anyone within firing range is in proximity to the life-threatening danger." *Id.* at 158.

The First Circuit's comments in *Conlogue* – which referred to events that occurred in 2014 – indicate that Sgt. Goodman is entitled to qualified immunity. Like the officers in *Conlogue*, Sgt. Goodman was confronted by a man who appeared to be armed with a firearm. The armed man's actions were erratic and threatening – pointing the weapon at passing cars, at shops in the Plaza, and scanning a Plaza that contained police officers and numerous other people. Sgt. Goodman shouted numerous warnings to the man to disarm. The man's actions in picking up the weapon (after momentarily leaning it against a building so that he could drink from a bottle of alcohol) and returning to his "scanning" movements with the weapon leveled – in spite of specific instructions from Sgt. Goodman not to pick it up because "I don't want to shoot you" – indicated an escalation of the situation. Finally, with the suggestion that the man had attempted to fire or was attempting to fire – a suggestion prompted by statements from a bystander and by Sgt. Goodman's observation of the man's apparent manipulation of the bolt area of the weapon – Sgt. Goodman, believing harm to himself and others was imminent, fired.

Based on the standard applied by the First Circuit in *Conlogue*, these facts compel a finding that Sgt. Goodman is entitled to qualified immunity.

## II.     THE DEFENDANT IS PROTECTED FROM TORT LIABILITY BY DISCRETIONARY FUNCTION IMMUNITY.

The Plaintiffs' wrongful death claims are barred by absolute discretionary function immunity under the Maine Tort Claims Act, 14 M.R.S.A. §§ 8101-8118 (2003 & Supp. 2020) ("the Act").[4] 14 M.R.S. § 8111(1)(C); *Carroll v. City of Portland*, 1999 ME 131, ¶ 6, 736 A.2d 279, 282 (emphasizing that that discretionary function immunity is absolute). "[D]iscretionary immunity ... applies unless the defendants' conduct 'clearly exceeded, as a matter of law, the scope of any discretion [they] could have possessed in [their] official capacity as [police officers].'" *Polley v. Atwell*, 581 A.2d 410, 414 (Me. 1990) (emphasis in original). It is established within this federal circuit that "[a] law enforcement official's use of force is a discretionary act." *Comfort v. Town of Pittsfield*, 924 F. Supp. 1219, 1236 (D. Me. 1996); *accord Roberts v. State*, 1999 ME 89, ¶ 10, 731 A.2d 855.

Maine precedent indicates that "the standard for deciding whether an officer accused of use of excessive force is entitled to [the Act's] immunity is the same as that for analyzing whether he or she is entitled to qualified immunity with respect to a parallel federal Fourth Amendment claim. *Steeves v. City of Rockland*, 600 F. Supp. 2d 143, 183 (D. Me. 2009) (citing *Smith v. Jackson*, 463 F. Supp.2d 72, 81 (D. Me. 2006) and *Richards v. Town of Eliot*, 2001 ME 132, ¶ 32, 780 A.2d 281). Therefore, for the reasons discussed above with regard to qualified immunity, Sgt. Goodman is entitled to summary judgment on the Plaintiffs' wrongful death claims because he is protected by discretionary function immunity.

## CONCLUSION

For the reasons set forth in this Motion and incorporated memorandum of law, Sgt. Goodman is entitled to summary judgment on all claims in this matter.

---

[4] Both the Act and the wrongful death statute provide that wrongful death claims are subject to the provisions of the Act. *See* 14 M.R.S. § 8104-C; 18-C M.R.S. § 2-807(4).

Dated at Portland, Maine this 16th day of July, 2021.

Attorneys for Defendant Nicholas Goodman
MONAGHAN LEAHY, LLP
95 Exchange Street, P.O. Box 7046
Portland, ME 04112-7046
(207) 774-3906
jwall@monaghanleahy.com

BY:   /s/ John J. Wall, III
      John J. Wall, III

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2021, I electronically filed **Defendant's Motion for Summary Judgment, with Incorporated Memorandum of Law** using the CM/ECF system, which will provide notice to me and all other counsel of record.

Dated at Portland, Maine this 16th day of July, 2021.

Attorneys for Defendant Nicholas Goodman
MONAGHAN LEAHY, LLP
95 Exchange Street, P.O. Box 7046
Portland, ME 04112-7046
(207) 774-3906
jwall@monaghanleahy.com

BY:   /s/ John J. Wall, III
      John J. Wall, III