## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| TERRY R. BAKER et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:19-cv-00251-JAW |
| | ) | |
| NICHOLAS GOODMAN et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On February 18, 2017, a police officer shot and killed a man in the parking lot of a downtown mall, resulting in a lawsuit by representatives of the man's estate against the officer. The officer now moves for summary judgment, claiming that his actions were objectively reasonable and that he is entitled to qualified immunity under federal law and discretionary function immunity under state law. As the Court finds material facts in dispute, it denies summary judgment.

## I.    PROCEDURAL HISTORY

On February 13, 2019, Terry R. Baker and Shantel L. Baker, acting as personal representatives of the estate of Chance D. Baker (Plaintiffs), filed a lawsuit in state of Maine Superior Court for Cumberland County pursuant to 42 U.S.C. § 1983, 5 M.R.S. § 4682, and 18-A M.R.S. § 2-804 against Portland Police Sergeant Nicholas Goodman, Lewiston Pawn Shop, Inc. d/b/a Coastal Trading & Pawn (Lewiston Pawn),

and Lewiston Pawn's employee or manager "John Doe."[1]  *Aff. of John J. Wall, III* (ECF No. 3), Attach. 1, *Docket R.*; *id.*, Attach. 3, *Compl.*  The Plaintiffs alleged that Sgt. Goodman used excessive and deadly force against Chance D. Baker on February 18, 2017, in Portland, Maine, and thereby violated his rights under the United States and Maine Constitutions.  *Compl.* ¶ 1.  On June 3, 2019, Sgt. Goodman removed this case from state to federal court.  *Notice of Removal* (ECF No. 1).  Sgt. Goodman answered the Complaint on June 24, 2019.  *Answer to Compl. and Affirmative Defenses and Demand for Jury Trial (Nicholas Goodman)* (ECF No. 11).

On May 4, 2021, Sgt. Goodman filed a notice of intent to file a motion for summary judgment.  *Def.'s Notice of Intent to File Mot. for Summ. J.* (ECF No. 45).  On June 4, 2021, the Court held a Local Rule 56(h) pre-filing conference.  *Min. Entry* (ECF No. 52).  On July 16, 2021, Sgt. Goodman filed his motion for summary judgment with a corresponding statement of facts in support of his motion and supporting evidence.  *Def.'s Mot. for Summ. J.* (ECF No. 53) (*Def.'s Mot.*); *Statement of Material Facts in Supp. of Def.'s Mot. for Summ. J.* (ECF No. 54) (DSMF); *Zoom Dep. of: Nicholas Lincoln Goodman* (ECF No. 55) (*Goodman Dep.*); *Zoom Dep. of: Kyle Andrew Knutson* (ECF No. 56) (*Knutson Dep.*); *Aff. of Nicholas Goodman* (ECF No. 57) (*Goodman Aff.*).

On August 27, 2021, the Plaintiffs filed a response in opposition to the Defendant's motion for summary judgment and to the Defendant's statement of

---

[1]    Lewiston Pawn sold Chance Baker the BB rifle he was carrying at the time of his death.  *Id.*  On February 19, 2020, the Court dismissed the Plaintiffs' Complaint against Lewiston Pawn.  *Order on Mot. to Dismiss Compl.* (ECF No. 24).

material facts, as well as their own statement of material facts with supporting evidence. *Pls.' Resp. to Def.'s Mot. for Summ. J.* (ECF No. 62) (*Pls.' Opp'n*); *Resp. to Def.'s Statement of Material Facts* (ECF No. 63) (PRDSMF); *Pls.'[] Statement [of] Additional [] Material Facts* (ECF No. 63) (PSAMF); *Decl. of Thomas Robinson* (ECF No. 64) (*Robinson Decl.*); *Zoom Dep. of: Robert J. Doherty, Jr.* (ECF No. 65) (*Doherty Dep.*); *Zoom Dep. of: John Vincent Nueslein, Jr.* (ECF No. 66) (*Nueslein Dep.*); *Zoom Dep. of: Eli Boyd Chase* (ECF No. 67) (*Chase Dep.*); *Exhibit 1 Nicholas Goodman Dep.* (ECF No. 68) (*Goodman Dep. Ex. 1*); *Pls.' Placeholder for Video Exs.* (ECF No. 69).

On September 27, 2021, Sgt. Goodman filed his reply in response to the Plaintiffs' opposition to his motion for summary judgment with a consolidated statement of material facts including his response to the Plaintiffs' statement of additional material facts. *Def.'s Summ. J. Reply* (ECF No. 73) (*Def.'s Reply*); *Consolidated Statements of Material Facts Including Def.'s Resp. to Pls.' Statement of Additional Material Facts* (ECF No. 74) (DRPSAMF).

## II.   FACTS

### A.   Sergeant Goodman's Background

Sgt. Nicholas Goodman is presently a lieutenant and eighteen-year veteran of the City of Portland's Police Department (Department). DSMF ¶ 1. On February 18, 2017, his rank at the Department was Sergeant and he had received training on the use of deadly force, crisis intervention for behavioral health, firearms, and different weapon systems. DSMF ¶¶ 2-3; PRDSMF ¶¶ 2-3. Sgt. Goodman was also a firearms instructor. DSMF ¶ 3; PRDSMF ¶ 3.

As of February 18, 2017, Sgt. Goodman was also the Team Leader 2 of the Department's Special Reaction Team[2] of which he had been a member since 2009. DSMF ¶¶ 3-4; PRDSMF ¶¶ 3-4.  The Team is responsible for responding to calls for service that are irregular or too dangerous for a patrol response, such as barricaded suspects with propensities for violence or access to firearms, active shooter situations, high-risk drug warrants, hostage rescue scenarios, high-risk warrant arrests, and felony stops and premeditated felony warrants, depending on the suspect's history. DSMF ¶ 4; PRDSMF ¶ 4.  As Team Leader of the Special Reaction Team, Sgt. Goodman received training in, and was tasked with, operational planning, including comprehensive reviews of a suspect's criminal history, the structural layout of an area and the intended methods of operation, threat assessment, and after-action report writing and training.  DSMF ¶ 5; PRDSMF ¶ 5.  As part of Sgt. Goodman's training with regard to armed suspects, he was instructed to treat a weapon that looks like a genuine firearm as a firearm and not to assume it is anything but that.  DSMF ¶ 6; PRDSMF ¶ 6.

### B.   The 911 Call

On Saturday, February 18, 2017, Sgt. Goodman was on duty for the Department and in full uniform.  DSMF ¶ 7; PRDSMF ¶ 7.  Shortly after 11:11 AM,

---

[2]       Sgt. Goodman's statement of material fact paragraph 3 says that he was a member of the "Department's Special <u>Response</u> Team."  DSMF ¶ 3 (emphasis added).  Sgt. Goodman's statement of material fact paragraph 4 says that he was "also the Team Leader of the Portland Police Department's Special <u>Reaction</u> Team."  DSMF ¶ 4 (emphasis added).  The Court was uncertain whether Sgt. Goodman was a member of two different teams with slightly different names.  In reviewing the record citation, however, the Court found that Sgt. Goodman referred to the team only as the "special reaction team."  *Goodman Aff.* ¶ 2; *Goodman Dep.* at 199:16-24.  The Court concluded that Defendant's reference to "Response" Team is in error and the Court has substituted "Reaction" for "Response" Team.

Sgt. Goodman became aware of several 911 calls reporting that a man was armed and walking around the Union Station Plaza in Portland, Maine, with what appeared to be a rifle or shotgun.  DSMF ¶ 8; PRDSMF ¶ 8.  Sgt. Goodman learned that the man was aiming what looked to be a rifle at cars that were passing by and waving it around in the air.[3]  DSMF ¶ 9; PRDSMF ¶ 9.  Sgt. Goodman also learned that the man was pointing the gun at various occupied businesses within the Plaza, including Margarita's and Subway restaurants.  DSMF ¶ 10; PRDSMF ¶ 10.  Dispatch reported that additional 911 callers conveyed similar concerns: that there was a man at the Union Station Plaza brandishing a long gun, described by some callers as a rifle or shotgun.  DSMF ¶ 11; PRDSMF ¶ 11.  Sgt. Goodman later learned that the man described in these 911 calls was Chance Baker.  DSMF ¶ 12; PRDSMF ¶ 12.

Sgt. Goodman proceeded to Union Station Plaza in response to the 911 calls. DSMF ¶ 13; PRDSMF ¶ 13.  As the supervisor in charge of the area where Union Station Plaza is located and the first supervisor on scene, Sgt. Goodman was primarily responsible for organizing the response and trying to contain the area, although when Lieutenant Doherty later arrived, he had authority over Sgt. Goodman based on his rank.  DSMF ¶ 22; PRDSMF ¶ 22.  While on route to the Plaza, Sgt. Goodman instructed other officers who had arrived on scene before him to "stage" consistent with Department policy, meaning he did not want the officers to approach

---

[3]      The Plaintiffs dispute the assertion that Mr. Baker was "aiming [the weapon] at people and cars driving by," instead contending that the cited deposition testimony indicates only that Mr. Baker was "aiming what looked to be a rifle at passerby – cars that were passing by and waving it around in the air."  PRDSMF ¶ 19.  As the non-movant the Court accepts the Plaintiffs' qualification and omits the disputed portion of the Defendant's statement of fact.

Mr. Baker, who was armed with a rifle.  DSMF ¶ 14; PRDSMF ¶ 14.  Instead, he wanted them to hold back so they could attempt to establish verbal contact with Mr. Baker.  DSMF ¶ 14; PRDSMF ¶ 14.

### C.   Arrival at Union Station Plaza

To his knowledge, Officer Knutson was the first officer to arrive at the scene in response to the call.[4]  PSAMF ¶ 14; DRPSAMF ¶ 14.  Upon his arrival Officer Knutson saw Mr. Baker standing by the nail salon and Subway restaurant in Union Plaza[5] and noticed that Mr. Baker was staggering and unsteady on his feet with some sort of firearm in his hand.  PSAMF ¶¶ 15, 17; DRPSAMF ¶¶ 15, 17.  Officer Knutson thought it looked like Mr. Baker may have been intoxicated and Mr. Baker remained unsteady on his feet throughout Officer Knutson's interactions with him.[6]  PSAMF

---

[4]     The Defendant interposes a qualification that the "cited deposition testimony merely reflects that to the best of Officer Knutson's knowledge, he was the first officer to arrive."  DRPSAMF ¶ 14. The Court modified this statement to accurately reflect Officer Knutson's deposition testimony, which was that "to my knowledge," he was the first officer to arrive at the scene.  *Knutson Dep.* at 12:22-24.

[5]     The Defendant denies the Plaintiffs' assertion that when Officer Knutson arrived Mr. Baker was standing next to the Subway restaurant at Union Station Plaza, arguing that the cited deposition testimony does not support the assertion.  DRPSAMF ¶ 15.  Officer Knutson's exact testimony is that when he arrived Mr. Baker was by the nail salon.  *Knutson Dep.* at 17:25-18:4.  However, Officer Knutson was then asked where the nail salon was in relation to the Subway restaurant.  *Id.* at 18:5-6.  Officer Knutson explained that the nail salon and the Subway restaurant share a divided building. *Id.* at 18:7-13.  So, in effect, Officer Knutson explained that by standing by the nail salon, Mr. Baker was also standing by the Subway restaurant.  The Court is unclear why the Defendant wished to make an issue of this minor point, but the Court amended the statement to reflect Officer Knutson's testimony.

[6]     The Plaintiffs' statement of material fact paragraph 18 states: "Mr. Baker appears intoxicated to Officer Knutson."  PSAMF ¶ 18.  The Defendant interposes a qualification that "[t]he cited deposition testimony indicates that the deponent thought the person may be intoxicated."  DRPSAMF ¶ 18.  The actual interchange at Officer Knutson's deposition was:

> Attorney Tzovarras: And when you see him -- first see him there, what is Mr. Baker doing?
> Officer Knutson: He was staggering with a firearm of some sort in his hand.
> Attorney Tzovarras: And when you say staggering, could you describe what that looked like?
> Officer Knutson: He looked unsteady on his feet.
> Attorney Tzovarras: Did it look like he may be intoxicated?

¶¶ 18-19; DRPSAMF ¶¶ 18-19. Officer Knutson saw Mr. Baker pumping the firearm lever and broadcast over the radio that "he's pumping it like a BB gun, but—." PSAMF ¶ 16; DRPSAMF ¶ 16.

Sgt. Goodman arrived in the area of Union Station Plaza at approximately 11:16:57 AM.[7] and parked his cruiser in a nearby parking lot out of sight of Mr. Baker's last known position. DSMF ¶ 20; PRDSMF ¶ 20; PSAMF ¶ 42; DRPSAMF ¶ 42. Around the time Sgt. Goodman arrived at the scene, dispatch informed him that one caller reported that he believed Mr. Baker's weapon was a BB gun, but he was not 100% sure.[8] PSAMF ¶ 44; DRPSAMF ¶ 44; DSMF ¶ 15; PRDSMF ¶ 15. Dispatch also reported that some 911 callers were reporting that the weapon with which Mr. Baker was armed was a rifle or a shotgun, while others reported it was either a pellet gun or BB gun.[9] DSMF ¶ 21; PRDSMF ¶ 21. It was around this same time that

---

Officer Knutson: Yes.

*Knutson Dep.* at 19:7-15. Based on this interchange, the Court revised the Plaintiffs' statement of material fact to accurately reflect Officer Knutson's deposition testimony.

[7]    The Defendant accepts the Plaintiffs' statement as to the time of Sgt. Goodman's arrival, DRPSAMF ¶ 42, and the Plaintiffs similarly accept the Defendant's statement as to the time of Sgt. Goodman's arrival, PRDSMF ¶ 20, even though the parties propose slightly different times. In the light most favorable to the Plaintiffs, the Court accepts the Plaintiffs' statement that Sgt. Goodman arrived at 11:16:57 AM.

[8]    The Defendant denies this statement interposing that "[t]he cited deposition testimony reflects that the information imparted by dispatch to Sergeant Goodman was that one of the callers believed Mr. Baker was holding a rifle or a pellet or BB gun." DRPSAMF ¶ 44.

   Although Sgt. Goodman denied this paragraph, he proposed a virtually identical paragraph in his own statements of material fact: "Around the time Sgt. Goodman arrived at the scene, dispatch informed him that one caller reported that he believed Mr. Baker's weapon was a BB gun, but he was not 100 percent sure." DSMF ¶ 15. The Plaintiffs admitted this assertion. PRDSMF ¶ 15. The Court is troubled that when the Plaintiffs proposed precisely this same fact, Sgt. Goodman objected.

[9]    The Plaintiffs dispute that dispatch made the report "[a]s Sgt. Goodman exited his cruiser," PRDSMF ¶ 21, instead admitting "that dispatch had previously provided the information." *Id.* In the light most favorable to the Plaintiffs the Court admits the Defendant's statement of fact, but omits the portion indicating that dispatch made the report as Sgt. Goodman exited his cruiser.

Officer Knutson saw Mr. Baker pumping the firearm lever and Office Knutson broadcast over the radio that, "he's pumping it like a BB gun, but—." PSAMF ¶ 16; DRPSAMF ¶ 16; DSMF ¶¶ 16-17; PRDSMF ¶¶ 16-17. Sgt. Goodman responded to dispatch that they were not going to start guessing now. PSAMF ¶ 45; DRPSAMF ¶ 45. Sgt. Goodman never had any discussion with Officer Knutson about what he had seen when he radioed that "he is pumping it like a BB gun, but—." PSAMF ¶ 50; DRPSAMF ¶ 50.

### D.    Chance Baker's Location and Conduct

Upon Sgt. Goodman's arrival at the scene, Mr. Baker was standing by the Subway.[10] PSAMF ¶ 21; DRPSAMF ¶ 21. Sgt. Goodman and Officer Knutson saw Mr. Baker holding what appeared to be a hunting rifle or shotgun.[11] DSMF ¶ 24; PRDSMF ¶ 24. Sgt. Goodman observed Mr. Baker's position and determined that from 100 yards away where he and Officer Knutson were standing, it was difficult to see whether Mr. Baker was pumping the gun like a lever action rifle or like a BB gun.

---

[10]      The Defendant interposes a qualification that "[t]he cited deposition testimony reflects that Mr. Baker had moved closer to the Subway door at the time Sergeant Goodman arrived." DRPSAMF ¶ 21. When read in the context of Officer Knutson's previous testimony, the cited deposition testimony supports the Plaintiffs' fact that Mr. Baker was located near the Subway restaurant and also that he moved closer to the door. *See Knudson Dep.* at 30:7-11. The Court accordingly rejects the Defendant's denial and accepts the Plaintiffs' statement of fact.

[11]      The Plaintiffs deny the following fact: "At the time Sgt. Goodman arrived at the Union Station Plaza, he saw Mr. Baker walking between a row of cars in the vicinity of the parking lot where customers of the Plaza park." PRDSMF ¶ 23; DSMF ¶ 23. In their denial the Plaintiffs cite deposition testimony from Officer Knutson, which states that Mr. Baker was by the nail salon when Sgt. Goodman arrived on the scene and that Mr. Baker started to move closer to the Subway door. PRDSMF ¶ 23; *Knutson Dep.* at 30:3-11. Reading the record in the light most favorable to the Plaintiffs, a factfinder could reasonably conclude that Mr. Baker was standing near the nail salon and Subway and not walking through the parking lot when Sgt. Goodman arrived. Accordingly, the Court accepts the Plaintiffs' denial and does not consider this statement of fact. The Court similarly accepts the Plaintiffs' denial as to the Defendant's other reference to Mr. Baker walking through the parking lot, DSMF ¶ 24; PRDSMF ¶ 24, and excludes this portion of the Defendant's fact.

DSMF ¶ 18; PRDSMF ¶ 18.  Based on his observations, Sgt. Goodman believed Officer Knutson's report that Mr. Baker was pumping the gun like a BB gun was a guess at best.  DSMF ¶ 19; PRDSMF ¶ 19.  Sgt. Goodman previously received radio reports that Mr. Baker was intoxicated, and also observed signs indicating Mr. Baker was intoxicated and noticed that Mr. Baker was walking and kind of stumbling.[12]  PSAMF ¶¶ 47-48; DRPSAMF ¶¶ 47-48.

At this time, Mr. Baker was holding the weapon under his arm parallel to the ground, with the butt of the rifle between his armpit and his waist and the barrel facing into the Subway restaurant.  DSMF ¶ 25; PRDSMF ¶ 25.  As Sgt. Goodman watched Mr. Baker brandishing the rifle[13] in the parking lot, he was concerned about the distance between himself and Mr. Baker because there were many people out and about and there was heavy traffic on Congress Street that day.[14]  DSMF ¶¶ 27, 29; PRDSMF ¶¶ 27, 29.  This concern prompted Sgt. Goodman to move closer towards Mr. Baker.  DSMF ¶ 28; PRDSMF ¶ 28.

---

[12]     The Defendant interposes a qualification that "[t]he cited deposition testimony does not state that Mr. Baker appeared unsteady on his feet, just that he was 'walking kind of stumbling.'" DRPSAMF ¶ 48.  The Court accepts this qualification.

[13]     The Plaintiffs deny the Defendant's stated fact that "[w]ith the weapon in that position, Mr. Baker was capable of firing the weapon at others at any moment."  DSMF ¶ 26; PRDSMF ¶ 26.  The Plaintiffs cite Sgt. Goodman's deposition testimony which states that he did not know whether Mr. Baker's finger was on the trigger of the gun.  *Goodman Dep.* at 107:4-11.  Viewing the record in the light most favorable to the Plaintiffs, a reasonable factfinder could conclude that if Sgt. Goodman did not know whether Mr. Baker's finger was on the trigger, Mr. Baker may not have been capable of firing the weapon at others at any moment.  The Court accepts the Plaintiffs' denial and excludes the Defendant's paragraph 26.

[14]     The Plaintiffs deny "many people were walking around Union Station Plaza" as not supported by the record citation.  PRDSMF ¶ 29.  Viewing the record in the light most favorable to the Plaintiffs, the Court accepts this denial as a qualification and accordingly alters the Defendant's statement of material fact.

9

### E.   Sergeant Goodman and Officer Knutson Get Into Position and Attempt to Communicate with Chance Baker

Sgt. Goodman and Officer Knutson moved across Congress Street to Union Plaza and took up a position behind a black pick-up truck.[15]  PSAMF ¶ 22; DRPSAMF ¶ 22.  The pickup truck was parked approximately 114 feet (38 yards) from Mr. Baker's location.  DSMF ¶ 30; PRDSMF ¶ 30; PSAMF ¶¶ 49, 52; DRPSAMF ¶¶ 49, 52.  Officer Knutson was also with Sgt. Goodman in that position, DSMF ¶ 31; PRDSMF ¶ 31, and both Officer Knutson and Sgt. Goodman were armed, Sgt. Goodman with a .223 Remington caliber police carbine, and Officer Knutson with an AR-15 style rifle.  DSMF ¶ 32; PRDSMF ¶ 32.  Sgt. Goodman had a 40 millimeter less-lethal sponge round weapon in his cruiser when he arrived at the scene but chose not to take it out of the cruiser.[16]  PSAMF ¶ 46; DRPSAMF ¶ 46.  Mr. Baker continued to stand by the Subway with the BB gun in hand as Officer Knutson and Sgt. Goodman took up their position by the black pickup truck.[17]  PSAMF ¶ 24; DRPSAMF ¶ 24.

---

[15]    The Defendant interposes a qualification that Officer Knutson and Sgt. Goodman "ran into the parking lot and took a position next to a dark-colored pick-up truck."  DRPSAMF ¶ 22.  The Court rejects the Defendant's qualification as not material.  The Plaintiffs' fact is admitted.

[16]    The Defendant admits that the Plaintiffs' fact correctly reflects Sgt. Goodman's deposition testimony but qualify that it "does not reflect the follow up questions as to why Sergeant Goodman did not take it out of the cruiser" and that Sgt. Goodman explained in his testimony that "such a weapon would be inappropriate as a first option for dealing with a person armed with a rifle" and that the "distance between him and Mr. Baker was too great for such a weapon to be effective."  DRPSAMF ¶ 46 (citing *Goodman Dep.* at 29:24-30:5).  The Court rejects this qualification as neither party disputes that Sgt. Goodman had a less lethal weapon in his vehicle.

[17]    The Defendant qualifies this statement stating that the testimony only reflects that "when Officer Knutson and Sgt. Goodman took a position next to a dark-colored pickup truck, Mr. Baker was standing in relatively the same area with a firearm in his hands."  DRPSAMF ¶ 24.  The Court finds that the context of Officer Knutson's testimony supports the Plaintiffs' statement.  Taking the facts in the light most favorable to the non-moving party, the Court admits the Plaintiffs' paragraph 24.

10

Positioned beside the pickup truck, Sgt. Goodman and Officer Knutson observed Mr. Baker standing very close to the building in between the nail salon and the Subway restaurant, just steps from the entrance door of Subway. DSMF ¶ 33; PRDSMF ¶ 33. Sgt. Goodman estimated that Mr. Baker was standing approximately two to three, maybe five, feet from the building and only steps from the entrance of Subway, where Mr. Baker remained during the encounter. DSMF ¶ 34; PRDSMF ¶ 34. From his position beside the pickup truck, Sgt. Goodman observed what appeared to be Mr. Baker manipulating the bolt area of the firearm he was holding, as if trying to figure out how to clear or load the weapon. DSMF ¶ 35; PRDSMF ¶ 35.

From that location Sgt. Goodman made several attempts to communicate with Mr. Baker in an effort to persuade him to disarm. DSMF ¶ 36; PRDSMF ¶ 36. Sgt. Goodman very loudly yelled to Mr. Baker several times identifying himself as a police officer and instructing him to disarm. DSMF ¶ 37; PRDSMF ¶ 37. Officer Knutson also yelled multiple times for Mr. Baker to drop the gun. DSMF ¶ 38; PRDSMF ¶ 38. Mr. Baker did not react to Sgt. Goodman's commands and never appeared to react to any commands provided to him. PSAMF ¶¶ 25-26; DRPSAMF ¶¶ 25-26. Sgt. Goodman did not see or hear anything to indicate whether Mr. Baker was hearing him. DSMF ¶ 39; PRDSMF ¶ 39.

Sgt. Goodman then observed Mr. Baker level the gun, holding it parallel to the ground, waving it or moving it over the Union Station area, prompting Sgt. Goodman to yell even louder that Mr. Baker needed to put the gun down.[18] DSMF ¶ 40;

---

[18] The Plaintiffs deny the Defendant's assertion that Mr. Baker was "scanning" his gun over the Union Station Area. The Court accepts the Plaintiffs' denial as a qualification and replaces the

PRDSMF ¶ 40.  Mr. Baker appeared to be moving the weapon erratically, with the muzzle pointed all over the place.  DSMF ¶ 41; PRDSMF ¶ 41.  Sgt. Goodman told Mr. Baker numerous times to "please put your gun down, we don't want to have to shoot you."[19]  DSMF ¶ 42; PRDSMF ¶ 42.

At one point, after commanding Mr. Baker to put the weapon down, Sgt. Goodman observed Mr. Baker put the weapon down by leaning the gun against the Subway building approximately one foot from where he was standing, with the butt of the gun on the ground and the barrel sticking straight up in the air.  DSMF ¶ 43; PSAMF ¶ 43.  Sgt Goodman then yelled for Mr. Baker to come towards him.  DSMF ¶ 44; PRDSMF ¶ 44.  Sgt. Goodman also tried getting Lt. Doherty's attention when Mr. Baker put the BB gun down to see if Lt. Doherty could use the 40-millimeter sponge round on Mr. Baker.  PSAMF ¶ 56; DRPSAMF ¶ 56.

### F.    The Moments Before Sergeant Goodman "Takes the Shot"

Mr. Baker reached into his pocket and pulled out what appeared to be a bottle of malt liquor and took a few large drinks.  DSMF ¶ 45; PSAMF ¶ 45; PSAMF ¶ 55; DRPSAMF ¶ 55. While that was occurring, Sgt. Goodman observed a woman walking in close proximity to Mr. Baker towards the Subway restaurant entrance.  DSMF ¶

---

disputed language with "waving it or moving it over" the Plaza, as stated in the cited deposition testimony.  *Goodman Dep.* at 43:22-44:2.

[19]    The Plaintiffs dispute the Defendant's usage of "yelled" instead of "told," as stated in the deposition testimony.  DSMF ¶ 42; PRDSMF ¶ 42; *Goodman Dep.* at 52:12-24.  Accepting the facts in the light most favorable to the Plaintiffs the Court accepts the denial as a qualification and alters the Defendant's fact accordingly.

46; PRDSMF ¶ 46.  Mr. Baker did not react to the woman in any way.[20]  PSAMF ¶ 28; DRPSAMF ¶ 28.

Despite his instructions to Mr. Baker to come towards him, Sgt. Goodman observed Mr. Baker remain in position and pick the weapon back up.  DSMF ¶ 47; PRDSMF ¶ 47.  Sgt. Goodman then observed Mr. Baker hold the gun.[21]  DSMF ¶ 48; PRDSMF ¶ 48.  Sgt. Goodman then observed Mr. Baker begin to manipulate the gun

[20]    The Defendant qualifies the Plaintiffs' statement of fact and disputes the characterization of Mr. Baker as failing to "react" to the woman rather than failing to "acknowledge" her.  Viewing the record in the light most favorable to the Plaintiffs, the Court accepts the Plaintiffs' fact and rejects the Defendant's qualification.  The Plaintiffs' paragraph 28 is admitted.

[21]    The Defendant's full fact reads: "Sgt. Goodman then observed Mr. Baker hold the gun at waist level and parallel to the ground," DSMF ¶ 48 (citing *Goodman Dep.* at 68:10-24), which the Plaintiffs deny.  PRDSMF ¶ 48 (citing *Robinson Decl.* ¶ 14; *Knutson Dep.* at 63:16-25; *Doherty Dep.* at 35:11-13, 72:7-25, 73:1-20, 79:1-19).

    Even with the command to view disputed matters in the light most favorable to the non-movant, this is a close call based on witness observations.  The Plaintiffs present the declaration of Thomas Robinson, who states that he "did not see a gun in [Mr. Baker's] hands when he was shot standing by the Subway entrance."  *Robinson Decl.* ¶ 12.  But the parties agree that Mr. Baker was holding a rifle in his hands when he was shot.  They disagree whether he had raised it from a vertical to a horizontal position.

    For support, the Plaintiffs also cite Officer Knutson's deposition, where Officer Knutson states that Mr. Baker "appeared to be scanning the parking lot.  He was turning either his hips or he was turning on his feet, had the gun parallel to the gun pointed in the direction that I wasn't fully able to identify."  *Knutson Dep.* at 63:16-22.  Officer Knutson confirmed that he could not tell what direction the barrel of the gun was pointing.  *Id.* at 63:23-15.  But Officer Knutson elsewhere testified that even though he could not identify the direction that Mr. Baker was pointing the rifle, he was "holding the rifle at waist level, and swaying back and forth."  *Id.* at 64:7-11.

    Finally, they cite Lt. Doherty's deposition, where he says that, although he saw Mr. Baker hold the rifle in a vertical manner, he did not see Mr. Baker hold the rifle in any other manner or point the rifle.  *Doherty Dep.* 35:2-13.  But Lt. Doherty also said that he was not able to see Mr. Baker when Mr. Baker was shot.  *Id.* at 34:6-8.  Lt. Doherty further stated that he was operating his motor vehicle and looking at a number of things and his attention was drawn away for a time.  *Id.* at 73:13-20.

    Against these equivocal witness statements are the videos of the event taken by various people.  The clearest is the video taken by Mr. Robinson, which captured the moment of the shooting.  But that video, in the Court's view, is inconclusive as to how Mr. Baker held the rifle, given the distance from which it was taken.  What it does demonstrate is that the question of how Mr. Baker held the rifle at the instance of the shooting is a jury question.

    In sum, the Court partially accepts the Plaintiffs' denial.  None of Plaintiffs' citations properly contests the Defendant's stated fact as to Sgt. Goodman's observations under Local Rule 56(f) to the effect that that Mr. Baker was holding a rifle when he was shot, but, viewed in the light most favorable to the Plaintiffs, they do contradict the Defendant's assertion that Mr. Baker's gun was held waist level and parallel to the ground.  *See Doherty Dep.* at 73:1-20.  All told, the Court concludes that a factfinder must resolve what happened.

in a manner consistent with a bolt-action rifle, either trying to clear a malfunction or load a bullet into it.[22,23,24,25]   DSMF ¶ 52; PRDSMF ¶ 52.   Sgt. Goodman never once observed Mr. Baker pumping the gun like someone would a BB gun; Mr. Baker never manipulated it from the front or from the level.   DSMF ¶ 53; PRDSMF ¶ 53.   Sgt. Goodman continued to tell Mr. Baker to put the gun down and that "[he] d[id]n't want to shoot [him]."[26,27]   DSMF ¶ 54; PRDSMF ¶ 54.   Officer Knutson who was still next

---

[22]   The Plaintiffs deny the Defendant's fact, citing a declaration from Thomas Robinson which states, "I did not see a gun in the man's hands when he was shot standing by the Subway entrance." PRDSMF ¶ 52; *Robinson Decl.* ¶ 11.   The Plaintiffs' denial goes beyond the scope of the fact presented by the Defendant and is therefore not properly controverted under Rule 56(f).   D. ME. LOC. R. 56(f). The Defendant's fact is admitted.

[23]   The Defendant asserts the following fact: "Again holding the weapon in that position, Mr. Baker was capable of firing the weapon at others at any moment."   DSMF ¶ 49 (citing *Goodman Aff.* ¶ 7).   The Plaintiffs deny this statement of fact.   PRDSMF ¶ 49.   As just noted in the earlier footnote, although the issue is a close one, based on the Plaintiffs' citation, Mr. Baker may have been holding the gun vertically and not parallel to the ground.   *See Doherty Dep.* at 73:1-20.   Additionally, testimony from Sgt. Goodman suggests that he could not remember whether Mr. Baker's finger was on the trigger before he was shot.   *See Goodman Dep.* at 107:1-11.   Based on Plaintiffs' citations, a reasonable fact finder could plausibly conclude that Mr. Baker was not capable of firing the weapon at others at any moment because he may have been holding the gun vertically and/or did not have his finger on the trigger.   The Court is required to view the facts in the light most favorable to the Plaintiffs as the non-moving party and accordingly accepts the Plaintiffs' denial and excludes the Defendant's paragraph 49.

[24]   The Defendant states that "[w]ith the rifle in that orientation, Sgt. Goodman observed Mr. Baker face the position Sgt. Goodman had taken with Officer Knutson, with his weapon leveled at them."   DSMF ¶ 50 (citing *Goodman Dep.* at 68:25-69:5, 75:1-7).   The Plaintiffs deny this fact. PRDSMF ¶ 50.   Again, the Plaintiffs' citations properly contest whether Mr. Baker's gun was level and whether Mr. Baker was facing Sgt. Goodman and Officer Knutson or angled toward the Subway restaurant.   Taking the facts in the light most favorable to the Plaintiffs, the Court accepts the Plaintiffs' denial and excludes the Defendant's paragraph 50.

[25]   The Defendant asserts that "Sgt. Goodman and Officer Knutson observed Mr. Baker move the barrel of the rifle over everybody in the parking lot several times, which they described using terms such as scanning, lasering, flagging, and searching," DSMF ¶ 51, which the Plaintiffs deny. PRDSMF ¶ 52.   Based on the Plaintiffs' citations to testimony by Lt. Doherty and Sgt. Neuslien that neither of them saw Mr. Baker point a gun at anyone, a reasonable factfinder could conclude that Mr. Baker was not "mov[ing] the barrel of the rifle over everybody in the parking lot several times."   Because the Court is obligated to view the record in the light most favorable to the Plaintiffs, the Court accepts the Plaintiffs' denial and excludes the Defendant's paragraph 51.

[26]   The Plaintiffs dispute the Defendant's characterization of Sgt. Goodman "yelling" at Mr. Baker.   PRDSMF ¶ 54.   Viewing the record in the light most favorable to the Plaintiffs as the nonmoving party, the Court accepts the Plaintiffs' denial as a qualification and accordingly alters the Defendant's statement of fact.

[27]   The Plaintiffs deny the Defendant's statement of fact that "[s]omeone in the crowd to Sgt. Goodman's right yelled something like, "he's pulling the trigger again" or "he's pulling the trigger."

to Sgt. Goodman, also heard someone to his right say something like they heard a trigger click. DSMF ¶ 56; PRDSMF ¶ 56. At the time, there were customers inside Subway and the nail salon adjacent to Subway. DSMF ¶ 57; PRDSMF ¶ 57.

At some point either before or after Mr. Baker set the weapon down,[28] Officer Knutson believed he recognized Mr. Baker as a man named Adam Ruffino and told Sgt. Goodman he believed Mr. Baker was Adam Ruffino.[29] PSAMF ¶ 27; DRPSAMF ¶ 27. Sgt. Goodman then for a short time started calling to Mr. Baker as "Adam" in providing commands. PSAMF ¶ 27; DRPSAMF ¶ 27.

From his position, Sgt. Goodman could not tell whether Mr. Baker's weapon was a BB gun or a rifle, but he believed it was a rifle because (1) it looked like a rifle; (2) he appeared to be manipulating it like a rifle; (3) the lever was up making the weapon appear to have a regular sized barrel; and (4) it had a large optic (telescope) on top of it, which was inconsistent with Sgt. Goodman's experience with BB guns or pellet guns. DSMF ¶ 58; PRDSMF ¶ 58. Based on Sgt. Goodman's knowledge of firearms, training, and experience, he believed Mr. Baker was armed with a rifle when he fired his weapon on February 18, 2017, as Mr. Baker's weapon was fitted with optics and looked nearly identical to a Marlin 30-30 or .30-06 and Mr. Baker was

---

DSMF ¶ 55; PRDSMF ¶ 55 (citing *Knutson Dep.* at 46:6-20 that Officer Knudson heard someone say they heard a trigger click). Viewing the evidence in the light most favorable to the Plaintiffs as the nonmoving party, the Court accepts the Plaintiffs' denial and excludes the Defendant's paragraph 55.
[28]   Officer Knutson could not recall whether Sgt. Goodman began calling Mr. Baker "Adam" before or after Mr. Baker put down his weapon and picked it back up again. *Knutson Dep.* at 49:2-9.
[29]   The Defendant qualifies the Plaintiffs' paragraph 27, pointing out Officer Knutson's testimony that Sgt. Goodman called Mr. Baker "Adam" "for a short period of time." DRPSAMF ¶ 27 (citing *Knutson Dep.* at 49:7-13). The Court accepts this qualification and has added it to the statement of facts.

manipulating the weapon in a manner consistent with a rifle.  DSMF ¶ 59; PRDSMF ¶ 59.

### G.    Officer Goodman "Takes the Shot"

At approximately 11:19:29 AM, Sgt. Goodman fired a single shot from his weapon at Mr. Baker.[30]  DSMF ¶ 61; PRDSMF ¶ 61; *Robert Doherty Dep. Ex. 26: Robert Doherty Cruiser Video* (*Doherty Cruiser Video*); *Nicholas Goodman Dep. Ex. 11: Nicholas Goodman Cruiser Video* (*Goodman Cruiser Video*).  At the time Sgt. Goodman fired his weapon, Mr. Baker was standing just steps from the entrance of the Subway restaurant.[31]  DSMF ¶ 62; PRDSMF ¶ 62.  Sgt. Goodman could not tell from his position approximately forty yards away if Mr. Baker was holding a BB gun or actual firearm and believed the weapon to be a hunting rifle or other actual firearm.[32]  PSAMF ¶ 61; DRPSAMF ¶ 61.  Before shooting Mr. Baker, Sgt. Goodman

---

[30]    The Defendant's full statement of material fact states "[w]ith the barrel of Mr. Baker's gun leveled and facing towards Mr. Knutson and Sgt. Goodman, and Mr. Baker's right hand doing what appeared to be manipulating the bolt of the rifle (which was [in] the same area as the trigger), Sgt. Goodman fired a single shot from his weapon at Mr. Baker."  DSMF ¶ 61.  The Plaintiffs deny this fact, citing testimony that Mr. Baker was not holding the gun horizontally, was not pointing it at Office Knutson or Sgt. Goodman, or was not holding the gun at all.  PRDSMF ¶ 61 (citing *Robinson Decl.* ¶¶ 11-12, 14; *Knutson Dep.* at 63:16-25; *Doherty Dep.* at 35:11-13, 72:7-25, 73:1-20; 79:1-19; *Neuslein Dep.* at 33:3-6).  Viewing the facts in the light most favorable to the Plaintiffs as the nonmoving party, the Court concludes that a trier of fact could reasonably conclude that Mr. Baker was not holding his gun horizontally and pointed toward Officer Knutson and Sgt. Goodman.  The Court accordingly excludes part of the Defendant's paragraph 61 from the statement of material facts.

[31]    The Plaintiffs deny the Defendant's statement of fact.  PRDSMF ¶ 62 (citing *Robinson Decl.* ¶¶ 11-12, 14).  The Plaintiffs' denial and record citation addresses only whether Mr. Baker was holding the gun when Sgt. Goodman fired his weapon and does not dispute the remainder of the Defendant's statement of fact.  Viewing the record in the light most favorable to the Plaintiffs, the Court partially accepts the Plaintiffs' denial and omits the portion of the Defendant's fact referencing Mr. Baker's weapon.

[32]    The Defendant interposes a qualification that the context of the cited testimony establishes that "Sergeant Goodman believed the weapon to be a hunting rifle or other actual firearm."  DRPSAMF ¶ 61.  The Court accepts this qualification given that the Defendant already established, and the Plaintiffs admitted, that Sgt. Goodman believed Mr. Baker was armed with a rifle.  *See* DSMF ¶ 59; PRDSMF ¶ 59.

said to Officer Knutson, "I'm going to take the shot."  PSAMF ¶ 29; DRPSAMF ¶ 29.

Sgt. Goodman repeated, "I'm going to take the shot," and he then took a shot at Mr.

Baker.[33]  PSAMF ¶ 30; DRPSAMF ¶ 30.

At the time Mr. Baker was shot, he was not looking in the direction of Sgt.

Goodman but down at what Sgt. Goodman described as "trying to clear the bolt or

moving this bolt."[34]  PSAMF ¶ 58; DRPSAMF ¶ 58.  Officer Knutson could not tell

what direction Mr. Baker was pointing the BB gun.[35]  PSAMF ¶ 31; DRPSAMF ¶ 31.

Video footage taken in Union Plaza shows Mr. Baker with his back to the camera

standing near the Subway restaurant facing the building slightly bent over when he

is shot.[36]  PSAMF ¶ 13; DRPSAMF ¶ 13.  Mr. Baker never made any verbal threats

---

[33]    The Defendant qualifies the Plaintiffs' fact stating that Officer Knutson believed that Sgt Goodman fired his gun "pretty soon" after stating a second time that he was going to take the shot. DRPSAMF ¶ 30.  Officer Knutson's deposition testimony, which states that the shot came "seconds" after Sgt. Goodman stated for a second time that he was going to take the shot, supports the Plaintiffs' version of the facts.  *Knutson Dep.* at 67:15-24.  Viewing the record in the light most favorable to the Plaintiffs, the Court rejects the Defendant's qualification and accepts the Plaintiffs' statement of fact.
[34]    The Defendant denies this statement of fact, citing additional testimony from Sgt. Goodman that he could not tell if Mr. Baker was looking at him or down at the weapon trying to clear the bolt or move the bolt.  DRPSAMF ¶ 58 (citing *Goodman Dep.* at 185:5-21).  The Court is obligated to view the record in the light most favorable to the Plaintiffs, as the nonmoving party, and accordingly accepts the Plaintiffs' statement of fact which is supported by record citations.  The Court rejects the Defendant's denial.
[35]    The Defendant interposes a qualification that in the seconds before Sgt. Goodman fired the shot, Mr. Baker was scanning the parking lot, turning his hips or feet with the gun parallel to the ground but that the witness was not sure what direction the gun was pointed in before the shot was fired.  DRPSAMF ¶ 31.  The Court rejects the Defendant's qualification.  First, the Defendant's own qualification supports the conclusion that some witnesses were unable to identify the direction the gun was pointing in.  Second, the Defendant's qualification pertaining to Mr. Baker "scanning" the parking lot and turning his hips or feet is beyond the scope of the Plaintiffs' fact and therefore does not properly controvert the Plaintiffs' paragraph 31 under Local Rule 56(f).  *See* D. ME. LOC. R. 56(f).  Third, the Court is required to take the facts in the light most favorable to the nonmoving party and accordingly accepts the Plaintiffs' statement of fact.
[36]    The Defendant qualifies the Plaintiffs' statement of fact, stating that Mr. Baker's back is to the camera in the video and that the butt of the firearm is extending behind him.  DRPSAMF ¶ 13. The Court accepts the Defendant's qualification that Mr. Baker's back is to the camera, but, when viewing the video in the light most favorable to the Plaintiffs, rejects the Defendant's qualification as to the position of the gun which is unclear from the video.

before being shot; Sgt. Goodman was aware Mr. Baker never fired the BB gun in Union Plaza; and Sergeant Goodman did not know if Mr. Baker put his finger on the trigger at any time before Sgt. Goodman shot him.  PSAMF ¶¶ 59-60, 62; DRPSAMF ¶¶ 59-60, 62.

At the time he fired his weapon, Sgt. Goodman believed deadly force was necessary to prevent Mr. Baker from killing or seriously injuring Officer Knutson, Sgt. Goodman, other officers, and other innocent people present in the Plaza, a threat Sgt. Goodman believed was imminent under the circumstances.[37]  DSMF ¶ 63; PRDSMF ¶ 63.  This belief was based on Sgt. Goodman's training, education, and experience, as well as the totality of the circumstances, including the fact that Mr. Baker appeared to be manipulating the bolt as if trying to clear a malfunction in the weapon, signaling to Sgt. Goodman that he may have tried to fire the weapon already, that a woman walked right next to Mr. Baker just seconds before, and the fact that there were so many people in the area.[38]  DSMF ¶ 64; PRDSMF ¶ 64.  Based on the 911 calls, Sgt. Goodman's observations, and the way in which Mr. Baker was manipulating the weapon, Sgt. Goodman believed Mr. Baker was armed with a hunting rifle at the time he fired his weapon.[39]  DSMF ¶ 65; PRDSMF ¶ 65.

---

[37]    The Plaintiffs "[a]dmit this fact as to Sergeant Goodman's stated beliefs [but] deny as to the accuracy of the beliefs."  PRDSMF ¶ 63.  The Court rejects the Plaintiffs' partial denial and admits the entirety of the Defendant's paragraph 63 as this paragraph does not address the accuracy of Sgt. Goodman's belief.

[38]    The Court eliminates the following portion of the Defendant's statement of fact, in accordance with the Court's prior resolution of disputed facts: "the fact that he had a weapon leveled at Sgt. Goodman and Officer Knutson (not pointed toward his feet), and that he had been waving the leveled weapon all around the parking lot."  DSMF ¶ 64.

[39]    The Court rejects the Plaintiffs' denial of this fact.  The denial is not supported by the record citation and is therefore not properly controverted under Local Rule 56(f).  *See* D. ME. LOC. R. 56(f).

## H.   Lieutenant Doherty's Dash-Camera Video

Lt. Doherty was driving his cruiser across Congress Street into Union Plaza when he heard the shot ring out. PSAMF ¶ 32; DRPSAMF ¶ 32. Doherty Deposition Exhibit 26 shows the dash-camera footage from his cruiser from the time he received the call to Union Plaza until a few seconds after Mr. Baker is shot and killed. PSAMF ¶ 33; DRPSAMF ¶ 33. When Lt. Doherty got in his cruiser to cross Congress Street seconds before Mr. Baker was shot, he did not see Mr. Baker pointing the gun.[40] PSAMF ¶ 35; DRPSAMF ¶ 35. The last time Lt. Doherty saw Mr. Baker before he was shot, Mr. Baker was holding the BB gun vertical with the barrel facing the sky.[41] PSAMF ¶ 36; DRPSAMF ¶ 36. In the moments Lt. Doherty was able to see Mr. Baker before the shot, he never saw Mr. Baker change the position of the BB gun from this

---

[40]     The Defendant qualifies this statement with the following: "While Lt. Doherty does not see Mr. Baker pointing his gun at this particular moment in time, the cited testimony does not reflect that Mr. Baker was not pointing the gun in any particular direction, nor does it indicate that the deponent was concentrating on Mr. Baker at that moment—only that he would have been able to see him from the cruiser at that time. In addition, Lt. Doherty testified that he lost sight of Mr. Baker from the time his vehicle entered Congress Street until he parked behind a snowbank, during which interval the shot was fired. Finally, Lt. Doherty indicated that he considered Mr. Baker to be an imminent threat to him at that time because it appeared to him that Mr. Baker was holding a high-powered rifle or shotgun." DRPSAMF ¶ 35.

Viewing the video in the light most favorable to the Plaintiffs, the Court partially rejects the Defendant's qualification. Based on the video, at the time Lt. Doherty entered his car to cross Congress Street, a reasonable factfinder could conclude that he was able to see Mr. Baker and conclude that Mr. Baker was not pointing the gun in any direction. However, the Court does include in the facts that Lt. Doherty was driving his car across the street at this time. The Court rejects the remainder of the Defendant's qualification as argument as to the strength of Lt. Doherty's testimony, and the Court must view conflicting evidence in the light most favorable to the nonmovant.

[41]     The Defendant qualifies this statement of fact on the same grounds as the previous footnote. The Court rejects the Defendant's qualification and admits the Plaintiffs' statement of fact. Lt. Doherty's testimony supports the statement and the Defendant's arguments as to the credibility and weight of Lt. Doherty's testimony, in light of what he was paying attention to as he was crossing the street, is an issue for the jury. For the purposes of summary judgment, the Court accepts the fact in the light most favorable to the Plaintiffs.

vertical position as Lt. Doherty drove across Congress Street, nor did he see Mr. Baker pointing the BB gun at anyone.[42]  PSAMF ¶¶ 37-38; DRPSAMF ¶¶ 37-38.

## I.  Sergeant Neuslien's Observations

Sgt. Neuslien arrived on the scene and crossed Congress Street to the area of a snowbank in Union Plaza.[43]  PSAMF ¶ 39; DRPSAMF ¶ 39.  Sgt. Neuslien saw Mr. Baker standing by the Subway crouched over holding what appeared to be a rifle, but never saw Mr. Baker point the BB gun at anyone.  PSAMF ¶¶ 40-41; DRPSAMF ¶¶ 40-41

## J.  Thomas Robinson Witnesses the Shooting

Moments before Mr. Baker was shot and killed, Thomas Robinson was working as an Uber driver driving a passenger in the area of Union Plaza off Congress Street. PSAMF ¶ 1; DRPSAMF ¶ 1.  Mr. Robinson pulled into Union Plaza from Congress Street and saw Mr. Baker holding what appeared to be some sort of gun.  PSAMF ¶ 2; DRPSAMF ¶ 2.  Mr. Robinson noticed that Mr. Baker appeared very intoxicated and was wobbling and at one point saw him take a drink from a bottle.[44]  PSAMF ¶

---

[42]    The Defendant qualifies this statement of fact on the same grounds as discussed in the previous two footnotes.  The Court similarly rejects the Defendant's qualification and accepts the Plaintiffs' statement of facts.

[43]    The Defendant interposes a qualification stating "[t]his statement is not supported by a specific citation to record material, nor does the general area suggested by the citation support the assertions in this paragraph; therefore, the Court should strike or disregard this statement." DRPSAMF ¶ 39.  The Court rejects this qualification as the context of the citation supports the Plaintiffs' statement of fact.

[44]    The Defendant qualifies this statement on the grounds that the "cited record material does not provide sufficient foundation for the affiant to opine that Mr. Baker was intoxicated."  DRPSAMF ¶ 3. The Plaintiffs' support for this paragraph is paragraph four of Thomas Robinson's sworn declaration. PSAMF ¶ 3 (citing *Robinson Decl.* ¶ 4).  This paragraph reads, "The man appeared very intoxicated and wobbling; at one point he took a drink from a bottle."  *Robinson Decl.* ¶ 4.  The Court is required to view the evidence in the light most favorable to the nonmovant and the Court therefore declines to accept the Defendant's qualification.

3; DRPSAMF ¶ 3.  Mr. Robinson backed out of Union Plaza, turned onto St. John Street, and re-entered Union Plaza from the St. John Street entrance.  PSAMF ¶ 4; DRPSAMF ¶ 4.  At this time, he stopped his car in the Union Plaza parking lot and saw Mr. Baker standing by the entrance of the Subway restaurant.  PSAMF ¶ 7; DRPSAMF ¶ 7.

Mr. Robinson began filming Mr. Baker on his cellphone.  PSAMF ¶ 5; DRPSAMF ¶ 5.  While recording the cellphone video, Mr. Robinson had his driver's-side window down.  PSAMF ¶ 6; DRPSAMF ¶ 6.  While filming, Mr. Robinson heard a gunshot and saw Mr. Baker standing by the Subway entrance fall to the ground after being shot.  PSAMF ¶ 7; DRPSAMF ¶ 7.  Mr. Robinson did not see a gun in Mr. Baker's hands when he was shot standing by the Subway entrance nor did he see Mr. Baker pointing or waving any firearm or other object at the time he was shot.[45] PSAMF ¶¶ 8-9; DRPSAMF ¶¶ 8-9.  Nor did Mr. Robinson ever see Mr. Baker point the BB gun at anyone in Union Plaza.[46]  PSAMF ¶ 11; DRPSAMF ¶ 11.  Mr. Robinson did not hear anyone yelling commands before the gunshot.  PSAMF ¶ 10; DRPSAMF ¶ 10.

Mr. Robinson gave Detective Eli Chase of the Department the cellphone video that he took of Mr. Baker being shot.  PSAMF ¶ 63; DRPSAMF ¶ 63.  Detective Chase

---

[45]   The Defendant interposes a qualification stating that even if Mr. Robinson did not see a gun that does not mean that Mr. Baker was not holding one, that the video "establishes beyond dispute that the butt end of a firearm can be seen protruding behind Mr. Baker."  DRPSAMF ¶ 8.  As the Court is required to view the evidence in the light most favorable to the nonmovant, the Court declines to accept the Defendant's qualification.  Furthermore, the fact that Mr. Robinson did not see a firearm at the moment that Mr. Baker was shot does not mean that Mr. Baker did not possess a firearm at that time.

[46]   The Defendant attempts to qualify the Plaintiffs' fact for the same reasons discussed in the previous footnote.  The Court rejects this qualification.

took steps to treat the cellphone video footage to make it easier to observe certain details captured in the video.  PSAMF ¶ 64; DRPSAMF ¶ 64.  The treated video of Mr. Baker in the moments before he was shot and killed shows him standing facing the Subway restaurant slightly bent over.[47]  PSAMF ¶ 65; DRPSAMF ¶ 65.  Detective Chase isolated the frame of the video just prior to Mr. Baker being shot and treated it to make a better-quality image of Mr. Baker.[48]  PSAMF ¶ 66; DRPSAMF ¶ 66.  The photograph depicted in Exhibit 1 from Detective Chase's deposition shows the treated image of Mr. Baker just before he was shot and killed.  PSAMF ¶ 67; DRPSAMF ¶ 67.  The treated image of Mr. Baker in the moment before he was shot and killed shows him standing facing the Subway restaurant slightly bent over.[49]  PSAMF ¶ 67; DRPSAMF ¶ 67.

---

[47]    The Defendant interposes a qualification that "[w]hile the cited record material shows Mr. Baker standing near a building that contained the Subway restaurant, from the vantage point of the video—which shows Mr. Baker's back and does not show his face, the front of his body, or his hands—it is impossible to tell if he is 'facing' the Subway."  DRPSAMF ¶ 65.  The Court rejects the Defendant's qualification.  Despite Mr. Baker's back being to the camera, viewed in the light most favorable to the nonmovant, a reasonable factfinder could plausibly conclude from the treated video that Mr. Baker's body was angled toward or "facing" the Subway restaurant.  The Plaintiffs' fact is admitted unqualified.

[48]    The Defendant qualifies the Plaintiffs' fact stating that "[t]he statement is not supported by a specific citation to the record material. . . [and] [i]n any event, nowhere in the cited deposition testimony does the witness state that the treatment resulted in 'better image quality.'"  DRPSAMF ¶ 66.  The Court rejects the Defendant's qualification as to the impropriety of the Plaintiffs' record citation.  Although typically a citation to five pages of deposition testimony would be too broad, here, what Eli Chase, the deponent, had done to the video was technical and took a fair amount of time for Detective Chase to explain it during his deposition.  Accordingly, the Court overrules the Defendant's objection.  As for whether the Chase image is better quality is a matter of opinion and, viewing his testimony and the Chase video, the Court accepts the phrase, "better quality," as synoptic of what Detective Chase was attempting to and did produce.  The Court overrules the Defendant's objection.

[49]    The Defendant qualifies the Plaintiffs' statement about the treated image of Mr. Baker on the same grounds as discussed in footnote 45.  The Court rejects the Defendant's qualification and admits Plaintiffs' paragraph 68 for the reasons stated in that footnote.

### K.     The State and Departmental Investigations

As a result of the incident on February 18, 2017, the Maine Attorney General's Office conducted an investigation concerning Sgt. Goodman's use of deadly force and determined that he reasonably believed that unlawful deadly force against himself and others was imminent, and it was reasonable for him to use deadly force to protect himself and others from serious injury or death.  DSMF ¶ 66; PRDSMF ¶ 66.  The Attorney General concluded that the amount of force Sgt. Goodman used against Mr. Baker under the circumstances was reasonable.  DSMF ¶ 66; PRDSMF ¶ 66.  The Department also conducted an Internal Affairs investigation and determined that it was reasonable for Sgt. Goodman to believe it was necessary to use deadly force to protect Office Knutson, himself, and other people within Mr. Baker and his weapon's range, and that Sgt. Goodman had followed Department policies and procedures in responding to the call and using deadly force.  DSMF ¶ 67; PRDSMF ¶ 67.

## III.   THE PARTIES' POSITIONS

### A.     Sergeant Goodman's Motion for Summary Judgment

Under the first prong of the applicable qualified immunity framework, Sgt. Goodman argues that he did not violate Mr. Baker's Fourth Amendment rights.  *Def.'s Mot.* at 5.  Sgt. Goodman states that "Supreme Court and . . . First Circuit precedent establishes that a use of deadly force is reasonable—and, therefore, constitutional— when 'at a minimum, a suspect poses an immediate threat to police officers or civilians.'"  *Id.* (quoting *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 149 (1st Cir. 2003) (*per curiam*)).  Sgt. Goodman says that "while a warning must generally be given before force is used, if feasible, no 'magic words' are required."  *Id.* (citing *Conlogue v.*

23

*Hamilton*, 906 F.3d 150, 157 (1st Cir. 2018)).  Recounting his threat assessment as stated in his statement of material facts, Sgt. Goodman submits that "no reasonable factfinder could conclude – within the fairly wide zone of protection afforded the police – that [his] use of force was objectively unreasonable." *Id.* at 6.

Sgt. Goodman cites *Vincent v. Town of Scarborough*, No. 02-239-P-H, 2003 U.S. Dist. LEXIS 20910 (D. Me. Nov. 20, 2003), *adopted by* 2003 U.S. Dist. LEXIS 22934 (D. Me. Dec. 19, 2003), and *Fagre v. Parks*, 985 F.3d 16 (1st Cir. 2021), arguing both cases are consistent with granting summary judgment on qualified immunity grounds in this case. *Id.* at 9-11. Sgt. Goodman says the Court in *Vincent* upheld the officer's qualified immunity because a mistake cannot form the basis of a Fourth Amendment violation when the force is objectively reasonable. *Id.* at 9-10.

Sgt Goodman further argues that *Fagre v. Parks* is a similarly analogous case. *Id.* at 10-11. Sgt. Goodman contends that in that case, the Court upheld qualified immunity for an officer who, believing that he was in imminent danger, shot into a vehicle he believed was going to ram his cruiser. *Id.* at 10. The First Circuit rejected the argument that the officer did not reasonably believe he was in imminent danger because the suspect did not actually ram him. *Id.* at 11. Sgt. Goodman further cites Sixth and Eleventh Circuit cases as supporting summary judgment based on similar facts. *Id.* at 11-13.

Finally, Sgt. Goodman distinguishes two First Circuit cases, *McKenney v. Mangino*, 873 F.3d 75, 80 (1st Cir. 2017), and *Begin v. Drouin*, 908 F.3d 829, 836 (1st Cir. 2018). *Id.* at 13-14. Sgt. Goodman says that unlike *McKenney,* "Mr. Baker did

24

not constitute a passing risk to Sgt. Goodman, other officers, or the public" because Mr. Baker was "scanning" for a target, "leveled the weapon in the direction of Sgt. Goodman and Officer Knutson," and "did not heed Sgt. Goodman's orders." *Id.* at 13. Additionally, Sgt. Goodman submits that "unlike the armed man in *McKenney*, Mr. Baker consistently exhibited non-compliant and threatening behavior in the face of efforts by Sgt. Goodman to de-escalate the situation" and "[a]lthough Mr. Baker did not make any sudden movements, he generally seemed intent on searching out a target." *Id.* at 14. Sgt. Goodman further contends that "officers and innocent bystanders were in sufficient proximity to Mr. Baker . . . [which] place[d] them within the zone of danger," as to distinguish this case from *McKenney* and *Begin*. *Id.*

As to the second prong of the qualified immunity framework, Sgt. Goodman argues that "[a]s of February 18, 2017, there was no 'controlling case or robust consensus of cases' from the Supreme Court or the First Circuit finding a Fourth Amendment violation under circumstances similar to those confronting Sgt. Goodman." *Id.* at 15. Sgt. Goodman says he is entitled to summary judgment due to the lack of clearly established law because "cases in the First Circuit with facts analogous to those in this case indicate that the officers were, at the very least, protected by immunity." *Id.*

Sgt. Goodman further cites two decisions which he says "demonstrate that a reasonable officer in [his] position at the time he shot Mr. Baker would not have understood that he or she was violating a clearly established right." *Id.* Sgt. Goodman first points to *Kisela v. Hughes* for the proposition that courts should "not

25

define clearly established law at a high level of generality" and that "specificity 'is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Id.* at 16-17 (quoting *Kisela*, 138 S. Ct. 1148, 1152 (2018)). Sgt. Goodman contends that the Supreme Court's conclusion that *Kisela* was "far from an obvious case in which any competent officer would have known that shooting [the victim] would violate the Fourth Amendment," *id.* at 17 (quoting *Kisela*, 138 S. Ct. at 1152-53), applies here as "the circumstances that confronted Sgt. Goodman would not have indicated to a reasonable officer that the use of force would violate clearly established law." *Id.*

Sgt. Goodman argues "the situation confronting [him] was even more compelling than that in *Kisela*" because Mr. Baker's actions . . . had been described as erratic," he "level[ed] an apparent firearm and scann[ed] the Plaza," and "engaged in an overt act that placed Sgt. Goodman in imminent fear for himself and for others in the Plaza." *Id.* Sgt. Goodman further notes that he "gave numerous warnings throughout his interactions with Mr. Baker, including prior to firing." *Id.* Sgt. Goodman concludes that "if *Kisela* is . . . a 'far from obvious case,' the circumstances confronting Sgt. Goodman render his use of force even further from 'the obvious case.'" *Id.*

Sgt. Goodman also cites *Conlogue v. Hamilton*, arguing he is entitled to qualified immunity, like the officers in *Conlogue*, because he was similarly

"confronted by a man who appeared to be armed with a firearm[;] . . . [t]he armed man's actions were erratic and threatening[;] [t]he man's actions in picking up the weapon . . . and returning to his 'scanning' movements with the weapon leveled . . . indicated an escalation of the situation[; and there was a] suggestion that the man had attempted to fire or was attempting to fire" and thus Sgt. Goodman "believe[ed] harm to himself and others was imminent." *Id.* at 19.

Finally, as to the pending state law claims, Sgt. Goodman says that the "Plaintiffs' wrongful death claims are barred by absolute discretionary function immunity under the Maine Tort Claims Act." *Id.* at 20. Sgt. Goodman submits that "Maine precedent indicates that 'the standard for deciding whether an officer accused of use of excessive force is entitled to [the Act's] immunity is the same as that for analyzing whether he or she is entitled to qualified immunity with respect to a parallel federal Fourth Amendment claim." *Id.* (quoting *Steeves v. City of Rockland*, 600 F. Supp. 2d 143, 183 (D. Me. 2009)). As a result, "Sgt. Goodman is entitled to summary judgment on the Plaintiffs' wrongful death claims because he is protected by discretionary function immunity." *Id.*

## B.   The Plaintiffs' Opposition

The Plaintiffs state "[t]here are several facts (undisputed and disputed) that create genuine factual issues . . . that could lead a fact-finder to determine Mr. Baker was not an immediate threat to anyone at the time he was shot and killed and deadly force was unreasonable." *Pls.' Opp'n* at 9. In particular, the Plaintiffs point to several key, disputed facts: whether Mr. Baker was aiming his gun at people; whether Sgt. Goodman yelled to Mr. Baker that he did not want to shoot him; whether someone in

27

the crowd yelled that Mr. Baker was pulling the trigger, and whether Mr. Baker leveled the gun toward Officer Knutson and Sgt. Goodman. *Id.* at 10. The Plaintiffs say they "are not aware of any cases that held it is reasonable as a matter of law to shoot a suspect who is unarmed, or not pointing a believed firearm in the direction of any person and looking down at the time he's shot." *Id.* at 11.

The Plaintiffs analogize this case to *McKenney v. Mangino* and argue that here "Mr. Baker was even further away from the officers than the suspect in *McKenney* (114 feet versus 69 feet[)]; Mr. Baker was standing still and not walking toward the officers." *Id.* at 13. "Mr. Baker was facing towards the Subway, slightly bent over and looking down when he was shot and killed," all facts that the Plaintiffs argue "create an even less sense of immediate danger." *Id.* The Plaintiffs go on to reason that even if Mr. Baker had previously scanned the BB gun over the parking lot "deadly force, even if reasonable at one moment, may become unreasonable in the next if the justification for the use has ceased." *Id.* (quoting *McKenney*, 873 F.3d at 82).

The Plaintiffs further distinguish the cases relied upon by Sgt. Goodman. First, the Plaintiffs say that *Vincent v. Town of Scarborough* is not analogous because the suspect's shooting stance in that case was particularly important, whereas here "[i]t is factually disputed . . . [whether] Mr. Baker ever took up a shooting stance, pointed the BB gun at the officers, or was even holding the BB gun at the time, and the officers never believed Mr. Baker had fired the BB gun." *Id.* at 14.

28

Second, the Plaintiffs distinguish *Fagre v. Parks* because in that case, the First Circuit "found the undisputed facts showed the officer was in immediate danger" but in this case "[it] is the immediate threat facts that are at issue." *Id.* at 14-15.

The Plaintiffs next distinguish the Sixth Circuit case, *DeMerrell v. City of Cheboygan*, 206 F. App'x 418 (6th Cir. 2006), arguing that the suspect in that case advanced toward the officers while pointing a gun at them and acting aggressively, while here "there is no evidence Mr. Baker was advancing on the officers, he did not act aggressively toward anyone in the parking lot, and, most importantly, it is disputed he ever pointed the BB gun at the officers." *Id.* at 15.

Finally, the Plaintiffs distinguish *Thorkelson v. Marceno*, 849 F. App'x 879 (11th Cir. 2021), which "involved a couple hour stand-off in which the suspect repeatedly threatened to kill and shoot the officers and pointed the gun at them," told the officers she had a rifle, and aimed it directly at one of the officers before being shot. *Id.* at 15-16. The Plaintiffs say "[n]one of the above type facts are present (or at least undisputed) in this case." *Id.* at 16.

The Plaintiffs acknowledge they cannot rely on *McKenney's* holding as clearly established law at the time of the events, because *McKenney* post-dates Mr. Baker's death. They point out, however, that *McKenney* adopted the reasoning of the district court "as to why the law was clearly established on April 12, 2014, the date of McKenney's shooting." *Id.* at 19. Thus, "if it was clearly established on April 12, 2014 that an officer violates clearly established law in shooting a suspect 69 feet away with a gun to his side, it was likewise clearly established on April 18, 2017 that [an]

29

officer violates clearly established law when he shoots a suspect from 114 feet away who is unarmed or not pointing the gun at anyone." *Id.* at 20.

The Plaintiffs also distinguish *Kisela* because it involved an "immediacy of a threat" that is not present in this case. *Id.* at 20-21. The Plaintiffs say that "[a]t the time Sergeant Goodman shot and killed Mr. Baker, there were several Circuit Court cases holding clearly established law is violated by shooting a suspect who is holding a weapon in a non-threatening manner." *Id.* at 21-24 (citing *Weinmann v. McClone*, 787 F.3d 444, 450-51 (7th Cir. 2015); *Williams v. Indiana State Police*, 797 F.3d 468 (7th Cir. 2015); *Estate of Escobedo v. Bender*, 600 F.3d 770 (7th Cir. 2010); *Mercado v. City of Orlando*, 407 F.3 1152, 1157-58 (11th Cir. 2005); *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013); *Connor v. Thompson*, 647 F. App'x 231, 233 (4th Cir. 2016)).

Finally, the Plaintiffs assert that Sgt. Goodman's actions were unreasonable under state law. *Id.* at 24. The Plaintiffs say that Maine law follows federal qualified immunity law, and because summary judgment should be denied as to qualified immunity, summary judgment should similarly be denied on all state law claims. *Id.*

## C.    Sergeant Goodman's Reply

In reply, Sgt. Goodman states that there are "no genuine issues of material fact with regard to the reasonableness of [his] belief that Mr. Baker presented an imminent threat of serious harm" nor, Sgt. Goodman argues, can the Plaintiffs "seriously contend that a factual issue exists with regard to whether Mr. Baker was holding his weapon at the time [he] fired." *Def.'s Reply* at 1. Sgt. Goodman argues that in the Complaint the Plaintiffs conceded that Mr. Baker picked the BB gun back up after taking a drink from the beer bottle and that Mr. Baker was in a crouched

position holding the BB gun parallel to the ground below his knees. *Id.* (citing *Compl.* ¶¶ 64-66). Sgt. Goodman asserts that "the Plaintiffs [] never once contended that Mr. Baker was not holding a weapon parallel to the ground at the time Sgt. Goodman took the shot . . . [and] should not be permitted to contradict that admitted fact." *Id.* at 2. Sgt. Goodman says that "[e]very witness who viewed Mr. Baker from the front—including Thomas Robinson—confirmed that Mr. Baker was holding a weapon in the period before the shot was fired" and that "Sgt. Goodman, Officer Knutson, Sgt. Neuslien, and Lt. Doherty all confirmed that Mr. Baker was holding the weapon at the time the shot was fired." *Id.* at 2 (citing *Goodman Dep.* at 81:14-82:7; *Knutson Dep.* at 63:16-22; *Doherty Dep.* at 72:7-73:4; *Neuslien Dep.* at 23:15-23).

Sgt. Goodman submits that "[t]he Plaintiffs' reliance on the statements in Mr. Robinson's declaration to attempt to generate an issue of fact on this point is misplaced" as "Mr. Robinson does not state that Mr. Baker was not holding a weapon at the time the shot was fired–only that he did not see a gun in Mr. Baker's hands." *Id.* (citing *Posey v. Skyline Corp.*, 702 F.2d 102, 106 (7th Cir. 1983)). He also contends that Mr. Robinson could only see Mr. Baker's back and did not see a weapon "because from his vantage point he could not see *anything* Mr. Baker was holding." *Id.* at 3 (emphasis in original).

Sgt. Goodman further submits that "the suggestion that Mr. Baker was not holding the weapon at the time the shot was fired is contradicted by video evidence." *Id.* He says that "[t]he video Mr. Robinson took – in both its "untreated" form and as treated by Officer Chase – clearly shows the butt of the weapon Mr. Baker was

holding extending behind him by his right hip, as Sgt. Goodman identified during his deposition" and, as such, "Mr. Robinson's inability to see does not give rise to a genuine factual issue." *Id.*

Sgt. Goodman also argues that "the record establishes beyond dispute that [he] reasonably believed that Mr. Baker was armed with a high-powered hunting rifle" because Officer Knutson and the 911 callers were not one hundred percent sure it was a BB gun and "Sgt. Goodman himself testified that he was unable to determine whether the weapon was a pellet gun or a rifle [and] believed it was a rifle based on the way it looked and actions by Mr. Baker that were consistent with manipulating a rifle." *Id.* at 4. "In light of that reasonable belief," Sgt. Goodman says, "it is undisputed that [he] acted consistent with his training and department policy." *Id.*

Sgt. Goodman also argues that "[t]here is no competent evidence to suggest that Mr. Baker was not pointing his weapon at the officers when Sgt. Goodman fired." *Id.* "Contrary to the Plaintiffs' suggestion, neither Officer Knutson nor Lt. Doherty testified to that effect." *Id.* "Officer Knutson could not tell exactly where the weapon was pointed, but he did not say it was *not* pointed at him and Sgt. Goodman." *Id.* Sgt. Goodman also submits that "Lt. Doherty did not see Mr. Baker at the moment the shot was fired because his attention was focused on crossing Congress Street and because his view was blocked by a snow bank." *Id.* "In any event," Sgt. Goodman says "it is not – and cannot – be disputed that Mr. Baker had consistently 'scanned' the parking lot – including passing vehicles, occupied restaurants, adjacent open

32

businesses, and the officers' position – with the weapon in the moments leading up to the shot." *Id.* at 5.

Finally, Sgt. Goodman says that "[t]he Plaintiffs have admitted that [he] believed that deadly force was necessary at the time he took the shot to prevent Mr. Baker from killing or seriously injuring the officers present (including Sgt. Goodman) and other innocent people present in the plaza" and that "[u]nder the rules that govern summary judgment, that admission should be considered unqualified." *Id.* In conclusion, Sgt. Goodman reiterates his previous arguments as to why the Court should grant summary judgment in his favor. *See id.* at 6-8

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a

factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a court "views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### A.   Summary Judgment and Qualified Immunity

"The intersection between summary judgment and qualified immunity can be tricky to navigate." *Adle v. Me. Police Dep't*, 279 F. Supp. 3d 337, 349 (D. Me. 2017) (citing *Morelli v. Webster*, 552 F.3d 12, 18 (1st Cir. 2009)).

> The difficulty arises because the summary judgment standard requires absolute deference to the nonmovant's factual assertions (as long as those assertions are put forward on personal knowledge or otherwise documented by materials of evidentiary quality), whereas qualified immunity, when raised on summary judgment, demands deference to the reasonable, if mistaken actions of the movant. In order to ease this inherent tension, we think it wise for courts to cabin these standards and keep them logically distinct, first identifying the version of events that best comports with the summary judgment standard and then asking whether, given that set of facts, a reasonable officer should have known that his actions were unlawful.

34

*Morelli*, 552 F.3d at 18-19 (internal citations omitted).  In a summary judgment motion turning on qualified immunity "the court [is] bound to ask not whether [the officer's account is] plausible, but rather, whether under the plaintiff's version of the facts a reasonable officer should have known that the degree of force used was plainly excessive." *Id.* at 25 (citing *Griffith v. Coburn*, 473 F.3d 650, 656-57 (6th Cir. 2007) ("Because determining reasonableness in [the excessive force] context is such a fact-intensive endeavor summary judgment is improper if the legal question of immunity turns on which version of the facts is accepted")); *see also Adle*, 279 F. Supp. 3d at 350 ("Particularly in assessing a deadly force claim, courts 'may not simply accept what may be a self-serving account by the police officer' where 'the witness most likely to contradict [the officer's] story—the person [he] shot dead—is unable to testify'" (alterations in *Adle*) (quoting *Flythe v. D.C.*, 791 F.3d 13, 19 (D.C. Cir. 2015)).  The Court must therefore "carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts." *Adle*, 279 F. Supp. 3d at 350 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).  "This includes 'the circumstantial evidence that, if believed, would tend to discredit the police officer's story.'" *Id.* (quoting *Flythe*, 791 F.3d at 19).

## V.   DISCUSSION

### A.    Qualified Immunity

"Qualified immunity is a doctrine that shelters government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McKenney v. Mangino*, 873 F.3d 75, 80 (1st Cir. 2017) (quoting *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982)).  The purpose of the doctrine is to "allow public officials to perform discretionary tasks without the constant threat of legal liability," *Morelli*, 552 F.3d at 18, and to protect "all but the plainly incompetent [and] those who knowingly violate the law." *Id.* (alteration in *Morelli*) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The invocation of qualified immunity requires the Court to engage in a two-step analysis. *McKenney*, 873 F.3d at 81; *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018)).

> First, the court must determine "whether the plaintiff's version of the facts makes out a violation of a protected right." [*Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017)].  Second, the court must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (quoting *Matalon v. Hynnes*, 806 F.3d 627, 633 (1st Cir. 2015)).  This second step is itself divisible into two components. To begin, the plaintiff must point to "'controlling authority' or a 'consensus of cases of persuasive authority'" that broadcasts "a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." *Id.* at 76 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).  Then, the court must evaluate "whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." *Id.*

*McKenney*, 873 F.3d at 81.

As the First Circuit has described, "qualified immunity is appropriate in an excessive force case when an officer 'correctly perceive[s] all of the relevant facts but [has] a mistaken understanding' as to the legality of his chosen level of force."[50]

---

[50]     In *Irish v. Maine*, 849 F.3d 521 (1st Cir. 2017), the First Circuit explained that "violation of [police] protocol and training is relevant . . . to the . . . qualified immunity inquir[y]," *id.* at 528, and that the absence of "detail[s] on acceptable police procedures or training, if any," gave the appellate court "pause" in both the motion to dismiss and summary judgment context. *Id.* at 527 (citing *Stamps v. Town of Framingham*, 813 F.3d 27, 32-33 (1st Cir. 2016) ("[W]e emphasized how the officer's decision to keep his finger on the trigger, to keep his weapon 'off safe' at all times, and to point the weapon's muzzle at an innocent civilian's head, rather than in a safe direction, all violated police rules, training,

36

*Morelli*, 552 F.3d at 24 (alterations in *Morelli*) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).   Courts have described the two prongs of the qualified immunity framework as having "overlapping objective reasonableness inquir[ies]." *See  Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009).

### 1.   Step One: Whether Sergeant Goodman Violated Chance Baker's Constitutional Rights

The Court must first determine whether Sgt. Goodman acted unreasonably in his use of force and violated Mr. Baker's Fourth Amendment rights.

### a.   Legal Standard

"When a plaintiff alleges excessive force in effecting an arrest, the federal right at issue is the Fourth Amendment prohibition of unreasonable seizures." *Adle*, 279 F. Supp. 3d at 351 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).  The Fourth

---

and basic firearm safety procedures")).  The First Circuit explained that "if no or few protocols were violated, the officers' chance of successfully asserting qualified immunity may increase, as a reasonable officer may not have known that acting in line with their own standard procedures and training would violate a private citizen's constitutional rights." *Id.* at 528 (citing *Mlodzinski v. Lewis*, 648 F.3d 24, 32 (1st Cir. 2011)).  In *Irish*, the First Circuit concluded that it was impossible to discern whether police protocols were violated as "[n]either party . . . could provide any detail on acceptable police procedures or training" and the appellate court "d[id] not know the steps, if any, that officers should take" under the circumstances. *Id.* at 527-28.  As a result, the First Circuit reversed the district court's dismissal of the case, because it was impossible "to reach any of these conclusions without a fuller development of the facts." *Id.* at 528.  Although *Irish* was before the First Circuit on a motion to dismiss, the First Circuit has considered the role of police policies and procedures in resolving cases before it on summary judgment. *See Stamps*, 813 F.3d at 32-33; *Irish v. Fowler*, 979 F.3d 65, 77 (1st Cir. 2020) (stating, in resolving a motion for summary judgment, that "[a] defendant's adherence to proper police procedures bears on all prongs of the qualified immunity analysis").

As in *Irish*, here there are no facts on the record detailing the Department's policies and procedures than an officer must follow when presented with a scenario such as the one in this case.  Although, both parties merely agree that the Department conducted an investigation and concluded that Sgt. Goodman followed all policies and procedures, the record is silent on the precise contours of those policies and procedures.  Following the First Circuit's lead, the absence of these facts similarly gives the Court "pause." *Irish*, 849 F.3d at 527.  Given the First Circuit's directive that police policies and procedures serve a vital role in resolving qualified immunity cases, the absence of these facts, alone, might be sufficient to preclude summary judgment, although the Court has not based its decision on the absence of these facts given the other disputed material facts in the record that otherwise preclude summary judgment in favor of Sgt. Goodman.

Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.

To succeed in "a Fourth Amendment excessive [or deadly] force claim, a plaintiff must show that the defendant employed force that was unreasonable under all the circumstances." *Morelli*, 552 F.3d at 23. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks partially omitted) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)); *see also Adle*, 279 F. Supp. 3d at 351 (citing *Scott v. Harris*, 550 U.S. 372, 383 (2007)). In assessing reasonableness, the Court must "make allowance for the need of police officers to make split second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." *Parker v. Gerrish*, 547 F.3d 1, 9 (2008) (internal quotation marks omitted); *see also Adle*, 279 F. Supp. 3d at 351 (quoting *Graham*, 490 U.S. at 396-97).

The Supreme Court has identified a non-exhaustive list of factors for determining the objective reasonableness of an officer's use of force: (1) "the severity of the crime at issue;" (2) the degree to which "the suspect poses an immediate threat to the safety of the officers or others;" and (3) whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

38

#### b.      Analysis

In determining whether Sgt. Goodman's use of force was reasonable under the circumstances—and thus whether he violated Mr. Baker's constitutional rights—the Court must balance Sgt. Goodman's interest in preventing harm to himself, other officers, and the public against Mr. Baker's right to be free from deadly force.   In doing so, the Court applies the *Graham* factors and ultimately concludes that there are disputed material facts as to whether Sgt. Goodman's use of force was reasonable and that a factfinder could plausibly conclude that Sgt. Goodman's use of deadly force violated Mr. Baker's constitutional rights.

To begin, the Court notes that the first *Graham* factor—the severity of the crime at issue—is inapplicable in this case as the record is devoid of any mention of criminal activity on Mr. Baker's part or any efforts by the Department to arrest Mr. Baker for committing a crime.[51]   *See Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005) ("Because this situation does not involve a criminal arrest, our facts do not fit neatly within the *Graham* framework"); *Conlogue v. Hamilton*, No. 1:16-cv-296-GZS, 2017 U.S. Dist. LEXIS 187170, at *27 n.29 (D. Me. Nov. 13, 2017) ("The

---

[51]      Sgt. Goodman says that Mr. Baker posed a threat to him, other officers, and passersby by pointing his weapon around a busy commercial parking lot as if scanning for a target. *Def.'s Mot.* at 13.   Even though Sgt. Goodman does not expressly identify the crime, the Court assumes that Mr. Baker's actions, as Sgt. Goodman presents them, must have constituted some type of crime.   But not all crimes, even felonies, justify the use of deadly force.   In *Tennessee v. Garner*, 471 U.S. 1 (1985), the Supreme Court wrote in the context of an escape that "[i]t is not better that all felony suspects die than that they escape." *Id.* at 11.   The *Garner* standard is: "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.*
         The issue for summary judgment purposes, however, is that the Court is not able to decide this motion based on Sgt. Goodman's version of the events.   It may be that possessing and waving a BB rifle in a downtown mall constitutes a crime, even a felony, but if so, Sgt. Goodman does not identify what that crime is and why law enforcement would have had the right to arrest and charge him, much less shoot him.

Court notes that the classic *Graham* factors for assessing the use of deadly force . . . are not readily applicable to situations . . . involving a police stand-off rather than a police pursuit of a person wanted in connection with the commission of a crime"). However, the Court nonetheless applies the second and third *Graham* factors.

### i. Whether Chance Baker Posed an Immediate Threat to the Safety of Officers and Others

The Court begins with the second *Graham* factor and considers whether Mr. Baker posed a threat to Sgt. Goodman, other officers, and the general public. *See Graham*, 490 U.S. at 396. Sgt. Goodman contends that Mr. Baker posed a threat because Mr. Baker was "brandishing a long weapon, holding it in a manner that the weapon could be fired at others at any moment;" he "appeared to be manipulating the bolt area of the firearm;" Sgt. Goodman saw "Mr. Baker level the gun, holding [the weapon] parallel to the ground, and scan it over the Plaza;" Mr. Baker later leveled the weapon at him and Officer Knutson as they crouched behind the truck; and Sgt. Goodman heard someone yell that Mr. Baker was "pulling the trigger." *Def.'s Mot.* at 6-8.

The Plaintiffs respond that several key facts are in dispute: (1) whether Mr. Baker was "aiming [the gun] at people as opposed to waving it at passing cars;"[52] (2) whether a member of the crowd yelled that Mr. Baker was pulling the trigger; and (3) whether Mr. Baker leveled the gun in Sgt. Goodman and Officer Knutson's

---

[52]   Plaintiffs dispute that dispatch told law enforcement that people were reporting that Mr. Baker was "aiming [the gun] at people." *Pl.'s Opp'n* at 10. Instead, they say dispatch received information that Mr. Baker was "waving [the gun] a[t] passing cars." *Id.*

direction just before he was shot.[53]  *Pls.' Opp'n* at 10.  The Court agrees with the Plaintiffs that these factual issues have been placed in dispute.  Viewing the evidence in the light most favorable to the Plaintiffs, a factfinder could reasonably conclude that Mr. Baker did not pose an immediate threat to Sgt. Goodman, other officers, or members of the public and that Sgt. Goodman's use of deadly force was unreasonable.

First, even assuming that Mr. Baker was holding a rifle rather than a BB gun,[54] there is a genuine issue of material fact as to whether Mr. Baker was wielding the gun in a threatening manner at, or just prior to, the moment he was shot.  Sgt. Goodman claims that Mr. Baker was aiming the weapon at people and cars and scanning the crowd repeatedly.  *Def.'s Mot.* at 6-7.  The Plaintiffs, on the other hand, dispute this characterization, claiming that Mr. Baker was merely waving the gun around.  *Pls.' Opp'n* at 10.  These dual characterizations create a genuine dispute of

---

[53]   The Plaintiffs also state that "[t]here are factual disputes as to whether Mr. Baker was holding . . . the BB gun," *Pls.'s Opp'n* at 7, and emphasize that Mr. Robinson did not see Mr. Baker holding a gun.  *Id.* at 5.  The Court agrees with Sgt. Goodman that this does not raise a genuine dispute of material fact in light of Mr. Robinson's testimony that he did not *see* Mr. Baker hold a gun (which does not mean that he was not holding one in light of the fact that Mr. Baker's back was to Mr. Robinson), and Lt. Doherty's testimony that he saw Mr. Baker holding a gun seconds before he was shot.  However, the Court does accept that there is a genuine dispute as to how Mr. Baker was holding the BB gun at the time Sgt. Goodman shot him.

[54]   Although Mr. Baker was holding a BB gun instead of a rifle, this alone does not render Sgt. Goodman's use of force unreasonable.  *See, e.g.*, *Thorkelson v. Marceno*, 849 F. App'x 879, 883 (11th Cir. 2021) (concluding that qualified immunity applied where it was unclear whether the suspect was holding a BB gun or a rifle and where the suspect was pacing, telling the officers that she was going to shoot them, refused to comply with warnings, and raised the gun to her shoulder with her finger on the trigger and aimed at one of the officers).  In light of Sgt. Goodman's training that he was "instructed to treat a weapon that looks like a genuine firearm as a firearm and not to assume it is anything but that," DSMF ¶ 6; PRDSMF ¶ 6, the similarities between Mr. Baker's weapon and a real rifle, *Goodman Aff.*, Attach. 1, *Goodman Aff. Ex. 1*, the lack of consensus among 911 callers as to whether Mr. Baker was holding a BB gun and not a rifle, and Sgt. Goodman's own inability to decipher the gun from a distance, no reasonable jury could conclude that Sgt. Goodman acted unreasonably in assuming that Mr. Baker's weapon was, in fact, a rifle.  However, that does not end the Court's inquiry, as Sgt. Goodman may have nonetheless acted unreasonably in his use of deadly force, even assuming that Mr. Baker was holding a rifle.

41

material fact, because a factfinder, viewing the evidence in the light most favorable to the Plaintiffs, could conclude that Mr. Baker was waving the gun around in a non-threatening manner consistent with his intoxication, but not, as Sgt. Goodman contends, consistent with the intent of aiming it at, or honing in on, particular people or cars. Ultimately, whether Mr. Baker was "scanning" the crowd, using the weapon to aim at individual people, versus waving the weapon around in a disoriented manner, is an issue for a factfinder, not this Court, to resolve.

Second, there is a genuine issue as to whether Mr. Baker was capable of firing the weapon at any moment based on Mr. Baker's positioning of the gun and whether his finger was on the trigger. Sgt. Goodman asserts that Mr. Baker was "capable of firing the weapon at others at any moment" but also testified that he could not remember if he ever saw Mr. Baker's finger on the trigger. *Def.'s Mot.* at 7; *Pls.' Opp'n* at 10. Given the discrepancy in testimony, a reasonable jury could plausibly conclude that Mr. Baker did not have his finger on the trigger and was not capable of firing at that moment. *Contra Vincent v. Town of Scarborough*, No. 02-239-P-H, 2003 U.S. Dist. LEXIS 20910, at *59 (D. Me. Nov. 20, 2003), *adopted by*, 2003 U.S. Dist. LEXIS 22934 (D. Me. Dec. 19, 2003)) (concluding that an officer's use of force was reasonable where the suspect "appeared to be ready to fire at someone" because the suspect cocked the hammer of his rifle, put his finger on the trigger, and assumed a "shooter's stance" with the rifle to his shoulder).[55] This issue should be reserved for a jury

---

[55]     Sgt. Goodman cites *Vincent v. Town of Scarborough*, 2003 U.S. Dist. LEXIS 20910, as analogous and contends that "[t]he reasoning applied by the Court in *Vincent* is directly applicable to the claims against Sgt. Goodman" because here too a fatal mistake cannot form the basis of a constitutional violation if, based on what the officer knew at the time, the use of force was objectively

because the credibility of Sgt. Goodman's testimony as to how Mr. Baker was holding the weapon is central to the reasonableness of Sgt. Goodman's use of deadly force.

Similarly, key disputes persist as to how Mr. Baker was holding the weapon. Sgt. Goodman asserts that Mr. Baker was holding the gun at waist level and parallel to the ground, DSMF ¶ 48, while Lt. Doherty testified that at all times Mr. Baker was visible to him, he saw Mr. Baker holding the weapon vertically with the butt to the ground and the barrel to the sky. PRDSMF ¶ 49. There is some dispute as to Lt. Doherty's line of sight and focus on Mr. Baker while he crossed Congress Street; however, based on his dash camera video, a reasonable jury could conclude that Lt. Doherty could see Mr. Baker until approximately 11:19:25, *see Doherty Cruiser Video*, mere moments before Sgt. Goodman fired, and that he therefore could have plausibly seen Mr. Baker hold his weapon vertically just prior to being killed. What Lt. Doherty could or could not see and the credibility of his testimony is an issue for a factfinder that precludes granting summary judgment.

Additionally, there is a material dispute as to where Mr. Baker was pointing the gun at the time Sgt. Goodman fired the shot. Sgt. Goodman asserts that Mr. Baker was aiming the gun at himself and Officer Knutson. *Def.'s Mot.* at 7. However, Plaintiffs refute this with evidence that Officer Knutson could not tell what direction

reasonable. *Def.'s Mot.* at 9-10. While the Court agrees that the fact that Mr. Baker had a BB gun instead of a rifle does not automatically make Sgt. Goodman's actions unreasonable, the Court disagrees as to degree of similarity between this case and *Vincent* and easily distinguishes *Vincent*.

Although *Vincent* took place in a shopping plaza, as this case does, and involved a suspect armed with a gun, the similarities end there. *Vincent* involved a four-hour stand-off with a suspect who was agitated and pacing back and forth. *Vincent*, 2003 U.S. Dist. LEXIS 20910 at *45-48. The *Vincent* suspect engaged with the police officers and lifted his gun in a shooter's stance with his right hand on the trigger and his left hand on the lever of the gun. *Id.* Viewed in the light most favorable to the Plaintiffs, none of these threat indicators is present in this case.

the gun was pointing in, that Lt. Doherty and Sgt. Neuslein never saw Mr. Baker point the gun at anyone, and video evidence[56] that Mr. Baker's body was oriented away from Sgt. Goodman and Officer Knutson and he was looking down at the time he was killed.  *See C.V. ex rel Villegas v. City of Anaheim*, 823 F.3d 1252, 1256 (9th Cir. 2016) (concluding that summary judgment was inappropriate where officers presented inconsistent testimony on a suspect's behavior with a weapon).

In the light most favorable to the Plaintiffs, Mr. Baker's orientation away from Sgt. Goodman and Officer Knutson in Mr. Robinson's video is consistent with Lt. Doherty, Sgt. Neuslein, and Officer Knutson's testimony, and the videotape evidence, which can reasonably be interpreted in various ways.  A reasonable jury could conclude that it is unlikely that Mr. Baker was pointing his weapon threateningly in a different direction than how his body was oriented.  At a minimum, where Mr. Baker was pointing the BB gun is a disputed material fact that should be resolved by a factfinder and not by this Court on summary judgment.  *See Weinmann v. McClone*, 787 F.3d 444, 449-50 (7th Cir. 2015) (concluding that summary judgment is not appropriate where it is disputed how the plaintiff was holding the gun at the time the officer fired at him).

Even if Mr. Baker was gripping the gun horizontally across his body with the barrel pointed in the direction of Officer Knutson and Sgt. Goodman, a jury could still

---

[56]    Sgt. Goodman asserts that Mr. Robinson's video "establishes beyond dispute that the butt end of a firearm can be seen protruding behind Mr. Baker when the shot was fired, which indicated that the gun was pretty level in the officers' direction."  DRPSAMF ¶ 11.  How Mr. Baker was holding the gun, where it was pointed, and the location of the butt and muzzle of the gun are, however, far from "beyond dispute."  Due to the color and shape of Mr. Baker's jacket and Mr. Robinson's vantage point it is unclear from the video where the gun is, let alone where it is pointed.

reasonably conclude that Mr. Baker did not present a threat justifying deadly force because it could find that his body was angled away from Officer Knutson and Sgt. Goodman, that he was bent over and unmoving, that he was looking down, and that he was not gripping the weapon in a shooting stance. *Contra Vincent*, 2003 U.S. Dist. LEXIS 20910, at *48, 58-59 (holding that an officer acted reasonably in using deadly force where the suspect had his right hand on the trigger guard and the lever of the rifle, his left hand on the upper stock, and pointed the rifle directly at officers).

Third, there is a genuine dispute of material fact as to whether Sgt. Goodman heard a bystander state that Mr. Baker was about to pull the trigger. *Def.'s Mot.* at 8. Officer Knutson stated that he never heard a bystander yell this warning but only heard someone say something about a trigger click. *Pls.' Opp'n* at 10. Whether Sgt. Goodman or Officer Knutson's testimony is more accurate and should be believed is an issue for a factfinder to resolve. *See C.V. ex rel Villegas*, 823 F.3d at 1256, n.3 (noting that the resolution of inconsistencies in officers' testimony is a "quintessential jury question").

For the purposes of summary judgment, a jury could plausibly conclude that a bystander never yelled that Mr. Baker was pulling the trigger, which casts doubt on the objective reasonableness of Sgt. Goodman's use of deadly force. While Sgt. Goodman may have subjectively believed that he was in danger, his subjective belief is immaterial for the purposes of the Court's Fourth Amendment analysis. *See, e.g.*, *Graham*, 490 U.S. at 397 ("As in other Fourth Amendment contexts, . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is

45

whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regards to their underlying intent or motivation. . . An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional"); *Weinmann*, 787 F.3d at 449.

Fourth, a reasonable factfinder could conclude that Mr. Baker posed no immediate threat to the public or, more precisely, that the level of immediate threat did not justify the use of deadly force.  While neither party disputes that there were people moving about the Plaza and in the Subway restaurant and nail salon, Sgt. Goodman points to the woman who walked by Mr. Baker as evidence that "the public [was] well within range of what [he] believed was deadly force."  *Def.'s Mot.* at 14. However, a reasonable jury could also interpret this incident as evidence that the threat that Mr. Baker posed to the public did not justify the use of deadly force as Mr. Baker never responded to the woman in a threatening manner, or in any way at all, and the woman never changed her trajectory upon seeing Mr. Baker, which the jury could reasonably be interpreted as her not feeling threatened by Mr. Baker's presence.  *Compare Glenn v. Washington Cty.*, 673 F.3d 864, 873 (9th Cir. 2011) (concluding that officers were not entitled to qualified immunity in part because the victim "was not in a physical altercation with anyone, he was not threatening anyone with the [weapon] and no one was trying to get away from him" (internal quotation marks and alterations omitted)), *with Kisela v. Hughes*, 138 S. Ct. 1148, 1151, 1154

(2018) (concluding that an officer reasonably believed that a suspect was a threat where she was standing with a knife within six feet of another person after police received reports of a person attacking a tree with a knife).

This conclusion is consistent with Lt. Doherty's dash camera footage which shows a figure, at approximately 11:18:10 AM, walk toward Mr. Baker, stand near him for approximately thirty seconds, and then, at approximately 11:18:50 AM, walk into the Subway restaurant.  While the camera is some distance away, a reasonable factfinder could find no indications of a public threat during those thirty seconds and conclude that Mr. Baker did not appear to move aggressively or with any speed.

While Sgt. Goodman asserts that Mr. Robinson was concerned enough about Mr. Baker that "he backed out of the parking lot and used another entrance rather than risk driving past Mr. Baker." *Def.'s Reply* at 2.  The Court concurs that this is one way of looking at what Mr. Robinson did.  However, viewing this fact in the light most favorable to the Plaintiffs, Mr. Robinson's decision to reenter the Plaza, rather than leave the area entirely, could similarly be interpreted as Mr. Robinson not feeling threatened by Mr. Baker's presence.

Finally, while the record reflects that there were people in the Subway restaurant and Nail Salon, there is nothing to suggest that Sgt. Goodman or other officers attempted to clear these areas or warn the public to stay in a safe location, which a reasonable jury could interpret as evidence that Mr. Baker was not an imminent threat. *See Vincent*, 2003 U.S. Dist. LEXIS 20910, at *36 (officer instructed

customers in a plaza to "stay inside, get down and stay away from the windows" while a man armed with a rifle within range of the stores marched back and forth outside).

Taking these disputed facts together in the light most favorable to the Plaintiffs, a reasonable jury could conclude that whatever threat Mr. Baker posed to Sgt. Goodman, other officers or the public did not justify the use of deadly force because, although he may have been waving the gun in a disoriented manner, a factfinder could find that Mr. Baker never "scanned" the crowd and never aimed the gun at anyone in the plaza, including Sgt. Goodman and Officer Knutson. A reasonable jury could conclude that Mr. Baker remained stationary near the Subway and was angled away from Sgt. Goodman and Officer Knutson with a bent over body position.

Additionally, the video footage does not suggest that Mr. Baker made any sudden movements in the seconds before he was shot. From the time Mr. Baker becomes visible on Lt. Doherty's dash camera, beginning at 11:18:10, until 11:19:25, when his body becomes obscured by the snowbank, milliseconds before he was shot at 11:19:29, Mr. Baker remains in the same location and appears unmoving. *Doherty Cruiser Video* at 11:18:10-11:19:25; *see McKenney*, 873 F.3d at 79 (upholding the denial of summary judgment where a suspect began walking toward an officer but was not making any "sudden or evasive movements and was not pointing his gun at anyone"). The parties further agree that Mr. Baker never made any verbal threats and never fired his weapon. Moreover, taking the evidence in the light most favorable

to the Plaintiffs, Mr. Baker never put his finger on the trigger.  On balance, a reasonable factfinder could conclude that Mr. Baker posed no imminent threat.[57]

### ii.  Whether Chance Baker Resisted Arrest

The Court next considers the third *Graham* factor: whether Mr. Baker resisted arrest.  To begin, the parties agree that Mr. Baker never responded to any of the warnings given to him by Sgt. Goodman or Officer Knutson.  However, taking the facts in the light most favorable to the Plaintiffs, a reasonable jury could conclude that, under the circumstances, Mr. Baker's failure to respond was not "resisting arrest."

Courts have differentiated cases where a suspect has not responded to police in any way from those where a suspect has demonstrated an understanding of police presence and purposefully ignored it or demonstrated other resistant behavior. *Compare McKenney*, 873 F.3d at 78-79 (concluding that the denial of summary judgment was appropriate where a suspect was twice directed to put down his gun but did not respond and had a "vacant stare and appeared 'not at home' mentally"), *and Mercado*, 407 F.3d at 1157 (concluding that "Mercado was not actively resisting arrest" because "there is no evidence that he struggled with the police"), *with Roy v. Inhabitants of Lewiston*, 42 F.3d 691, 696 (1st Cir. 1994 ) (describing how the plaintiff "tried to kick and strike at the officers . . . [and] disobeyed repeated instructions to put down the weapons"), *Conlogue*, 2017 U.S. Dist. LEXIS 187170, at *13-16

---

[57]     At the same time, it would be equally plausible for a reasonable factfinder to find any or all of these disputed factual issues in favor of Sgt. Goodman.  But this is not the standard for summary judgment.

(describing a suspect's threatening fixation on police officers, in that he was pointing at officers with his fingers like a gun, drew what the officers understood to be "a line in the sand" between himself and the officers, and was yelling obscenities in response to instructions), *Adle*, 279 F. Supp. 3d at 345-46 (stating that a suspect was "mostly unresponsive but he did say 'no' and shake his head in response to requests that he put down the knife" and later began swiping his knife through the air and saying words to the effect of "I'll cut you"), *and Vincent*, 2003 U.S. Dist LEXIS 20910, at *52-53 (finding that an officer acted reasonably where the suspect "appeared to understand that the officers wanted him to put his gun down" but was refusing to do so).

Here, Mr. Baker never acknowledged the officers or gave any recognition that they were attempting to get him to disarm, which aligns with the facts of *McKenney* and *Mercado*, where failure to respond was not considered resistance, rather than *Roy*, *Conlogue*, *Adle*, and *Vincent*, where there were indicia that the suspect understood the warning and consciously chose to ignore it.  Moreover, there is no evidence on the record that Mr. Baker attempted to flee nor was Mr. Baker wanted for any crimes.  *See Glenn*, 673 F.3d at 873 (emphasizing the "context-specific" nature of the reasonable-force analysis, which considers more than "the single fact that the suspect was armed").

While Mr. Baker did not heed Sgt. Goodman's and Officer Knutson's warnings, a jury could nonetheless conclude that Mr. Baker was not resisting arrest because

the clarity and context of the warnings are disputed in light of Mr. Baker's intoxicated state, which was known to Sgt. Goodman at the time.[58]

First, the parties dispute the volume of Sgt. Goodman's warnings to Mr. Baker. Although Sgt. Goodman contends that he "yelled" to Mr. Baker, DSMF ¶¶ 40, 42, the Plaintiffs cite deposition testimony from Officer Knutson in which he recalled Sgt. Goodman's initial warnings to Mr. Baker as being loud, but could not recall whether the warnings just prior to Sgt. Goodman taking the shot were of a similar volume. *Knutson Dep.* at 46:2-24. Additionally, Mr. Robinson, who had his car window down at the time of the shooting, stated that he did not hear anyone yell commands to Mr. Baker prior to Sgt. Goodman taking the shot. PSAMF ¶ 10 (citing *Robinson Aff.* ¶ 13); DRPSAMF ¶ 10. Under the circumstances a reasonable juror could conclude that Mr. Baker could not hear Sgt. Goodman's warnings because Mr. Robinson did not hear anything, and Officer Knutson could not recall Sgt. Goodman's tone of voice despite being able to recall that Sgt. Goodman's initial warnings were "yelled." The credibility of various witnesses and what they heard and can recall is a factual issue for the jury.

Additionally, there are material disputes as to the contents of Sgt. Goodman's warning. The record reflects that at some point, Officer Knutson believed that he recognized Mr. Baker as Adam Ruffino, informed Sgt. Goodman of this, and that Sgt. Goodman began calling Mr. Baker "Adam" in his commands, although Officer

---

[58]     Sgt. Goodman differentiates *McKenney* on the grounds that "Mr. Baker consistently exhibited non-compliant and threatening behavior in the face of efforts by Sgt. Goodman to de-escalate the situation." *Def.'s Mot.* at 14. However, as the Court explains, there are disputes as to the clarity of the warning and the reasonableness of Mr. Baker's ability to comprehend it given his intoxicated state.

Knutson could not recall whether this occurred before or after Mr. Baker set his weapon down against the Subway restaurant wall. PSAMF ¶ 27; DRPSAMF ¶ 27; *Knutson Dep.* at 43-48. In the light most favorable to the Plaintiffs, a reasonable juror could conclude that even if Sgt. Goodman did give Mr. Baker a warning, the warning was ineffective because Sgt. Goodman was calling Mr. Baker by the wrong name, and it was therefore reasonable that Mr. Baker did not respond to Sgt. Goodman's commands. The significance of Sgt. Goodman calling Mr. Baker "Adam" is an issue to be resolved by a factfinder, not this Court, as a reasonable factfinder could plausibly conclude that such a warning was inadequate. *Cf. Begin v. Drouin*, No. 1:16-cv-00092-JCN, 2017 U.S. Dist. LEXIS 60160, at *23 n.15 (D. Me. Apr. 20, 2017) ("To the extent Defendants contend that the "hey, hey, hey" Defendant Drouin yelled at Plaintiff just before she discharged her weapon constitutes a command to stop, whether the directive was a command to stop . . . [is a] factual issue[] for the fact finder to decide").

Additionally, the record shows that Mr. Baker was stumbling and unsteady and that Mr. Robinson, Sgt. Goodman, and Officer Knutson all reported or observed signs that Mr. Baker was intoxicated. *See* PSAMF ¶¶ 3, 18, 47; DRPSAMF ¶ 3, 18, 47. In light of Mr. Baker's apparent intoxication, a reasonable jury could further conclude that a warning calling Mr. Baker by the wrong name was ineffective. *See Glenn*, 673 F.3d at 876 (concluding that an officer was not entitled to qualified immunity where the decedent "may not have heard or understood the[] warnings

because he was intoxicated and there were other people yelling" (internal citation and quotation marks omitted)).

In sum, a reasonable jury could find that Mr. Baker never resisted arrest because he never attempted to flee and remained in the same spot until he was shot. Moreover, Mr. Baker's failure to respond was consistent with his intoxication and may not have been not unreasonable given that Sgt. Goodman was addressing him as "Adam."

### iii.    Summary

Ultimately, a reasonable factfinder could plausibly conclude that, under *Graham*, Mr. Baker was neither a threat nor resisting arrest and that Sgt. Goodman's use of deadly force was in violation of Mr. Baker's Fourth Amendment rights.[59]

---

[59]     In addition to *Vincent v. Town of Scarborough*, Sgt. Goodman cites *Fagre v. Parks*, *DeMerrell v. City of Cheboygan*, and *Thorkelson v. Marceno*, to support his argument that he did not violate Mr. Baker's Constitutional rights. However, each of these cases is distinguishable from the present case when viewing the record in the light most favorable to the Plaintiffs.

First, *Fagre v. Parks*, 985 F.3d 16 (1st Cir. 2021), is readily distinguishable on its facts. In *Fagre* officers found a woman in the passenger seat of a truck and suspected that she and the driver were breaking into homes in the area. *Id.* at 19. One of the officers saw a suspect (who turned out to be the driver) heading back toward the truck and briefly exchanged gunfire with the suspect. *Id.* at 20. A second officer heard the gunshots. *Id.* The second officer saw the truck driving toward him and, believing that the driver intended to ram him with deadly force, fired several shots into the truck killing the passenger. *Id.* In his motion, Sgt. Goodman highlights that "[t]he First Circuit rejected the argument made by the passenger's estate that the vehicle presented no immediate danger to the officer: '[The plaintiff's] argument that [the officer] was not in immediate danger because the Durango did not hit him and appeared to turn slightly away from him before hitting the cruiser was not persuasive. It relies on the "20/20 vision of hindsight," not the "perspective of a reasonable officer at the scene."'" *Def.'s Mot.* at 11 (quoting *Fagre*, 985 F.3d at 24). In *Fagre* it was objectively reasonable for an officer to believe that he was in danger when faced with an oncoming truck that appeared to be headed straight for him, knowing that the driver of the truck had previously exchanged fire with another officer. Here, however, a jury could find that Sgt. Goodman did not act in an objectively reasonable manner because there was no altercation between Mr. Baker and the officers or any members of the public that would reasonably lead Sgt. Goodman to believe that Mr. Baker was attempting to hurt someone. Additionally, unlike the driver in *Fagre*, Mr. Baker was not moving quickly or aggressively toward Sgt. Goodman or anyone else, but instead remained in the same spot by the Subway restaurant entrance.

Second, in *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 421 (6th Cir. 2006), officers shot a suspect who had previously stabbed his girlfriend twice and was holding a weapon that turned out

## 2.    Step Two: Clearly Established Law

Under the second prong of the qualified immunity analysis, the Court must analyze the legal landscape at the time of the constitutional violation and determine whether the law "clearly establishes" a constitutional right.  "A clearly established right is one sufficiently defined at a level of specificity that would put a state actor (such as a police officer) on fair notice that his specific actions offended the constitution."  *Morelli*, 552 F.3d at 23.

For law to be "clearly established" it "must be particularized to the facts of the case," *McKenney*, 873 F.3d at 82 (quoting *White*, 137 S. Ct. at 552), meaning that the court "should not over-rely on precedents that are 'cast at a high level of generality.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).  However, "there need not be 'a case directly on point' to satisfy the second step of the qualified immunity paradigm,'" *id.* at 82-83 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)), and

---

to be a pellet gun.  The suspect was agitated, waving the weapon around and taunting the officers, and eventually raised the weapon, pointing it at the officers while advancing towards them.  *Id.*  Sgt. Goodman cites the Sixth Circuit's emphasis that DeMerrell had advanced on the officers with the gun pointed at them and had refused to comply with demands to drop the weapon.  Sgt. Goodman notes that the fact that the weapon turned out to be a pellet gun did not preclude summary judgment in *DeMerrell*.  *Def.'s Mot.* at 11-12.  *DeMerrell* is factually distinguishable because the suspect was agitated, pointed his weapon at the officers, and advanced on them.  As discussed previously, viewed in the light most favorable to the Plaintiffs, a reasonable jury could conclude that Mr. Baker never pointed his weapon at Sgt. Goodman and Officer Knutson, nor is there evidence that Mr. Baker advanced towards either officer in a threatening manner.

Third, in *Thorkelson v. Marceno*, 849 F. App'x 879 (11th Cir. 2021), the Eleventh Circuit granted qualified immunity when officers fired upon a woman armed with a weapon that officers could not distinguish as a BB gun or a rifle.  While *Thorkelson* is similar to this case in that Thorkelson and Mr. Baker held some sort of weapon, and there was disagreement as to whether it was a BB gun or rifle, *Thorkelson* is otherwise distinguishable.  The suspect in *Thorkelson* was agitated and aggressive, pacing on the porch, yelling to the officers that she was going to shoot and kill them, and eventually raising the gun to her shoulder with her finger on the trigger, aiming directly at one of the officers. *Id.* at 881.  In particular the Eleventh Circuit noted her erratic behavior, her refusal to disarm, and her repeated threats to kill and shoot the officers, and it was in light of these circumstances that it found that the officer was not required "to wait 'and hope for the best'" to determine whether she was holding a BB gun or rifle.  *Id.* at 882-83.

may instead be established by a "consensus of cases of persuasive authority." *Id.* at 81 (quoting *Alfano*, 847 F.3d at 75); *Adle*, 279 F. Supp. 3d at 351 ("A 'case presenting the same set of facts' is not necessary, however, to hold that defendants 'had fair warning'" (quoting *Mlodzinski v. Lewis*, 648 F.3d 24, 38 (1st Cir. 2011)); *see also McKenney v. Mangino*, No. 2:15-cv-00073-JDL, 2017 U.S. Dist. LEXIS 55649, at *25 (D. Me. Apr. 12, 2017) ("Courts should . . . look to cases that analyze similar circumstances, such as whether a suspect is armed, the suspect's conduct and proximity to the officer, and warnings given by the officer, to determine whether a reasonable officer would be on notice that his or her actions in a particular factual scenario would fall outside the bounds of the Constitution").

"The test is whether existing case law has 'placed the statutory or constitutional question beyond debate.'" *McKenney*, 873 F.3d at 83 (quoting *al-Kidd*, 563 U.S. at 741). Ultimately, "[w]hat counts is whether precedents existing at the time of the incident 'establish the applicable legal rule with sufficient clarity and specificity to put the official on notice that his contemplated course of conduct will violate that rule.'"[60] *Id.* (quoting *Alfano*, 847 F.3d at 76)); *see Adle*, 279 F. Supp. 3d at 351 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

---

[60]   Sgt. Goodman argues "[t]here were no decisions between May of 2010 and February 18, 2017 from either the Supreme Court or the First Circuit to suggest an evolution of Fourth Amendment law that would have placed the constitutional question presented by the circumstances in which Sgt. Goodman acted 'beyond debate.'" *Def.'s Reply* at 6.  However, First Circuit case law is not required to demonstrate "clearly established law." *Begin v. Drouin*, 2017 U.S. Dist. LEXIS 60160, at *19 n.11 ("Plaintiff is not required to identify a First Circuit case with the same or similar facts to provide notice to Defendants of Plaintiff's Rights) (citing *McCue v. City of Bangor*, 838 F.3d 55, 64 (1st Cir. 2016) ("We have also looked to the case law of sister circuits in determining whether a right was clearly established"); *Mlodzinski v. Lewis*, 648 F.3d 24, 38 (1st Cir. 2011) ("Even without a First Circuit case presenting the same set of facts, defendants would have had fair warning that given the circumstances, the force they are alleged to have used was constitutionally excessive")).

### a.      The Legal Landscape as of February 18, 2017

Viewing the evidence in the light most favorable to the Plaintiffs, the question presented is whether a reasonable officer in Sgt. Goodman's position would have understood that he violated the Fourth Amendment by using deadly force against a seemingly intoxicated individual holding a gun who was approximately 114 feet away from the officer; who had been warned earlier to drop his gun and did not respond in any way to the warnings; had previously waved the weapon around but had not pointed it at the officers or members of the public, had not threatened anyone with the gun or made any sudden moves; remained in the same place throughout the duration of the event; and who was bent over, looking down, and facing away from the officer at the time he was shot.

### i.      First Circuit Case Law

In *McKenney v. Mangino*,[61] the First Circuit upheld the district court's conclusion that an officer was not entitled to qualified immunity. Police received a call from the plaintiff's wife informing them that he was threatening suicide, was aggressive and had access to firearms. 873 F.3d at 78. When police arrived, they found McKenney in the front of the house holding a gun. *Id.* Officers twice directed McKenney to put down the gun, which he refused to do. *Id.* McKenney proceeded to enter and exit the house several times with his gun dangling from his hand. *Id.* When McKenney was approximately 100 feet from the officers, he raised the gun over his head and then lowered it without firing. *Id.* at 78-79. Officers testified that he

---

[61]     *McKenney* was decided October 6, 2017, after Mr. Baker was shot. However, the case analyzed clearly established law as of April 2014.

had a "vacant stare and appeared 'not at home' mentally." *Id.* McKenney began walking slowly toward the officers, without pointing his gun or making sudden or evasive movements, and officers fired on him when he was sixty-nine feet away. *Id.* at 79.

The First Circuit agreed with the district court that "well-settled precedents address[ed] the lawfulness of using deadly force against an individual who was suicidal, armed, slow in gait, some distance away from the officer, and had received no commands or warnings for several minutes." *Id.* at 83. In particular, the First Circuit noted the officer's ability to consider "McKenney's suicidality, the slowness of his gait, the clear visibility, the fact that six minutes had elapsed since any officer had last ordered McKenney to drop his weapon, the fact that nobody had warned McKenney that deadly force would be used if he failed to follow police commands, and the six-minute gap between when McKenney raised his gun skywards and when the defendant pulled the trigger," before assuming the situation warranted deadly force. *Id.* at 84.

In *Roy v. Inhabitants of Lewiston*, the First Circuit affirmed the district court's conclusion that officers were entitled to qualified immunity after shooting a man armed with two knives. Two officers were dispatched to Mr. Roy's residence after receiving reports of a domestic violence incident. 42 F.3d at 693. When officers arrived, they found Mr. Roy intoxicated. *Id.* Officers also learned that a third officer was on his way to Mr. Roy's house to serve a summons on Mr. Roy for an assault complaint made against him earlier in the day. *Id.* After refusing the summons, Mr.

Roy became upset, reentered his home, and returned wielding two steak knives. *Id.* Mr. Roy "advanced [toward the officers], flailing his arms while continuing to hold the knives." *Id.* Officers repeatedly warned Mr. Roy to drop the knives and attempted to distract and disarm him. *Id.* An officer eventually fired on Mr. Roy when he made a "kicking-lunging motion" within a couple of feet of two officers. *Id.* In its affirmance, the First Circuit noted that Mr. Roy was armed, he had tried to "kick and strike at the officers; he disobeyed repeated instructions to put down the weapons;" and the officers reasonably believed that Mr. Roy was capable of assault, in part based on the complaint made against him earlier that same day. *Id.* at 693, 696.

### ii.   District of Maine Case Law

In *Vincent v. Town of Scarborough*, the district court affirmed the Magistrate Judge's recommendation that officers were entitled to qualified immunity after multiple officers fatally shot an armed gunman who was agitatedly pacing back and forth in a plaza with stores, and who eventually assumed a shooting stance, pointing his gun directly at police officers. 2003 U.S. Dist. LEXIS 20910, at *45, 58-59. The Magistrate Judge concluded that no reasonable trier of fact could conclude that any of the officers used excessive force in light of the gunman assuming a shooter's stance and pointing his weapon directly at the officers. The district court reasoned that even though the officers made a mistake in thinking the suspect fired his rifle, "a fatal mistake . . . does not form the basis for a Fourth Amendment violation if the use of force is objectively reasonable based on the facts and circumstances known to the officer at the time." *Id.* at *110-11.

In *Norton v. City of Portland*, 831 F. Supp. 2d 340 (D. Me. 2011), the district court held that a police officer's use of deadly force was objectively reasonable and the officer was entitled to qualified immunity when the officer fired upon a suspect with mental health issues who was threatening suicide and exited his home carrying two knives after a four-hour stand-off with police officers. *Id.* at 348-49, 354-57. Despite warnings from officers, the suspect "mov[ed] continuously in the direction of [one of the officers]" and officers fired on him when he got within approximately fifteen feet of one of the officers. *Id.* at 356-57. The Court concluded that "[g]iven this totality of circumstances, any reasonable officer on the scene would necessarily have perceived [the suspect] as acting expressly in accordance with his stated plan, which was to 'get violent' and do whatever was necessary to make officers use deadly force against him." *Id.* at 364.

### iii.    Other Circuit Court Case Law

In *Weinmann v. McClone*, the Seventh Circuit affirmed the district court's determination that an officer was not entitled to qualified immunity where the officer kicked down a door and shot a suicidal individual who was not resisting arrest or threatening anyone else. Police received a 911 call from Weinmann's wife that her husband was in the garage and attempting to kill himself. 787 F.3d at 446. When the officer arrived, he heard a sound coming from the garage and kicked down the door. *Id.* Weinmann was in a lawn chair with the gun resting on the armrests. *Id.* at 447. Weinmann argued that he never pointed his gun at the officer or did anything that could be perceived as threatening, although the officer stated that he perceived the weapon as being pointed in his direction. *Id.* The officer shot Weinmann four

times.  *Id.*  The Seventh Circuit rejected the officer's argument that he reasonably believed he was in danger given the circumstances and positioning of the gun, because it was disputed how Weinmann was holding the gun at the time the officer fired.  *Id.* at 449 ("It does not matter for purposes of the Fourth Amendment that [the officer] subjectively believed that his life was in danger. The test is an objective one, and taking the facts as [Weinmann] presents them, it is not met").

In *Glenn v. Washington County*, the Ninth Circuit reversed the district court's grant of summary judgment, holding that an officer was not entitled to qualified immunity where the officers fatally shot, within four minutes of their arrival on the scene, an agitated and intoxicated 18-year-old who was threatening to kill himself with a knife.  673 F.3d at 868.  The decedent was not threatening anyone and none of his family members was attempting to get away from him, but he was holding a knife to his own neck.  *Id.*  After screaming several warnings, officers fired several beanbag rounds.  *Id.* at 869.  The decedent attempted to move away from the beanbag fire, at which time the officers fired their semiautomatic weapons.  *Id.*  The Ninth Circuit concluded that "although [the decedent] did not respond to officers' orders to put the knife down during the approximately three minutes that elapsed before he was shot with the beanbag gun, a number of other circumstances weigh against deeming him 'an immediate threat to the safety of the officers or others'" including that he was intoxicated, "emotionally disturbed," he was not wanted for any crimes, he did not have a gun, he was not in a physical altercation with anyone, he was not threatening

anyone, including the officers, and no one was attempting to get away from him.  *Id.* at 873.

As to the adequacy of the warnings, the Ninth Circuit emphasized the district court's observation that the decedent "'may not have heard or understood these warnings' because he was intoxicated and there were other people yelling." *Id.* at 876.  The court also considered whether there was a "less intrusive means of force" that the officers could have used instead, including "time as a tool," rather than shooting the decedent "with numerous beanbag rounds approximately three minutes into the encounter" and shooting "him to death within four minutes of their arrival." *Id.*  Although "officers [are not] required to attempt . . . less intrusive alternatives[,] . . . available lesser alternatives are . . . relevant to ascertaining th[e] reasonable range of conduct." *Id.* at 878.

In *Partlow v. Stadler*, 774 F.3d 497 (8th Cir. 2014), the Eighth Circuit reversed the district court, concluding that officers were entitled to qualified immunity when they fired on an intoxicated man holding a gun who "took a shooters position and brought the gun up to his shoulder," aimed at the officers, and moved "quickly." *Id.* at 500.  Police received a call from Partlow's aunt that he had a gun and was attempting to end his life. *Id.* at 499-500.  When police were outside, Partlow emerged from the residence carrying a gun, and all officers present testified that they perceived the gun as pointing forward towards them. *Id.* at 500.  The officers yelled for Partlow to drop the gun. *Id.*  Officers testified that Partlow then moved swiftly, loaded a round in the chamber of the gun, and brought it to his shoulder in a shooters

position, at which time the officers opened fired on Partlow.  *Id.*  Partlow argued that he was attempting to put the gun down and comply with officer demands at the time he was shot.  *Id.* at 502.  However, the court concluded that the officers' actions were objectively reasonable given the circumstances and the facts that Partlow "forcefully pushed open the door to the apartment building with a shotgun in his hand," "[m]ere seconds" after which "the officers opened fire."  *Id.* at 502.  The officers had shouted for Partlow to drop the gun, and they perceived, based on how they observed him move the gun, that Partlow was aiming the gun barrel at them.  *Id.*

### b.    Analysis

In light of the case law available at the time of Mr. Baker's death, there was a "controlling consensus" that under the circumstances, again viewed in the light most favorable to the nonmovants, Sgt. Goodman's exercise of force violated Mr. Baker's Fourth Amendment rights.

Taking the evidence in the light most favorable to the Plaintiffs, it is "clearly established" that it is unreasonable and in violation of the Fourth Amendment for an officer to fire on an armed, immobile person who is not using his weapon in a threatening manner.  *See, e.g.*, *Shannon v. Koehler*, 616 F.3d 855, 864 (8th Cir. 2010) ("Long before September 13, 2006, this court (among others) had announced that the use of force against a suspect who was not threatening and not resisting may be unlawful") (collecting cases).   At the time Sgt. Goodman pulled the trigger, a reasonable jury could find that Mr. Baker was standing immobile near the Subway restaurant with his body angled away from Sgt. Goodman, slightly bent over with the barrel of the gun not pointed at Sgt. Goodman, Officer Knutson, or any other person.

Compare Weinmann, 787 F.3d at 447 (officer not entitled to qualified immunity where plaintiff was sitting in a chair with his gun across his lap and the parties disputed where the gun was pointed), *with Partlow*, 774 F.3d at 500 (officer entitled to qualified immunity where there was consensus among witnesses that the plaintiff had assumed a shooter's stance and aimed his gun at the officers); *see also Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) ("Under [the non-moving party's] version of the shooting, the police officers could not reasonably have believed the use of deadly force was lawful because [the decedent] did not point the gun at the officers and apparently was not facing them when they shot him the first time"); *Perez v. Suszczynski*, 809 F.3d 1213, 1221 (11th Cir. 2016) ("[I]n the Estate's version of events, Suszczynski shot a compliant, prostrate man in the back while having no reason to believe that the man would place anyone's safety in danger" (internal quotation omitted)).

Furthermore, a factfinder could reasonably conclude that the threat Mr. Baker posed at the moment he was shot did not justify the use of deadly force. Mr. Baker never threatened the officers or members of the public, he was not a suspect for the commission of any crimes, he was not engaged in any altercation with others, and members of the public were not attempting to get away from Mr. Baker. *See Glenn*, 673 F.3d at 868, 873 (concluding that a suspect was not an immediate threat because the officers knew he was intoxicated, "emotionally disturbed," he was not wanted for any crimes, he did not have a gun, he was not in a physical altercation with anyone, he was not threatening anyone, including the officers, and nobody was attempting to

get away from him); *Mercado*, 407 F.3d at 1156-61 (holding that an officer acted unreasonably by firing a "Sage Launcher" at a suicidal, knife-wielding plaintiff, because the plaintiff was not committing a crime, resisting arrest, or posing an immediate threat to the officers or others).  Sgt. Goodman acknowledged that Mr. Baker was located near the entrance to the Subway restaurant and remained there for the duration of the encounter, meaning that Mr. Baker made no sudden movements or attempts to flee the scene.  *Compare Glenn*, 673 F.3d at 874 (concluding an officer's actions were unreasonable when the plaintiff "stayed in the same position from the moment officers arrived and showed no signs of attempting to move until after he was fired upon"), *and McKenney*, 873 F.3d at 79 (plaintiff was holding a gun and walking slowly but without making any sudden movements), *with Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) (upholding qualified immunity where it was undisputed that the suspect was "charging" the officer), *Partlow*, 774 F.3d at 500 (reasoning that an officer acted reasonably in firing at the plaintiff where the plaintiff was moving quickly toward the officers), *and Norton*, 831 F. Supp. 2d at 356-57 (determining that the officer acted reasonably by firing on a plaintiff who "mov[ed] continuously in the direction of [one of the officers]").

Furthermore, Mr. Baker was not standing so close to Sgt. Goodman as to make any of his actions innately threatening to Sgt. Goodman himself.  *Compare Kisela*, 138 S. Ct. at 1151, 1154 (officer entitled to qualified immunity where the suspect holding a knife was within six feet, i.e., "striking distance," of another person),[62]

---

[62]     Sgt. Goodman urges the Court to adopt *Kisela* as evidence that it was not "clearly established" at the time of the shooting that his action violated Mr. Baker's constitutional rights.  *Def.'s Mot.* at 16-

*Berube*, 506 F.3d at 81, 85 (officer entitled to qualified immunity where the plaintiff

charged the officer from ten feet away), *and Norton*, 831 F. Supp. 2d at 336-37 (officer

entitled to qualified immunity where plaintiff was moving quickly within fifteen feet

of the officers), *with McKenney*, 873 F.3d at 79 (officer not entitled to qualified

immunity where plaintiff was sixty-nine feet away, moving slowly, and not making

any erratic movements), *and Begin*, 908 F.3d at 836 ("We think that an objectively

reasonable officer would regard a knife at twenty feet as posing no greater threat to

an armed police officer than does a gun at sixty-nine feet").

    In the absence of undisputed evidence that Mr. Baker threatened the officers

or members of the public, Mr. Baker's possession of the weapon alone is not enough

---

17.  He argues that "the situation confronting Sgt. Goodman was even more compelling than that in *Kisela*. *Id*. at 17. "As the dissent in *Kisela* noted, the record indicated that the armed woman made no overt threat – in word or deed – toward the other woman behind the fence before the defendant officer started shooting." *Id*. (citing *Kisela*, 138 S. Ct. at 1155 (Sotomayor, J., dissenting)).  Sgt. Goodman notes that Mr. Baker's behavior was "erratic" and that he "level[ed] an apparent firearm and scann[ed] the Plaza" and therefore "engaged in an overt act that placed Sgt. Goodman in imminent fear for himself and for others in the Plaza." *Id*.
    In the light most favorable to the Plaintiffs, a reasonable factfinder could conclude that Mr. Baker was not erratic and had not leveled the weapon at Sgt. Goodman and Officer Knutson.  Assuming that neither Mr. Baker nor the suspect in *Kisela* made an overt threat, *Kisela* is still distinguishable on its facts, as the suspect in *Kisela* was within six feet of another person and the officers received reports that the suspect had been hacking at trees with the knife,  *Kisela*, 138 S. Ct. at 1148, whereas Mr. Baker was 114 feet away from officers and none of the officers had received any reports that Mr. Baker had previously fired the weapon.
    Sgt. Goodman also cites *Conlogue v. Hamilton*, 906 F.3d 150 (1st Cir. 2018), as reaching a similar conclusion.  In particular, Sgt. Goodman argues that in *Conlogue* the court held that a person need not be pointing a gun directly at an officer in order to be threatening, and that pointing above officers' heads at a forty-five-degree angle is sufficient.  *Def.'s Mot*. at 19 (citing *Conlogue*, 906 F.3d at 157).  Sgt. Goodman also points to the fact that Conlogue received clear and timely warnings and chose to ignore them.  *Id*.  Sgt. Goodman compares Conlogue's actions to Mr. Baker's, arguing that Mr. Baker was similarly erratic and threatening, he put down his weapon and then picked it up again and "scanned" the plaza and attempted to fire the weapon.  *Id*.  As the Court has discussed, there is a dispute of material fact as to where Mr. Baker was pointing the gun, thus this case does not neatly align with *Conlogue*.  Moreover, although Conlogue received clear warnings and the police knew his identity because it was his wife who had called 911, he was being actively resistant and yelling obscenities. *Conlogue*, 906 F.3d at 153.  Here, in contrast, Mr. Baker was passive and did not engage with the officers who were calling him by the wrong name.

to justify Sgt. Goodman's use of deadly force.  It is well established that "the mere possession of a [deadly weapon] by a suspect is not enough to permit the use of deadly force. . .. Instead, deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is *threatened* with the weapon." *Connor v. Thompson*, 647 F. App'x 231, 237 (4th Cir. 2016) (alterations and emphasis in *Connor*) (quoting *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013)).

Although Sgt. Goodman repeatedly told Mr. Baker to put down his weapon, and Mr. Baker failed to respond in any way, such a failure to respond is not per se reasonable grounds for using deadly force when the plaintiff is intoxicated or experiencing a mental health event.  *See Glenn*, 673 F.3d at 875 (concluding that qualified immunity was inappropriate in part because the plaintiff may not have heard or understood the warning based of his intoxication and mental state).  Here, Sgt. Goodman was on notice that Mr. Baker appeared intoxicated, the record shows that Mr. Baker took a drink of alcohol prior to being shot, and Mr. Baker was standing in a hunched position which a jury could reasonably interpret as being consistent with intoxication.

Both parties agree that at some point after Sgt. Goodman's arrival, but before Sgt. Goodman and Officer Knutson took up their position next to the pick-up truck, Mr. Baker was "brandishing the rifle" and was holding the rifle with the barrel facing into the Subway restaurant.  DSMF ¶¶ 25, 27; PRDSMF ¶¶ 25, 27.  However, Mr. Baker later put the gun down against the wall of the Subway restaurant, and then

66

subsequently picked it up again, at which point the parties dispute how Mr. Baker was holding the gun and where the barrel was pointed. DSMF ¶ 43; PRDSMF ¶ 43.

Even if Sgt. Goodman had been justified in shooting Mr. Baker when the barrel of the gun was pointed into the restaurant, a reasonable factfinder could conclude that, upon picking up the gun once again, Mr. Baker was not holding it in a threatening manner (as discussed above) and, as a result, Sgt. Goodman was no longer justified in shooting Mr. Baker. *See Lytle*, 560 F.3d at 413 ("But an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased"); *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999) ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect"); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity"); *see also McKenney*, 873 F.3d at 82 (citing *Lytle* and *Abraham*). Thus, it was clearly established at the time of Mr. Baker's death that Sgt. Goodman did not have license to shoot Mr. Baker if the perceived threat justifying deadly force had passed.

The Court also considers the timing of the altercation. Sgt. Goodman arrived at approximate 11:16:57 AM and fired at Mr. Baker at 11:19:29 AM, just over two minutes later. Courts have suggested that firing on a suspect within three minutes of arrival, where that suspect is neither resisting arrest nor threatening anyone, is "so plainly excessive [force] that no analogous case is needed." *Weinmann*, 787 F.3d at 451; *see also Tenorio v. Pitzer*, 802 F.3d 1160, 1163, 1166 (10th Cir. 2015) (qualified

immunity inapplicable where the suspect was "unspeaking with a blank stare on his face, made no aggressive movements toward any of the officers with his knife and the officer fired within four minutes of arrival at the scene); *Glenn*, 673 F.3d at 866 (qualified immunity inapplicable where the suspect was unmoving and not posing an immediate threat to those around him and the officer used deadly force within four minutes of arrival). *Contra Norton*, 831 F. Supp. 2d at 349 (qualified immunity appropriate where the officer fired after a four-hour standoff after the suspect moved threateningly toward the officers holding two knives). In the light most favorable to the Plaintiffs, a reasonable factfinder could plausibly conclude that firing on an armed man standing stationary with his body angled away from officers who was not making any threats or pointing his weapon at anyone was unreasonable and against clearly established law.

Although Sgt. Goodman "need not [have] avail[ed] [himself] of the least intrusive means of responding to an exigent situation," *Glenn* 673 F.3d at 876, he was "required to consider what other tactics if any were available, and if there were clear, reasonable and less intrusive alternatives to the force employed, that militates against finding the use of force reasonable." *Id.* (alterations and internal quotation marks omitted). Here, the parties agree that Sgt. Goodman had a 40 millimeter less-lethal sponge round weapon in his cruiser when he arrived at the scene, but Sgt. Goodman stated that he chose not to take it out of the cruiser because of his assessment that Mr. Baker was too far away, and his clothing too bulky, to use it on him. PSAMF ¶ 46; DRPSAMF ¶ 46; *Goodman Dep.* at 30:1-25. Specifically, Sgt.

Goodman testified that sponge rounds are only effective up to a range of fifty yards. *Goodman Dep.* at 30:14-21.   However, Sgt. Goodman later attempted to get Lt. Doherty's attention when Mr. Baker put the BB gun down to see if Lt. Doherty could use the 40-millimeter sponge round on Mr. Baker.   PSAMF ¶ 56; DRPSAMF ¶ 56. Moreover, Sgt. Goodman was thirty-eight yards away from Mr. Baker at the time he fired the shot, well-within what Sgt. Goodman has said was the range of the sponge round weapon.   PSAMF ¶ 49; DRPSAMF ¶ 49.   In light of the fact that Mr. Baker was stationary and did not point his weapon at Sgt. Goodman or Officer Knutson after he picked the BB gun up again, a reasonable factfinder could conclude that Sgt. Goodman could have used an alternative, less-lethal form of force against Mr. Baker or "time as a tool."   *Glenn*, 673 at 876; *see also Booke v. Cty of Fresno*, 98 F. Supp. 3d 1103, 1120-21 (E.D. Cal. 2015) (concluding that a reasonable jury could find that officers used excessive force where they did not first attempt alternative methods).

### 3.   Summary

The Court does not diminish that Sgt. Goodman was faced with an unknown and potentially serious situation in a public place, and that Mr. Baker was carrying a weapon that looked like a rifle.   The Court is also sensitive to the admonition of the United States Supreme Court that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - - in circumstances that are tense, uncertain, and rapidly evolving - - about the amount of force that is necessary in a particular situation."   *Graham*, 490 U.S. at 396-97; *Fagre*, 985 F.3d at 22.

However, here the Court is not acting as a factfinder.  Instead, on the record before the Court, and in the light most favorable to the Plaintiffs, "*Graham* [*v. Connor*], *supra* and [*Tennessee v.*] *Garner*, [471 U.S. 1 (1985)] stand for the proposition that a person has a constitutional right not to be shot unless an officer reasonably believes that he poses a threat to the officer or someone else." *Weinmann*, 787 F.3d at 450.[63]  Here, the Plaintiffs have raised genuine issues of material fact that preclude a conclusion that at the time Sgt. Goodman shot him, Chance Baker posed such a threat.

Although Sgt. Goodman subjectively believed that he, other officers, and the public were at risk, the Court must view the reasonableness of his use of force through an objective lens.  *See id.*, 787 F.3d at 449.  Based on the Court's analysis and in the light most favorable to the Plaintiffs, it was clearly established at the time of Mr. Baker's death that Sgt. Goodman's action violated Mr. Baker's Fourth Amendment rights.  Sgt. Goodman is therefore not entitled to qualified immunity.  As the Court's analysis reveals, here "the legal question of immunity turns on which version of the facts [the Court] accept[s]" which means that summary judgment is inappropriate.  *Morelli*, 552 F.3d at 25 (citing *Griffith*, 473 F.3d at 656-57).

## B.   The Maine Tort Claims Act

"The [Maine Tort Claims Act (MTCA)] protects law enforcement officials performing discretionary functions from Suit even when that discretion is abused." *Comfort v. Town of Pittsfield*, 924 F. Supp. 1219, 1236 (D. Me. 1996).  "An officer

---

[63]   Although *Weinmann* is not a First Circuit case, the First Circuit cited it with apparent approval in *McKenney*.  *McKenney*, 873 F.3d at 82 (citing *Weinmann*, 787 F.3d at 450).

exercises his discretionary duties when he or she is 'required to use [his or her] judgment while acting in furtherance of a departmental policy." *Id.* (alterations in *Comfort*) (quoting *Moore v. City of Lewiston*, 596 A.2d 612, 616 (Me. 1991)). "A law enforcement official's use of force is a discretionary act." *Id.* (citing *Roy*, 42 F.3d at 696). In application, "[t]he MTCA affords police officers discretionary immunity except to the extent they act in a manner so egregious as to 'clearly exceed, as a matter of law, the scope of any discretion [they] could have possessed in [their] official capacity as [police officers].'" *Id.* (alterations in *Comfort*) (quoting *Lyons v. City of Lewiston*, 666 A.2d 95, 101 (Me. 1995)).

Under Maine law, as Sgt. Goodman concedes, "the standard for deciding whether an officer accused of use of excessive force is entitled to MTCA immunity is the same as that for analyzing whether he or she is entitled to qualified immunity with respect to a parallel federal Fourth Amendment claim." *Def.'s Mot.* at 20 (quoting *Steeves v. City of Rockland*, 600 F. Supp. 2d 143, 183 (D. Me. 2009)). As discussed above, the Court finds that Sgt. Goodman is not entitled to qualified immunity, as there are genuine issues of material fact as to the reasonableness of his actions. Because the MTCA is coextensive with federal law, the Court accordingly denies summary judgment on the Plaintiffs' state law claims for the same reasons set forth above.

71

## VI.    CONCLUSION

The Court DENIES Sgt. Goodman's motion for summary judgment (ECF No. 53).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 25th day of February, 2022